# 22-2101-bk(L),

22-2104-bk(CON),
22-2107-bk(CON),
22-2108-bk(CON),

22-2109-bk(CON), 22-2111-bk(CON), 22-2112-bk(CON), 22-2113-bk(CON), 22-2114-bk(CON),

22-2115-bk(CON), 22-2116-bk(CON), 22-2117-bk(CON), 22-2119-bk(CON), 22-2120-bk(CON),

*(For Continuation of Docket Numbers See Inside Cover)*

# United States Court of Appeals

*for the*

# Second Circuit

In Re: Fairfield Sentry Limited

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR APPELLANTS

DAVID J. MOLTON
MAREK P. KRZYZOWSKI
BROWN RUDNICK LLP
Seven Times Square
New York, New York 10036
(212) 209-4800

– and –

PAUL D. CLEMENT
MATTHEW D. ROWEN
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, Virginia 22314
(202) 742-8900

CAITLIN J. HALLIGAN
DAVID ELSBERG
ANDREW R. DUNLAP
MICHAEL DUKE
MAX H. SIEGEL
SELENDY GAY ELSBERG PLLC
1290 Avenue of the Americas
New York, New York 10104
(212) 390-9000

*Attorneys for Appellants*

22-2121-bk(CON), 22-2122-bk(CON), 22-2123-bk(CON), 22-2125-bk(CON), 22-2126-bk(CON),
22-2127-bk(CON), 22-2128-bk(CON), 22-2129-bk(CON), 22-2130-bk(CON), 22-2131-bk(CON),
22-2132-bk(CON), 22-2133-bk(CON), 22-2134-bk(CON), 22-2135-bk(CON), 22-2136-bk(CON),
22-2137-bk(CON), 22-2138-bk(CON), 22-2139-bk(CON), 22-2140-bk(CON), 22-2141-bk(CON),
22-2142-bk(CON), 22-2143-bk(CON), 22-2144-bk(CON), 22-2145-bk(CON), 22-2146-bk(CON),
22-2147-bk(CON), 22-2148-bk(CON), 22-2149-bk(CON), 22-2150-bk(CON), 22-2151-bk(CON),
22-2152-bk(CON), 22-2153-bk(CON), 22-2156-bk(CON), 22-2157-bk(CON), 22-2158-bk(CON),
22-2159-bk(CON), 22-2161-bk(CON), 22-2162-bk(CON), 22-2163-bk(CON), 22-2164-bk(CON),
22-2165-bk(CON), 22-2166-bk(CON), 22-2167-bk(CON), 22-2168-bk(CON), 22-2169-bk(CON),
22-2170-bk(CON), 22-2171-bk(CON), 22-2172-bk(CON), 22-2173-bk(CON), 22-2174-bk(CON),
22-2175-bk(CON), 22-2176-bk(CON), 22-2177-bk(CON), 22-2179-bk(CON), 22-2180-bk(CON),
22-2181-bk(CON), 22-2183-bk(CON), 22-2185-bk(CON), 22-2186-bk(CON), 22-2188-bk(CON),
22-2189-bk(CON), 22-2190-bk(CON), 22-2192-bk(CON), 22-2193-bk(CON), 22-2194-bk(CON),
22-2195-bk(CON), 22-2196-bk(CON), 22-2197-bk(CON), 22-2199-bk(CON), 22-2200-bk(CON),
22-2201-bk(CON), 22-2202-bk(CON), 22-2203-bk(CON), 22-2204-bk(CON), 22-2205-bk(CON),
22-2207-bk(CON), 22-2208-bk(CON), 22-2209-bk(CON), 22-2210-bk(CON), 22-2211-bk(CON),
22-2212-bk(CON), 22-2213-bk(CON), 22-2214-bk(CON), 22-2215-bk(CON), 22-2216-bk(CON),
22-2218-bk(CON), 22-2219-bk(CON), 22-2221-bk(CON), 22-2222-bk(CON), 22-2223-bk(CON),
22-2227-bk(CON), 22-2228-bk(CON), 22-2229-bk(CON), 22-2230-bk(CON), 22-2233-bk(CON),
22-2234-bk(CON), 22-2235-bk(CON), 22-2236-bk(CON), 22-2237-bk(CON), 22-2238-bk(CON),
22-2239-bk(CON), 22-2240-bk(CON), 22-2241-bk(CON), 22-2242-bk(CON), 22-2243-bk(CON),
22-2244-bk(CON), 22-2245-bk(CON), 22-2246-bk(CON), 22-2247-bk(CON), 22-2248-bk(CON),
22-2249-bk(CON), 22-2250-bk(CON), 22-2251-bk(CON), 22-2252-bk(CON), 22-2253-bk(CON),
22-2254-bk(CON), 22-2255-bk(CON), 22-2256-bk(CON), 22-2257-bk(CON), 22-2258-bk(CON),

22-2259-bk(CON), 22-2260-bk(CON), 22-2261-bk(CON), 22-2262-bk(CON), 22-2263-bk(CON),
22-2264-bk(CON), 22-2265-bk(CON), 22-2266-bk(CON), 22-2267-bk(CON), 22-2268-bk(CON),
22-2269-bk(CON), 22-2270-bk(CON), 22-2271-bk(CON), 22-2272-bk(CON), 22-2273-bk(CON),
22-2275-bk(CON), 22-2276-bk(CON), 22-2277-bk(CON), 22-2278-bk(CON), 22-2279-bk(CON),
22-2280-bk(CON), 22-2281-bk(CON), 22-2284-bk(CON), 22-2285-bk(CON), 22-2286-bk(CON),
22-2287-bk(CON), 22-2288-bk(CON), 22-2289-bk(CON), 22-2290-bk(CON), 22-2291-bk(CON),
22-2292-bk(CON), 22-2293-bk(CON), 22-2294-bk(CON), 22-2299-bk(CON), 22-2300-bk(CON),
22-2302-bk(CON), 22-2303-bk(CON), 22-2304-bk(CON), 22-2305-bk(CON), 22-2306-bk(CON),
22-2308-bk(CON), 22-2309-bk(CON), 22-2311-bk(CON), 22-2314-bk(CON), 22-2333-bk(CON),
22-2334-bk(CON), 22-2336-bk(CON), 22-2338-bk(CON), 22-2339-bk(CON), 22-2340-bk(CON),
22-2341-bk(CON), 22-2342-bk(CON), 22-2343-bk(CON), 22-2344-bk(CON), 22-2345-bk(CON),
22-2346-bk(CON), 22-2347-bk(CON), 22-2348-bk(CON), 22-2349-bk(CON), 22-2350-bk(CON),
22-2351-bk(CON), 22-2352-bk(CON), 22-2353-bk(CON), 22-2354-bk(CON), 22-2355-bk(CON),
22-2356-bk(CON), 22-2357-bk(CON), 22-2358-bk(CON), 22-2359-bk(CON), 22-2360-bk(CON),
22-2361-bk(CON), 22-2362-bk(CON), 22-2363-bk(CON), 22-2364-bk(CON), 22-2365-bk(CON),
22-2366-bk(CON), 22-2367-bk(CON), 22-2368-bk(CON), 22-2369-bk(CON), 22-2370-bk(CON),
22-2371-bk(CON), 22-2372-bk(CON), 22-2373-bk(CON), 22-2374-bk(CON), 22-2375-bk(CON),
22-2376-bk(CON), 22-2380-bk(CON), 22-2381-bk(CON), 22-2382-bk(CON), 22-2383-bk(CON),
22-2384-bk(CON), 22-2385-bk(CON), 22-2386-bk(CON), 22-2387-bk(CON), 22-2388-bk(CON),
22-2389-bk(CON), 22-2390-bk(CON), 22-2391-bk(CON), 22-2392-bk(CON), 22-2393-bk(CON),
22-2394-bk(CON), 22-2395-bk(CON), 22-2396-bk(CON), 22-2398-bk(CON), 22-2399-bk(CON),
22-2401-bk(CON), 22-2404-bk(CON), 22-2405-bk(CON), 22-2407-bk(CON), 22-2408-bk(CON),
22-2409-bk(CON), 22-2410-bk(CON), 22-2411-bk(CON), 22-2412-bk(CON), 22-2413-bk(CON),
22-2414-bk(CON), 22-2415-bk(CON), 22-2416-bk(CON), 22-2417-bk(CON), 22-2418-bk(CON),
22-2419-bk(CON), 22-2420-bk(CON), 22-2421-bk(CON), 22-2422-bk(CON), 22-2423-bk(CON),

22-2424-bk(CON), 22-2425-bk(CON), 22-2426-bk(CON), 22-2427-bk(CON), 22-2428-bk(CON),
22-2429-bk(CON), 22-2431-bk(CON), 22-2432-bk(CON), 22-2433-bk(CON), 22-2434-bk(CON),
22-2435-bk(CON), 22-2436-bk(CON), 22-2437-bk(CON), 22-2440-bk(CON), 22-2441-bk(CON),
22-2442-bk(CON), 22-2443-bk(CON), 22-2444-bk(CON), 22-2445-bk(CON), 22-2446-bk(CON),
22-2448-bk(CON), 22-2450-bk(CON), 22-2451-bk(CON), 22-2453-bk(CON), 22-2455-bk(CON),
22-2456-bk(CON), 22-2457-bk(CON), 22-2458-bk(CON), 22-2459-bk(CON), 22-2460-bk(CON),
22-2461-bk(CON), 22-2462-bk(CON), 22-2463-bk(CON), 22-2466-bk(CON), 22-2467-bk(CON),
22-2468-bk(CON), 22-2470-bk(CON), 22-2472-bk(CON), 22-2473-bk(CON), 22-2474-bk(CON),
22-2475-bk(CON), 22-2477-bk(CON), 22-2478-bk(CON), 22-2479-bk(CON), 22-2481-bk(CON),
22-2482-bk(CON), 22-2483-bk(CON), 22-2484-bk(CON), 22-2485-bk(CON), 22-2486-bk(CON),
22-2488-bk(CON), 22-2489-bk(CON), 22-2491-bk(CON), 22-2492-bk(CON), 22-2493-bk(CON),
22-2494-bk(CON), 22-2495-bk(CON), 22-2496-bk(CON), 22-2497-bk(CON), 22-2498-bk(CON),
22-2499-bk(CON), 22-2500-bk(CON), 22-2501-bk(CON), 22-2502-bk(CON), 22-2503-bk(CON),
22-2504-bk(CON), 22-2506-bk(CON), 22-2507-bk(CON), 22-2508-bk(CON), 22-2509-bk(CON),
22-2510-bk(CON), 22-2511-bk(CON), 22-2512-bk(CON), 22-2513-bk(CON), 22-2514-bk(CON),
22-2515-bk(CON), 22-2516-bk(CON), 22-2517-bk(CON), 22-2518-bk(CON), 22-2520-bk(CON),
22-2521-bk(CON), 22-2522-bk(CON), 22-2523-bk(CON), 22-2524-bk(CON), 22-2525-bk(CON),
22-2526-bk(CON), 22-2528-bk(CON), 22-2529-bk(CON), 22-2532-bk(CON), 22-2534-bk(CON),
22-2535-bk(CON), 22-2536-bk(CON), 22-2538-bk(CON), 22-2539-bk(CON), 22-2540-bk(CON),
22-2541-bk(CON), 22-2545-bk(CON), 22-2548-bk(CON), 22-2549-bk(CON, 22-2551-bk(CON),
22-2552-bk(CON), 22-2553-bk(CON), 22-2554-bk(CON), 22-2555-bk(CON), 22-2556-bk(CON),
22-2557-bk(CON), 22-2558-bk(CON), 22-2559-bk(CON), 22-2560-bk(CON), 22-2562-bk(CON),
22-2565-bk(CON), 22-2566-bk(CON), 22-2567-bk(CON), 22-2568-bk(CON), 22-2570-bk(CON),
22-2571-bk(CON), 22-2572-bk(CON), 22-2573-bk(CON), 22-2574-bk(CON), 22-2575-bk(CON),
22-2576-bk(CON), 22-2577-bk(CON), 22-2579-bk(CON), 22-2580-bk(CON), 22-2581-bk(CON),

22-2582-bk(CON), 22-2583-bk(CON), 22-2585-bk(CON), 22-2586-bk(CON), 22-2587-bk(CON),
22-2589-bk(CON), 22-2590-bk(CON), 22-2591-bk(CON), 22-2592-bk(CON), 22-2593-bk(CON),
22-2594-bk(CON), 22-2595-bk(CON), 22-2596-bk(CON), 22-2597-bk(CON), 22-2598-bk(CON),
22-2602-bk(CON), 22-2603-bk(CON), 22-2604-bk(CON), 22-2606-bk(CON), 22-2607-bk(CON),
22-2608-bk(CON), 22-2611-bk(CON), 22-2612-bk(CON), 22-2613-bk(CON), 22-2614-bk(CON),
22-2615-bk(CON), 22-2617-bk(CON), 22-2618-bk(CON), 22-2619-bk(CON), 22-2622-bk(CON),
22-2626-bk(CON), 22-2631-bk(CON), 22-2641-bk(CON), 22-2642-bk(CON), 22-2643-bk(CON),
22-2644-bk(CON), 22-2645-bk(CON), 22-2654-bk(CON)

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Kenneth M. Krys and Greig Mitchell, in their capacities as liquidators and foreign representatives of Fairfield Sentry Limited (In Liquidation), Fairfield Sigma Limited (In Liquidation), and Fairfield Lambda Limited (in Liquidation) (together, the "Funds"), hereby state that none of the Funds has a parent corporation, and there is no publicly held corporation owning ten percent (10%) or more of the shares of any of the Funds.

Dated: January 27, 2023

Respectfully submitted,

CAITLIN J. HALLIGAN
DAVID ELSBERG
ANDREW R. DUNLAP
MICHAEL DUKE
MAX H. SIEGEL
SELENDY GAY
  ELSBERG PLLC
1290 Avenue of the Americas
New York, New York 10104
(212) 390-9000

/s/ Paul D. Clement
PAUL D. CLEMENT
MATTHEW D. ROWEN
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, Virginia 22314
(202) 742-8900

– and –

DAVID J. MOLTON
MAREK P. KRZYZOWSKI
BROWN RUDNICK LLP
Seven Times Square
New York, New York 10036
(212) 209-4800

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................... 1

JURISDICTIONAL STATEMENT ....................................................... 6

STATEMENT OF THE ISSUES .......................................................... 7

STATEMENT OF THE CASE .............................................................. 7

A.  Legal Background ...................................................................... 7

B.  Factual Background .................................................................. 16

C.  Procedural Background ............................................................ 22

    1.  The BVI Redeemer Actions ............................................... 22

    2.  The U.S. Redeemer Actions .............................................. 24

    3.  The Decisions Below ......................................................... 27

SUMMARY OF ARGUMENT ............................................................ 35

STANDARD OF REVIEW .................................................................. 42

ARGUMENT ........................................................................................ 43

    I.  The Forum Selection Clause Creates Personal Jurisdiction Over Defendants In New York Courts ............. 43

    II.  The Bankruptcy Code Safe Harbor Does Not Apply Extraterritorially To Bar The Liquidators' Foreign Avoidance Claims ................................................................ 51

        A.  The Bankruptcy Code Does Not Clearly and Affirmatively Rebut the Presumption Against Applying the Domestic Safe Harbor Extraterritorially .......................................................... 55

B. Applying the Section 546(e) Safe Harbor to Foreign Avoidance Claims Is Not a Domestic Application ................................................................. 68

C. Even If the Safe Harbor Applied, the Liquidators' Claims Would Fall Within the Exception for Intentional Fraudulent Transfers ............................... 74

III. The District Court Erred In Affirming The Dismissal Of The Liquidators' BVI Common Law And Contract Claims .................................................................. 79

IV. The Bankruptcy Court Erred In Ruling That The Liquidators Failed To State A Claim Under Section 246 Of The BVI Insolvency Act ................................... 92

CONCLUSION ................................................................. 94

# TABLE OF AUTHORITIES

## Cases

*ACE Cap. Re Overseas Ltd. v. Cent. United Life Ins. Co.*,
  307 F.3d 24 (2d Cir. 2002)........................................................ 45, 46

*Arar v. Ashcroft,*
  585 F.3d 559 (2d Cir. 2009)............................................................ 43

*Bankr. Est. of Norske Skogindustrieer ASA*
  *v. Cyrus Cap. Partners, L.P.*,
  2021 WL 1687903 (Bankr. S.D.N.Y. Apr. 29, 2021) ................ 75, 77

*BNSF Ry. Co. v. Loos,*
  139 S. Ct. 893 (2019) ..................................................................... 61

*Carlyle Inv. Mgmt. LLC v. Moonmouth Co. SA,*
  779 F.3d 214 (3d Cir. 2015)............................................................ 46

*Charles Schwab Corp. v. Bank of Am. Corp.*,
  883 F.3d 68 (2d Cir. 2018)............................................................. 42

*City of New York v. Chevron Corp.*,
  993 F.3d 81 (2d Cir. 2021)............................................................. 53

*Copperweld Corp. v. Indep. Tube Corp.*,
  467 U.S. 752 (1984) ....................................................................... 89

*Coregis Ins. Co. v. Am. Health Found., Inc.*,
  241 F.3d 123 (2d Cir. 2001)......................................... 45, 46, 47, 48

*Cruz-Miguel v. Holder,*
  650 F.3d 189 (2d Cir. 2011).......................................................... 84

*EEOC v. Arab Am. Oil Co.*,
  499 U.S. 244 (1991) ................................................................. 51, 52

*Emps.' Ret. Sys. of Gov't Virgin Islands v. Blanford,*
  794 F.3d 297 (2d Cir. 2015).......................................................... 75

iii

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
    651 F.3d 329 (2d Cir. 2011)......................................... 10, 16, 61, 69

*F. Hoffman-La Roche Ltd. v. Empagran S.A.*,
    542 U.S. 155 (2004) ......................................................52

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam*,
    2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018).................27, 28

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam*,
    2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020) .........27, 30, 77

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam*,
    596 B.R. 275 (Bankr. S.D.N.Y. 2018) ...................................*passim*

*Foley Bros. v. Filardo*,
    336 U.S. 281 (1949) ......................................................51

*Force v. Facebook*,
    934 F.3d 53 (2d Cir. 2019)..............................................72

*Haarhuis v. Kunnan Enters., Ltd.*,
    177 F.3d 1007 (D.C. Cir. 1999) ......................................64

*Hansard v. Fed. Ins. Co.*,
    46 N.Y.S.3d 163 (N.Y. Sup. Ct. 2017)...............................45

*Huffington v. T.C. Grp., LLC*,
    637 F.3d 18 (1st Cir. 2011)........................................46, 49

*In re A. Tarricone, Inc.*,
    80 B.R. 21 (Bankr. S.D.N.Y. 1987) ..................................61

*In re Atlas Shipping A/S*,
    404 B.R. 726 (Bankr. S.D.N.Y. 2009) ...............................9, 13

*In re Chateaugay Corp.*,
    945 F.2d 1205 (2d Cir. 1991).............................................7

*In re CIL Ltd.*,
    2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018) ...................9

iv

*In re CIL Ltd.*,
 582 B.R. 46 (Bankr. S.D.N.Y. 2018) ..................................................9

*In re Condor Ins. Ltd.*,
 601 F.3d 319 (5th Cir. 2010) ........................................ 13, 61, 67, 77

*In re Cozumel Caribe, S.A. de CV*,
 482 B.R. 96 (Bankr. S.D.N.Y. 2012) ..........................................66, 92

*In re Fairfield Sentry Ltd. Litig.*,
 458 B.R. 665 (Bankr. S.D.N.Y. 2011) ........................................54, 91

*In re Fairfield Sentry Ltd.*,
 714 F.3d 127 (2d Cir. 2013).......................................................12, 16

*In re Koreag, Controle et Revision S.A.*,
 961 F.2d 341 (2d Cir. 1992).......................................................13, 61

*In re LATAM Airlines Grp. S.A.*,
 55 F.4th 377 (2d Cir. 2022) ...........................................................43

*In re Lyondell Chem. Co.*,
 554 B.R. 635 (S.D.N.Y. 2016).........................................................75

*In re Metzeler*,
 78 B.R. 674 (Bankr. S.D.N.Y. 1987) .........................................13, 61

*In re Picard*,
 917 F.3d 85 (2d Cir. 2019)..............................................................71

*In re SPhinX, Ltd.*,
 351 B.R. 103 (Bankr. S.D.N.Y. 2006) ........................................54, 66

*In re SPhinX, Ltd.*,
 371 B.R. 10 (S.D.N.Y. 2007)............................................................54

*In re Teligent, Inc.*,
 640 F.3d 53 (2d Cir. 2011)...............................................................43

*In re Tribune Co. Fraudulent Conveyance Litig.*,
 499 B.R. 310 (S.D.N.Y. 2013)....................................................10, 69

*In re Tribune Co. Fraudulent Conveyance Litig.*,
  946 F.3d 66 (2d Cir. 2019)........................................................... 10

*In re Vitro S.A.B. de CV*,
  701 F.3d 1031 (5th Cir. 2012) ..................................................... 66

*In re Zetta Jet USA, Inc.*,
  624 B.R. 461 (Bankr. C.D. Cal. 2020)........................................... 9

*Jam v. Int'l Fin. Corp.*,
  139 S. Ct. 759 (2019) ................................................................. 58

*Kiobel v. Royal Dutch Petroleum Co.*,
  569 U.S. 108 (2013) ................................................................... 73

*Krys v. Farnum Place, LLC*,
  768 F.3d 239 (2d Cir. 2014)........................................................ 58

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015)........................................................ 75

*Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*,
  252 F.3d 218 (2d Cir. 2001)........................................................ 48

*Manley v. AmBase Corp.*,
  337 F.3d 237 (2d Cir. 2003)........................................................ 91

*Martinez v. Bloomberg LP*,
  740 F.3d 211 (2d Cir. 2014)................................................... 44, 49

*Mary Jo C. v. N.Y. State & Loc. Ret. Sys.*,
  707 F.3d 144 (2d Cir. 2013)........................................................ 84

*Maxwell Commc'n Corp. v. Societe Generale PLC*,
  186 B.R. 807 (S.D.N.Y. 1995)....................................................... 9

*Mei Xing Yu v. Hasaki Rest., Inc.*,
  944 F.3d 395 (2d Cir. 2019)........................................................ 61

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
  138 S. Ct. 883 (2018) ................................................ 11, 56, 69, 71

vi

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985) ........................................................................ 44

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010) .......................................................... 52, 59, 67

*Palmer v. Amazon.com, Inc.*,
    51 F.4th 491 (2d Cir. 2022) ........................................................ 43

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
    392 U.S. 134 (1968) ..................................................................... 89

*Phillips v. Audio Active Ltd.*,
    494 F.3d 378 (2d Cir. 2007) ....................................................... 46

*RJR Nabisco, Inc. v. Euro. Cmty.*,
    579 U.S. 325 (2016) ............................................................ *passim*

*Roby v. Corp. of Lloyd's*,
    996 F.2d 1353 (2d Cir. 1993) ..................................................... 48

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    2022 WL 4390915 (Bankr. S.D.N.Y. Sept. 22, 2022) .................... 47

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    2022 WL 4542915 (Bankr. S.D.N.Y. Sept. 28, 2022) .................... 47

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    2022 WL 6237071 (Bankr. S.D.N.Y. Oct. 7, 2022) ....................... 47

*Shekoyan v. Sibley Int'l*,
    409 F.3d 414 (D.C. Cir. 2005) .................................................... 52

*Sherwood Invs. Overseas Ltd. v. Royal Bank of Scot. N.V.*,
    2015 WL 4486470 (Bankr. M.D. Fla. July 22, 2015) ...................... 9

*United States v. Prado*,
    933 F.3d 121 (2d Cir. 2019) ....................................................... 64

*Validus Reinsurance, Ltd. v. United States*,
    786 F.3d 1039 (D.C. Cir. 2015) .................................................. 64

*WesternGeco LLC V. ION Geophysical Corp.*,
138 S. Ct. 2129 (2018) ...................................................................... 70

**Statutes**

11 U.S.C. § 103 ................................................................................. 56

11 U.S.C. § 544 ............................................................................. 8, 9

11 U.S.C. § 545 ................................................................................. 8

11 U.S.C. § 546 .......................................................... 10, 15, 56, 74

11 U.S.C. § 547 ................................................................................. 8

11 U.S.C. § 548 ............................................................ 8, 11, 15, 74

11 U.S.C. § 561 ............................................................... 14, 31, 57

11 U.S.C. § 701 ........................................................................... 8, 56

11 U.S.C. § 702 ........................................................................... 8, 56

11 U.S.C. § 703 ........................................................................... 8, 56

11 U.S.C. § 704 ............................................................................... 56

11 U.S.C. § 1104 ......................................................................... 8, 57

11 U.S.C. § 1105 ............................................................................... 8

11 U.S.C. § 1106 ............................................................................... 8

11 U.S.C. §§ 1501 *et seq.* ............................................................... 8

11 U.S.C. § 1501 .................................................... 54, 55, 66, 91

11 U.S.C. § 1507 ................................................................ 12, 66, 78

11 U.S.C. § 1509 ............................................................................. 12

11 U.S.C. § 1511 ......................................................................... 13, 60

11 U.S.C. § 1512 ............................................................................. 13

11 U.S.C. § 1515.................................................................................12

11 U.S.C. § 1521.................................................................................12

11 U.S.C. § 1523.................................................... 13, 14, 32, 60

Pub. L. No. 95-598, 92 Stat. 2549 (1978)......................................77

Pub. L. No. 97-222, 96 Stat. 235 (1982)........................................77

Pub. L. No. 98-353, 98 Stat. 333 (1984)........................................77

Pub. L. No. 101-311, 104 Stat. 267 (1990)....................................77

Pub. L. No. 109-8, 119 Stat. 23 (2005)..........................................77

Pub. L. No. 109-390, 120 Stat. 2692 (2006)..................................77

## Other Authorities

1 Digest of Commercial Laws of the World § 8:27 .................................85

*ABN AMRO Fund Servs. (Isle of Man) 24 Nominees Ltd. v. Krys*,
  Nos. BVIHCMAP: 11-16, 23-28 of 2016.............................................83

BVI Companies Act § 103.................................................................84

BVI Insolvency Act § 246 ...............................................................76, 92

*Derry v. Peek* [1889] 14 App. Cas. 337 (HL) ...........................................76

*Fairfield Sentry Ltd. (in Liquidation) v. Migani*
  [2014] UKPC 9..........................................................................23-25

H.R. Rep. No. 109-31, pt. 1 (2005) ........................................................66

*In re Stanford Int'l Bank (In Liquidation)*
  [2015] Claim No: ANUHCV2009/0149 ....................................................81, 88

*IsZo Capital LP v. Nam Tai Prop. Inc. et al.*
  [2022] Claim No. BVIHC (COM) 2020/0165) .............................................85

*Jetivia SA v. Bilta (UK) Ltd. (in liquidation)* [2015] UKSC 23..............88

*Marks & Spencer plc v. BNP Paribas Secs. Servs. Tr. Co. (Jersey) Ltd.* [2015] UKSC 72 ........................................................................ 90

*Patel v. Mirza* [2016] UKSC 42 ................................................................ 86

*Phillips v. Brewin Dolphin Bell Lawrie* [2001] BCC 864 ...................... 93

*Potential Might Grp. Ltd. v. GST Int'l Mgmt. Ltd.* [2011] Claim No: BVIHC (COM) 2011/0120) ........................................................ 85

*Royal Brunei Airlines v. Tan* [1995] 2 A.C. 378 (PC) ............................ 76

*S.A. Mar. et Commerciale of Geneva v. Anglo-Iranian Oil Co.* [1954] 1 W.L.R. 492 ................................................................ 84, 91

*Skandinaviska Enskilda Banken AB (Publ) v. Conway (as Joint Official Liquidators of Weavering Macro Fixed Income Fund Ltd.)* [2019] UKPC 36 .................................................... 80-82, 87

*Tillman v Egon Zehnder Ltd.* [2019] UKSC 32 ...................................... 90

Yedidia Z. Stern, *Corporate Liability for Unauthorized Contracts— Unification of the Rules of Corporate Representation*, 9 U. Pa. J. Int'l Bus. L. 649 (1987) ................................................ 85

## PRELIMINARY STATEMENT

For thirteen years, innocent investors in foreign-based funds have been waiting to recoup some of their losses in the infamous Ponzi scheme orchestrated by Bernie Madoff. Chapter 15 of the Bankruptcy Code was enacted to make it easier for foreign liquidators to enlist the help of U.S. courts to obtain justice for such victims. The district court's decision in this case makes obtaining such justice all but impossible for the bulk of the claims. And the problems with the decision below do not end there. The district court reached its conclusion only by flouting the strong presumption against extraterritorial application of U.S. law and distorting foreign law beyond recognition. This Court should reverse and remand.

Years before the Madoff scheme came to light in 2008, Plaintiffs-Appellants Fairfield Sentry Ltd., Fairfield Sigma Ltd., and Fairfield Lambda Ltd. (the "Funds") were formed under the law of the British Virgin Islands ("BVI") to pool investor money and feed it into larger investment vehicles. The Funds entrusted the bulk of investors' money to Bernard L. Madoff Investment Securities ("BLMIS"), then supposedly a reputable firm with a demonstrated history of outsized returns. When

the Madoff scheme collapsed, most investors discovered overnight that Madoff was not managing their retirement funds and other savings but recycling them as part of the Ponzi scheme. But some, typically large-scale and sophisticated investors, managed to cash out before the scheme imploded—and not only did they not lose their investments; they received outsized returns paid for by their fellow investors' savings.

In the aftermath, the Funds went into liquidation under BVI bankruptcy law, and the Liquidators have spent the past thirteen years working to recover and equitably distribute as many assets as possible to the large group of innocent investors who were left holding the bag when the Ponzi scheme collapsed, much the way the Securities Investor Protection Corporation ("SIPC") trustee has sought to accomplish the same central task domestically. The investors who managed to cash out early and receive falsely inflated returns based on the principal of their fellow investors were an obvious target for equitable redistribution. To pursue that avenue, the Liquidators filed claims in BVI court under BVI statutory law to avoid those cash-out transactions. Because a large amount of the inflated returns—around $6 billion—went to investors who had consented to suit in New York, the Liquidators also filed claims

2

in federal bankruptcy court in New York, invoking Chapter 15 of the Bankruptcy Code and seeking relief under BVI law.

Chapter 15 is designed just for such claims. Its stated purpose is to protect and maximize the value of the debtor's assets, maximize assistance to the foreign court conducting the main proceeding, and facilitate complex cross-border bankruptcies by promoting comity and respect for foreign law in U.S. courts.

The decision below, however, turns Chapter 15 on its head. Notwithstanding the strong presumption against extraterritorial application of domestic law, the district court extended a "safe harbor" that shields certain kinds of *domestic* transactions from avoidance claims under *domestic* law and applied it to frustrate the avoidance of *foreign* transactions under *foreign* law. That was flatly contrary to the text, structure, and purpose of the Code.

By its plain terms, the safe harbor in 11 U.S.C. § 546(e) applies only to a subset of *domestic* avoidance claims. While the Code allows the safe harbor to be applied in Chapter 15 proceedings "to the same extent" as in ordinary domestic bankruptcy proceedings, that extent remains domestic: By its terms, and consistent with the presumption against

3

extraterritoriality, Section 546(e) precludes *domestic* avoidance claims only, whether those claims are asserted in a Chapter 15 case or an ordinary domestic bankruptcy case. The history and structure of Chapter 15 confirm that understanding and embody Congress' decision to protect certain domestic transactions even from foreign liquidators proceeding under Chapter 15, while otherwise facilitating, not frustrating, the work of foreign liquidators. Nowhere does the Code indicate that Congress intended to apply the safe harbor extraterritorially to shield the avoidance of foreign transactions under circumstances where a foreign jurisdiction would allow avoidance.

The district court held otherwise because it thought that the only way to give effect to the relevant Code provisions was to apply the *domestic* safe harbor to *foreign* transactions asserted under *foreign* law. That was wrong—the "same extent" language still gives the safe harbor work to do under Chapter 15—and it reflects a basic misunderstanding of how the domestic safe harbor interacts with foreign bankruptcies brought under Chapter 15. At a minimum, the court came nowhere near demonstrating that Congress clearly and unambiguously manifested an intention to apply the domestic safe harbor abroad. Compounding its

4

error, the court misread the BVI statutory avoidance regime in refusing to apply an intentional-fraud exception to the safe harbor.

The decision below erred in other fundamental respects as well. For one, it failed to apply the plain language of a foreign selection clause in which nearly all Fund investors agreed to sue and be sued in New York. The district court doubted the parties wanted to channel "almost any dispute between the investors and the Funds" into a single forum. But that is the very definition of a forum selection clause, and plainly what the parties agreed to here.

To top it off, the district court misread BVI law in eviscerating the BVI common law and contract claims that the Liquidators added to the case after discovering that the Funds' own agent continued to issue grossly inflated redemptions even after becoming aware that Madoff was cooking the books. Those additional BVI claims provided an independent basis for disgorging inflated redemptions and distributing the proceeds equitably among investors, but the district court disregarded binding BVI precedent in concluding that the Funds (and investors) were stuck with the result of their agent's fraud.

The district court's decision arbitrarily slashes the potential recovery for innocent victims by allowing a fortunate few to retain not only their full investments, but outsized returns funded by their fellow investors. It upends Chapter 15 and leaves foreign liquidators, who the law is designed to assist, with less authority to recoup the losses of innocent victims than the domestic SIPC trustee. There is no justification for a ruling that leaves both foreign liquidators and victims of the Madoff scheme diminished. This Court should reverse.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 158(d)(1). The parties stipulated to orders granting Defendants' motions to dismiss and denying the Liquidators' motions for leave to amend. *Fairfield Sentry Ltd. (in Liquidation) et al. v. Citibank NA London et al.*, No. 10-3622, ECF 73 (Apr. 2, 2019); *id.*, ECF 102 (Feb. 25, 2021). Under these stipulations, the bankruptcy court entered a final judgment pursuant to Federal Rule of Civil Procedure 54(b), as made applicable by Bankruptcy Court Rule 7054. *See Fairfield Sentry Ltd. (in Liquidation) et al. v. Citibank NA London et al.*, No. 10-3622, ECF 73 at 8 (Apr. 2, 2019). This Court has

28 U.S.C. § 158(d)(1) jurisdiction over these final judgments. *See In re Chateaugay Corp.*, 945 F.2d 1205, 1206 (2d Cir. 1991).

## STATEMENT OF THE ISSUES

1.     Whether the broad forum selection clause that nearly all Defendants agreed to when they invested in the Funds fails to create personal jurisdiction.

2.     Whether the domestic safe harbor of 11 U.S.C. § 546(e) applies extraterritorially to preclude foreign bankruptcy representatives from bringing foreign avoidance claims targeting foreign transfers.

3.     Whether the Liquidators' BVI common law and contract claims are barred by BVI Business Companies' Act Section 31(1)(e) and BVI common law.

4.     Whether the Liquidators failed to state a claim under Section 246 of the BVI Insolvency Act.[1]

## STATEMENT OF THE CASE

**A.     Legal Background**

1. At the heart of this case are several interlocking provisions of the Bankruptcy Code.  On the domestic side, Chapters 7 and 11 of the Code

---

[1] The district court did not address this fourth issue.

7

govern the liquidation and reorganization of U.S. companies under U.S. bankruptcy law. In Chapter 7 and 11 proceedings, a domestic "trustee" oversees the administration of the bankruptcy. 11 U.S.C. §§ 701-03, 1104-06. On the foreign side, Chapter 15 of the Code allows U.S. courts to assist foreign liquidators in administering foreign bankruptcies—i.e., bankruptcy proceedings originating in foreign jurisdictions and involving foreign companies under foreign bankruptcy law. 11 U.S.C. §§ 1501 *et seq.* In Chapter 15 proceedings, a "foreign representative" (rather than a domestic "trustee") acts on behalf of the insolvent foreign company. *See* 11 U.S.C. §§ 1509-15.

2. In a domestic bankruptcy under Chapter 7 or 11, a trustee may bring an adversary proceeding to "avoid" certain transactions that the insolvent company previously executed. The trustee's "avoidance" powers are carefully defined in the Code and allow the trustee to (for example) nullify certain liens, recover property transferred during a defined period before the bankruptcy filing, and recover transfers made with intent to defraud creditors. *See* 11 U.S.C. §§ 544, 545, 547, 548. The trustee's avoidance powers arise only under domestic law and do not include the power to bring avoidance claims under foreign sources of law.

*See, e.g.*, *In re Atlas Shipping A/S*, 404 B.R. 726, 744 n.16 (Bankr. S.D.N.Y. 2009). Likewise, the trustee's avoidance powers extend only to domestic transfers and do not allow the trustee to avoid foreign transfers. *See, e.g.*, *In re CIL Ltd.*, 582 B.R. 46, 69, 83-93 (Bankr. S.D.N.Y. 2018). Thus, a trustee in a Chapter 7 or 11 bankruptcy may bring avoidance claims only under domestic law and only with respect to domestic transfers.[2]

After granting the trustee the power to avoid certain domestic transfers under domestic law, the Bankruptcy Code creates a carveout,

---

[2] Most of the avoidance powers available to a domestic trustee were created by the Bankruptcy Code itself, so claims under those sections of the Code necessarily arise under domestic law. *See* 11 U.S.C. §§ 545, 547, 548. While one provision (known as the "strong-arm" provision) allows the trustee to avoid transfers that are voidable under other sources of "applicable law," 11 U.S.C. § 544(b)(1), no court has interpreted "applicable law" to include foreign law, *see In re Atlas Shipping*, 404 B.R. at 744 n.16, and courts have expressly rejected readings of the "strong-arm" provision that would incorporate avoidance powers under foreign sources of law, *see In re CIL Ltd.*, 582 B.R. at 96-97. Likewise, courts have consistently held that a domestic trustee's avoidance powers do not extend to foreign transfers. *See, e.g.*, *In re CIL Ltd.*, 2018 WL 3031094, at *6-7 (Bankr. S.D.N.Y. June 15, 2018); *In re CIL Ltd.*, 582 B.R. at 69, 83-93; *In re Zetta Jet USA, Inc.*, 624 B.R. 461, 476 (Bankr. C.D. Cal. 2020); *Maxwell Commc'n Corp. v. Societe Generale PLC* (*In re Maxwell Commc'n Corp.*), 186 B.R. 807, 818-21 (S.D.N.Y. 1995); *Sherwood Invs. Overseas Ltd. v. Royal Bank of Scot. N.V.* (*In re Sherwood Invs. Overseas Ltd.*), 2015 WL 4486470, at *18-22 (Bankr. M.D. Fla. July 22, 2015).

or "safe harbor," for particular kinds of domestic transactions that the trustee cannot avoid. As relevant here, a trustee in a Chapter 7 or 11 proceeding may not avoid a transfer that is a "settlement payment" "made by or to (or for the benefit of)" a "financial institution" "in connection with a securities contract." 11 U.S.C. § 546(e). In other words, a trustee may not undo a payment made by or to a financial institution in connection with the sale or purchase of a security. "Congress enacted § 546(e)'s safe harbor" to minimize "the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334 (2d Cir. 2011); *see also In re Tribune Co. Fraudulent Conveyance Litig.*, 499 B.R. 310, 317 (S.D.N.Y. 2013) ("By its own accounts, Congress enacted Section 546(e) in order to provide certainty to securities transactions and, in so doing, to enhance the stability of the nation's financial markets." (citing House and Senate reports)), *aff'd*, 946 F.3d 66 (2d Cir. 2019); *accord Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 888 (2018).

Adding a final layer of complexity, the Bankruptcy Code creates an exception to Section 546(e)'s safe harbor for transfers made "with actual

10

intent to hinder, delay, or defraud" creditors. 11 U.S.C. § 548(a)(1)(A). So, while the trustee in a Chapter 7 or 11 bankruptcy *ordinarily* may not avoid settled securities transactions (as a result of Section 546(e)), the trustee *may* seek to avoid any settled securities transactions that were made with fraudulent intent.

The Bankruptcy Code's substantive avoidance provisions and the Section 546(e) safe harbor are "two sides of the same coin." *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 894 (2018). On one side is the power to avoid various domestic transfers under domestic law (specifically, under Sections 544, 545, 547, and 548). On the other is Section 546(e), which "operates as a limit to the general avoiding powers of a bankruptcy trustee" and prevents the trustee from avoiding settled securities transactions made without fraudulent intent. *Id.*

3. While Chapters 7 and 11 of the Code govern domestic bankruptcy proceedings and the powers of domestic trustees, Chapter 15 of the Code addresses foreign bankruptcies and the powers of foreign bankruptcy representatives. In general, Chapter 15 is designed to "provide effective mechanisms for dealing with cases of cross-border insolvency, while promoting international cooperation, legal certainty, fair and efficient

11

administration of cross-border insolvencies, protection and maximization of debtors' assets, and the rescue of financially troubled businesses." *In re Fairfield Sentry Ltd.*, 714 F.3d 127, 132 (2d Cir. 2013).

Chapter 15 gives U.S. courts broad power to grant appropriate relief in recognized foreign bankruptcy proceedings. Under Chapter 15, a "foreign representative" may obtain "recognition of a foreign [bankruptcy] proceeding" in a U.S. court. 11 U.S.C. § 1515. Once a U.S. court has recognized a foreign bankruptcy proceeding, the foreign representative may initiate adversary proceedings and may "apply directly" to the U.S. court "for appropriate relief." 11 U.S.C. § 1509(b). The U.S. court "may, at the request of the foreign representative, grant any appropriate relief," 11 U.S.C. § 1521(a), and "may provide additional assistance" "consistent with the principles of comity" if, among other things, the assistance "will reasonably assure" "just treatment of all holders of claims" and "prevention of preferential or fraudulent dispositions of property of the debtor," 11 U.S.C. § 1507.

Chapter 15 also grants foreign representatives significant power to bring avoidance claims in U.S. court. To begin, the Code grants foreign representatives the authority to bring avoidance claims that arise under

12

foreign law and/or involve foreign transactions, *In re Condor Ins. Ltd.*, 601 F.3d 319, 329 (5th Cir. 2010)—a power that domestic trustees lack under Chapters 7 and 11, *Atlas Shipping*, 404 B.R. at 744 n.16. In fact, and of significance here, foreign representatives possessed the power to bring avoidance claims under foreign law even before the enactment of Chapter 15, *In re Metzeler*, 78 B.R. 674, 677 (Bankr. S.D.N.Y. 1987), and that avoidance power was not limited by the safe harbor provision applicable to domestic avoidance claims under Chapters 7 and 11, *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 357 (2d Cir. 1992).

In addition to carrying forward the foreign representative's power to bring avoidance claims arising under foreign law, Chapter 15 also grants foreign representatives a new power to bring avoidance claims under domestic law in certain circumstances. Specifically, Chapter 15 allows foreign representatives to initiate or participate as a party-in-interest in domestic bankruptcy proceedings under Chapters 7 and 11, 11 U.S.C. §§ 1511(a), 1512, and, when a foreign representative does so, Section 1523 of the Code vests the foreign representative with the avoidance powers of a domestic trustee, 11 U.S.C. § 1523(a). In other words, if a foreign representative, acting under the authority of Chapter

13

15, initiates or intervenes in a Chapter 7 or 11 proceeding, the foreign representative can bring claims arising under domestic law to avoid various domestic transfers, just like a domestic trustee.

A foreign representative thus possesses two sets of avoidance powers:  In recognized foreign bankruptcies under Chapter 15, it can bring claims arising under foreign law to avoid foreign transfers; and Chapter 7 or 11 bankruptcies, it can bring claims arising under domestic law to avoid various domestic transfers, to the same extent as a domestic trustee.  Domestic trustees, by contrast, possess only the latter power.

4. In the same amendment that added Chapter 15 to the Bankruptcy Code—and that grants foreign representatives domestic avoidance powers, *see* 11 U.S.C. § 1523(a)—Congress added another provision that places a parallel limit on foreign representatives' exercise of domestic avoidance powers.

Under Section 561(d), "[a]ny provisions" of the Code "relating to securities contracts" "shall apply in a case under [C]hapter 15" "to limit avoidance powers to the same extent as in a proceeding under [C]hapter 7 or 11." 11 U.S.C. § 561(d).  In other words, when a foreign representative (acting under Section 1511 of Chapter 15) initiates or intervenes in a

14

Chapter 7 or 11 proceeding, and (acting under Section 1523 of Chapter 15) exercises *domestic* avoidance powers in that proceeding, the foreign representative's *domestic* avoidance powers are limited by the safe harbor provision of Section 546(e). A foreign representative may thus avoid *domestic* securities transactions only if the transactions were made with fraudulent intent—exactly the same limitation that the Code places on domestic trustees, *see* 11 U.S.C. §§ 546(e), 548(a)(1)(A).

By contrast, when a foreign representative exercises its *foreign* avoidance powers in a Chapter 15 proceeding, there is no such limitation: Section 561(d) only limits a foreign representative's avoidance powers to "the same extent" that Section 546(e) limits a domestic trustee's avoidance powers—and domestic trustees have no powers vis-à-vis foreign transactions. The Code thus leaves foreign representatives free to assert claims to avoid *foreign* securities transactions, even those made without fraudulent intent, whenever the relevant foreign law authorizes such claims—a sensible division that respects comity.

\*     \*     \*

All in all, while this statutory scheme appears complex, it operates quite simply. On the one hand, the Code allows foreign representatives

15

to pursue *foreign* avoidance claims in U.S. courts just as they would in a *foreign* tribunal: subject to the scope and limitations of *foreign* avoidance law, but unencumbered by any domestic limitations. On the other hand, the Code allows foreign representatives to pursue *domestic* avoidance claims in U.S. courts just as *domestic* trustees pursue them: to the same extent, and subject to the same limitations, including the Section 546(e) safe harbor. That arrangement discourages forum shopping, facilitates cross-border bankruptcies, and respects the principle of comity, *see Fairfield*, 714 F.3d at 132, while continuing to allow the Section 546(e) safe harbor to minimize turbulence in domestic securities markets in the event of a large bankruptcy, *see Enron Creditors*, 651 F.3d at 334.

## B. Factual Background

1. For decades, Bernie Madoff ran the largest Ponzi scheme in history. Holding out his company, BLMIS, as a legitimate investment fund, and promising handsome returns, Madoff raised billions of dollars from investors, including sophisticated entities. But instead of investing the capital he raised as he promised, Madoff simply deposited it in a bank account and then falsified trading records to create the illusion of large investment returns. When investors sought to redeem their

16

investments and collect their paper gains, BLMIS paid the redemptions using money raised from other investors. Inevitably, requested redemptions eventually exceeded the amount of money raised from investors, and the scheme collapsed in 2008, revealing for the Ponzi scheme it was. As the market turned sour, BLMIS could no longer cover redemptions, and Madoff's sons turned him over to the authorities. Some investors—whether luckily or knowingly—cashed out their investments before the scheme was revealed, recouping not just their principal but substantial (and illusory) gains funded by their fellow investors. The remaining investors were not so lucky and saw substantial investments on which they were depending wiped out.

2. Much of the money BLMIS raised came from so-called "feeder funds"—investment funds that pool money from many investors and then place it in a master fund on their behalf. Fairfield Sentry Ltd. ("Sentry"), Fairfield Sigma Ltd. ("Sigma"), and Fairfield Lambda Ltd. ("Lambda") were investment funds organized under the laws of the British Virgin Islands, which functioned as feeder funds to BLMIS. Sentry was BLMIS's largest feeder fund, with over 95% of its assets invested in BLMIS. JA 481-82 (Oct. 21, 2016 Decl. of David J. Molton

17

(Dkt. 942) ("Molton Decl.") at 225 ¶ 2); JA 209-10 (Oct. 21, 2016 Decl. of William Hare (Dkt. 925) ("Hare Decl.") ¶ 9). Sigma and Lambda were "funds of funds" that invested all their assets in Sentry. JA 209-10 (Hare Decl. ¶ 9).

To participate in any of the Funds, an investor was required to execute a Subscription Agreement, under which the investor received shares in the Fund in exchange for the money invested. Defendants were among those who invested in the Funds, and all Defendants executed Subscription Agreements and received shares in the Funds. *E.g.*, Third Amended Complaint, *Fairfield Sentry Ltd. v. Citibank NA London (In re Fairfield Sentry Ltd.)*, No. 10-ap-03622 (CGM) (Bankr. S.D.N.Y. Jan. 9, 2020) (Dkt. 79) ("Compl.") ¶ 22.

For nearly all Defendants, the Subscription Agreements they signed contain a forum selection clause, which provides:

> Subscriber agrees that any suit, action or proceeding ('Proceeding') with respect to this Agreement and the Fund may be brought in New York. Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum.

18

Compl. ¶ 23.

The Subscription Agreements also address the redemption of shares in the Funds, providing that "Subscriber[s] [are] aware of the limited provisions for the redemptions" and "understand[] that the Fund will generally redeem Shares as of the last day of each month," and requiring investors to identify specific banks for receiving redemptions. *See, e.g.*, JA 2193, 2199 (Dkt. 1595, Ex. A ¶¶ 9, 30(g)).

The Funds' Articles of Association set forth the mechanics for processing the redemptions mentioned in the Subscription Agreements. JA 262 (Oct. 10, 2003 Articles of Association (Dkt. 925-6) ("Articles") § 10); *see* JA 210-11 (Hare Decl. ¶ 10(a)). Article 10 authorized the Funds to redeem shares at a "Redemption Price," which was defined as "the Net Asset Value per Share" (NAV) "as determined in accordance with" Article 11 as of the close of the relevant business day. JA 271-72 (Articles § 10(1)(b), (2)). Article 11 then set forth a formula for determining a NAV that divided a Fund's net assets by its issued shares, with a few minor adjustments. JA 272 (Articles § 11(1)). And Article 11(1) further provided that "[a]ny certificate as to the [NAV] or as to the Subscription Price or Redemption Price therefor *given in good*

19

*faith* by or on behalf of the Directors shall be binding on all parties."
JA 272 (emphasis added).

3. The Funds' Directors appointed Citco Fund Services (Europe) B.V. and its delegate Citco (Canada) Inc. (together, "Citco") as the Funds' "Administrator." JA 1625, 1627 (Feb. 20, 2003 Administration Agreement (Dkt. 963-3) ("Admin. Agreement") at 3, 5); *see* JA 211 (Hare Decl. ¶ 11). The Directors delegated to Citco the authority to "redeem Shares in accordance with" the Articles, which included "calculation of the Net Asset Value and the Net Asset Value per Share on a monthly basis in accordance with the Fund Documents," and "publishing the Net Asset Value per Share … as requested by the Fund." JA 1629-30, 1642-43 (Admin. Agreement at 7 (§ 3.4), 20 (Part 1(a)), 21 (Part 2(e))).

As early as 2000, executives at Citco were suspicious of Madoff and raised concerns about the Funds' investments in BLMIS. One executive remarked that Citco might be in a "dangerous situation" because it did "not seem to have an independent source to verify the information from BLMIS." Compl. ¶¶ 46, 50. Another insisted that Citco had "a legal obligation to obtain more assurance" of the Funds' assets. Compl. ¶¶ 47, 50-51. Some expressed doubts that the Funds' assets at BLMIS even

20

existed. *See* JA 451 (Oct. 21, 2016 Liquidators' Mot. to Amend (Dkt. 933) ("Mot. to Amend") at 7). But after trying and failing three times to verify the existence of the Funds' assets, Compl. ¶¶ 52-61, Citco simply stopped trying, and upper management told the executives to drop the issue.

Nevertheless, and despite Citco's own grave doubts about the legitimacy of BLMIS's stated investment returns, Citco continued to determine and certify NAVs based on BLMIS's stated investment returns and to redeem shares in the Funds based on those falsely inflated valuations. Compl. ¶¶ 50-55. Indeed, far from resigning as Administrator, and notwithstanding its duties to the Funds, Citco quietly ended its credit relationships with the Funds once it suspected the scheme Madoff was running. That minimized its own exposure to BLMIS—but left the Funds' investors fully exposed. Compl. ¶¶ 57-65. Layering deceit on deceit, Citco also negotiated an 800% increase in its custodian fees as a condition of continuing to do business with the Funds, and further negotiated that those fees would be calculated as a percentage of the inflated NAVs that Citco itself certified. Compl. ¶¶ 67-68.

21

## C. Procedural Background

### 1. The BVI Redeemer Actions

After Madoff's Ponzi scheme collapsed and the extent of the fraud was revealed, the Funds entered liquidation proceedings under BVI law. Appellants (or their predecessors) were appointed as Liquidators, responsible for recovering and distributing assets for investors in the Funds. One potential source of recovery was from investors who managed to redeem their shares in the Funds before Madoff's scheme came to light, thereby recouping not just their principal, but falsely inflated investment returns paid for by their fellow investors who stood to receive nothing.

The Liquidators started by filing 33 lawsuits (together, the BVI Redeemer Actions) in the BVI Eastern Caribbean Supreme Court, seeking restitution of approximately $1.45 billion from 74 investors (the BVI Defendants) who had redeemed Fund shares in late 2003 and 2004. JA 213-14 (Hare Decl. ¶¶ 17-20); *see Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 596 B.R. 275, 291-02 (Bankr. S.D.N.Y. 2018) ("*Fairfield II*"). (None of those redemptions is at issue in this case.) The Liquidators asserted claims under BVI common law for unjust enrichment, seeking restitution of the redemption

22

payments based on mistake of fact. Alternatively, the Liquidators sought to set aside the redemptions based on mutual mistake. JA 236-37 (Mar. 12, 2010 Statement of Claim (Dkt. 925-1) ¶¶ 9-12).

In 2011, over the Liquidators' objections, the BVI Court granted certain BVI Defendants a trial on "preliminary issues" related to certification and good consideration. JA 215-16 (Hare Decl. ¶¶ 24, 26). Factual questions, including any allegations regarding Citco, were not at issue. JA 223 (Hare Decl. ¶ 48). In fact, they were expressly carved out of the preliminary issue proceedings, JA 223 (Hare Decl. ¶ 48 & n.21), preserving the Funds' right to argue that those proceedings were not determinative in view of facts about Citco's own fraudulent behavior that came to light later in the litigation.

The preliminary issue proceedings culminated in a decision from the Judicial Committee of the Privy Council in *Fairfield Sentry Ltd. (in Liquidation) v. Migani* [2014] UKPC 9 (Dkt. 925-17) ("*Migani*"), SPA 149-62. In *Migani*, the Privy Council held that the NAV certificates Citco issued were binding, and so the Liquidators could not recover the corresponding redemptions. *See Fairfield II*, 596 B.R. at 288. In so holding, the Privy Council focused on the need for "finality, certainty

23

and workability" in securities transactions. *Id.* at 295. But *Migani* did not consider the Liquidators' allegations of Citco's bad faith. *Id.* at 289, 293.[3]

### 2. The U.S. Redeemer Actions

Shortly after filing the BVI Redeemer Actions, the Liquidators commenced related proceedings in the United States, initially in New York state court and then in federal bankruptcy court in New York. Invoking Chapter 15 of the Bankruptcy Code, the Liquidators sought recognition of the BVI liquidation proceedings as a foreign "main proceeding[]." SPA 11. The bankruptcy court granted recognition, and the Liquidators proceeded with the instant suits. JA 452 (Mot. to Amend at 8). These suits (collectively, the U.S. Redeemer Actions), which in the aggregate seek the return of more than $6 billion in redemption payments, JA 449 (Mot. to Amend at 5), concern a different set of redemption payments than the payments at issue in the BVI Redeemer Actions, *see* JA 865 (Jan. 13, 2017 Defs.' Mot. to Dismiss (Dkt. 960) at 22).

---

[3] The district court correctly held that *Migani* did not have preclusive effect, for this reason, among others. SPA 42-43 n.35.

24

In all 303 U.S. Redeemer Actions, the Liquidators asserted claims under BVI common law for unjust enrichment, mistaken payment, money had and received, and constructive trust (together, the "Common Law Claims"). The Liquidators also asserted BVI statutory avoidance claims under both (a) Section 245 of the BVI Insolvency Act, which allows a court to avoid an unfairly preferential transfer to a creditor, and (b) Section 246 of the BVI Insolvency Act, which allows a court to avoid an undervalue transaction. SPA 12.

The bankruptcy court stayed the actions pending a ruling in *Migani*. SPA 12 (describing procedural history). While the stay was pending, the Liquidators amended their complaints in some actions as of right, adding claims under BVI law for breach of contract and breach of the implied covenant of good faith and fair dealing (together, the "Contract Claims"). JA 457-58, 464 (Mot. to Amend at 13-14, 20).

After *Migani* was decided, the Liquidators obtained new evidence of Citco's bad faith—that Citco had ignored or silenced warnings from executives about Madoff and BLMIS, failed to verify the existence of Fund assets in BLMIS, continued to calculate the NAV based on falsely inflated investment returns from BLMIS, and shielded itself from the

25

effects of Madoff's scheme while leaving Fund investors exposed. The Liquidators consequently moved for leave to amend their Common Law and Contract Claims to allege that Citco had not issued the NAV certificates in good faith. JA 465 (Mot. to Amend at 21).

For the Common Law Claims, the Liquidators asserted that, because Article 11(1) required that NAV certificates be "given in good faith," the NAV certificates issued by Citco in bad faith were not binding, which meant that the Liquidators could recover inflated redemption payments tied to those non-binding NAVs. JA 464-65 475-78 (Mot. to Amend at 20-21, 31-34). For the Contract Claims in the actions that had been amended as of right, the Liquidators asserted that (1) certificates issued in bad faith were not binding, and (2) Defendants breached an "implied term for repayment of any overpayments" by not returning redemption payments in excess of the true NAVs. JA 464-45, 478-79 (Mot. to Amend at 20-21, 34-35); JA 753-55 (Am. Compl. (Dkt. 942) at 273-75 ¶¶ 191-93, 196-99). The Liquidators also sought to add those claims to the actions in which they had not previously asserted any claims. JA 465 (Mot. to Amend at 21). Defendants opposed the Liquidators' motion for leave to amend and simultaneously moved to

26

dismiss the Liquidators' claims in their entirety on various grounds, including lack of subject-matter jurisdiction and personal jurisdiction, improper service, the purported applicability of the Bankruptcy Code safe harbor, and failure to state a claim.  Bankr. Dkts. 959, 960.

In a series of decisions, the bankruptcy court dismissed all of the Liquidators' claims, except for the Liquidators' constructive trust claims against the few Defendants that the Liquidators alleged knew of the Madoff fraud when they redeemed their shares.  *See Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam* (*In re Fairfield Sentry Ltd.*), 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018) ("*Fairfield I*"); *Fairfield II*, 596 B.R. at 275; *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam* (*In re Fairfield Sentry Ltd.*), 2020 WL 7345988, at *1-4 (Bankr. S.D.N.Y. Dec. 14, 2020) ("*Fairfield III*").  The Liquidators appealed the bankruptcy court's rulings to the district court, which affirmed.

### 3. The Decisions Below

Personal jurisdiction.  The bankruptcy court ruled that the broad forum selection clause in the Subscription Agreements did not subject Defendants to personal jurisdiction.  "Defendants concede[d] that the actions are 'with respect to' the Funds," so the court focused on whether

27

the actions "are also 'with respect to' the Subscription Agreements." *Fairfield I*, 2018 WL 3756343, at *10. It answered that question in the negative, because it thought "and" could not be read disjunctively, and it read *Migani* to mean that "the Articles and the Subscription Agreement" could not be "an integrated, single agreement." *Id.* at *10, 12.

The district court reached the same result, concluding that the broad forum selection clause in the Subscription Agreements did not establish personal jurisdiction over the hundreds of Defendants whose Agreements contained the clause, for largely the same reasons.

As noted, the forum selection clause provides that "any suit … with respect to this [Subscription] Agreement and the Fund may be brought in New York." Compl. ¶ 23. The district court construed that clause conjunctively, to require that a covered lawsuit relate *both* to the Subscription Agreement *and* to the Fund, not just one or the other. The district court then held that the U.S. Redeemer Actions do not come within the scope of the forum selection clause because, the court believed, those actions assert claims "with respect to" the Funds but not "with respect to" the Subscription Agreements. In the district court's view, the "issues related to the NAV and the Redemption Payments here" are

28

governed by the Funds' Articles of Association, not the Subscription Agreements, and the "limited references" to the redemption process and "general description of the timing of the redemption payments" in the Subscription Agreements are not "relevant enough" to "make this dispute 'with respect to' them." SPA 23-24.

The Liquidators had argued that, because the Subscription Agreements are "the basis of the contractual relationship" between the Defendant investors and the Funds, the U.S. Redeemer Actions are "with respect to" both the Subscription Agreements and the Funds. SPA 24. The district court rejected that argument, reasoning that, "[u]nder that logic, almost any dispute between the investors and the Funds would be litigated in New York"—a result the court thought "would render the [reference to] 'Agreement' in the clause superfluous." SPA 24. The district court also rejected the argument that the U.S. Redeemer Actions are "with respect to" the Subscription Agreements because the Agreements "expressly incorporate[] all other Funds documents, including the Articles." SPA 24. Again, the court thought that "would render almost any investors' disputes subject to the forum selection clause," SPA 24, a result it rather circularly assumed the parties could

29

not have wanted. The court thus ruled that the forum selection clause could not establish personal jurisdiction over at least 206 Defendants.[4]

Safe harbor. In *Fairfield II*, the bankruptcy court ruled that Section 546(e) of the Bankruptcy Code could apply to transfers occurring entirely outside the United States. 596 B.R. at 306-15. Then, in *Fairfield III*, it ruled that Section 546(e) barred the Liquidators' BVI avoidance claims. 2020 WL 7345988, at *6-9. Specifically, it ruled that the Liquidators' claims did not fall under Section 546(e)'s carve-out for intentionally fraudulent claims, on the theory that that exemption applies only to claims brought under Section 548(a)(1)(A), which foreign representatives like the Liquidators cannot bring. *Id.* at *8.

The district court reached the same result, but for different reasons. To lay the groundwork, the district court recognized that Chapter 15 allows foreign representatives to assert foreign avoidance claims

---

[4] Although it affirmed the bankruptcy court's ruling on personal jurisdiction, the district court did so on slightly different grounds when it came to *Migani*. The bankruptcy court agreed with Defendants that the forum selection clause did not confer personal jurisdiction because of the Privy Council's decision in *Migani*. By contrast, the district court correctly held that *Migani* does not control because it does not address the issue of choice of forum, only choice of law, and concerns only preliminary issues raised as potential defenses to common law claims in the BVI Proceedings, not personal jurisdiction in U.S. courts. SPA 23.

30

targeting foreign transactions. SPA 27. But, the district court asserted, foreign representatives possess no domestic avoidance powers—i.e., no power to avoid domestic transactions under domestic law. SPA 27-28. According to the district court, "foreign representatives cannot seek to avoid transfers under the United States bankruptcy law," and "the court in a Chapter 15 case cannot grant any relief under various avoidance provisions under the Bankruptcy Code." SPA 27. In reaching that conclusion, the district court made no mention of 11 U.S.C. § 1523, which—contrary to its assertion that "foreign representatives cannot seek to avoid transfers under the United States bankruptcy law"—authorizes foreign representatives to do just that, i.e., bring domestic avoidance claims targeting domestic transfers in Chapter 7 and 11 cases.

The district court proceeded from that premise to the conclusion that Congress had "expressed a clear intent" to apply the Section 546(e) safe harbor extraterritorially to a foreign representative's assertion of foreign avoidance claims targeting foreign transfers. SPA 31. Section 561(d) limits a foreign representative's avoidance powers "to the same extent" as a domestic trustee's avoidance powers. 11 U.S.C. § 561(d). And because (it believed) foreign representatives do not possess

31

any domestic avoidance powers, *but see* 11 U.S.C. § 1523, the court concluded that Section 561(d) must mean that a foreign representative's *foreign* avoidance powers are limited "to the same extent" as a domestic trustee's *domestic* avoidance powers. SPA 29-33.

In the alternative, the district court ruled that, "even if there were no such Congressional intent" to apply the Section 546(e) safe harbor extraterritorially, it would still limit a foreign representative's foreign avoidance powers, because "the application of § 546(e) here is a domestic one." SPA 31. In the district court's view, the "focus" of Section 561(d) is domestic: "to limit the foreign representative's avoidance power in the United States court." SPA 34. Thus, the court concluded, applying the Section 546(e) safe harbor here "is a domestic application that is permitted under the presumption against extraterritoriality." SPA 34.

The district court next rejected the argument that the BVI avoidance claims here escape the safe harbor because they fall under Section 546(e)'s exception for intentional fraudulent transfer claims. SPA 35-38. In the court's view, that exception applies only to avoidance claims that "contain a fraud element," and the court did not believe that the BVI avoidance claims asserted here "contain a fraud element."

32

SPA 38.  The district court therefore affirmed the bankruptcy court's dismissal of the Liquidators' avoidance claims under BVI statutory law.

Non-statutory claims.  As noted, the bankruptcy court denied leave to amend the Common Law Claims, with one exception:  Applying its (mis)understanding of BVI law, the court dismissed all Common Law Claims except those brought against Defendants who allegedly knew the NAVs were inflated at the time of redemption.  It did so on two grounds.  First, the bankruptcy court thought that "*Migani*'s emphasis on finality, certainty[,] and workability" meant that "[n]either fraud nor illegality nor breach of trust allows either side to revisit [a] redemption payment in the absence of bad faith by the redeeming shareholder."  *Fairfield II*, 596 B.R. at 295.  Second, the bankruptcy court ruled, in the alternative, that Citco's bad faith itself barred the Liquidators from amending most of their Common Law Claims.  *Id.* at 299.

The district court reached the same result, for somewhat different reasons.  The district court held that Section 31 of the BVI Companies Act precludes the Common Law Claims and the Contract Claims, or, alternatively, that those claims are precluded by the BVI common law doctrine of *ex turpi causa non oritur actio* ("*ex turpi*"), except for the

33

Liquidators' constructive trust claims alleging that Defendants knew the NAVs were inflated at the time of redemption. SPA 43-45. The district court reasoned that Section 31's prohibition on challenging the validity and genuineness of corporate documents applied to the Liquidators' claim that the fraudulently certified NAVs are not binding and, thus, "Appellants acting on behalf of the Funds cannot seek to recover based on the inflated NAVs issued by the Funds themselves." SPA 43-44. The district court thus affirmed the bankruptcy court's dismissal of these claims.

Section 246. Finally, the bankruptcy court ruled that the Liquidators' claims under Section 246 of the BVI Insolvency Act, which sought to avoid undervalue transactions, reach only those Defendants who "at the time of a redemption … had reason to believe that the NAVs were inflated, and the Defendant's shares were worthless." *Fairfield II*, 596 B.R. at 303-05. The bankruptcy court thus found that the Liquidators stated a claim under Section 246 against only those Defendants who knew or suspected that the NAVs were inflated at the time of redemption, but not Defendants lacking contemporaneous knowledge. *Id.* at 304-05. The district court did not reach this issue.

34

\* \* \*

The Liquidators timely appealed the district court's rulings. *See* Notice of Appeal, *Fairfield Sentry Ltd. (in Liquidation) et al. v. Citibank NA, et al.*, No. 19-cv-3911, ECF 601 (Sept. 26, 2022). The Second Circuit consolidated all 400-plus appeals here. Motion Order, *In re: Fairfield Sentry Ltd.*, No 22-2101, ECF 30 (Nov. 23, 2022).

## SUMMARY OF ARGUMENT

The decisions below ignore the basic purpose of Chapter 15 and creates one obstacle after another to the efforts of foreign liquidators to recoup funds from Madoff investors who lost nothing in order to distribute them equitably to Madoff investors who lost nearly everything.

To begin, the decisions below badly misconstrue the forum selection clause that nearly all Defendants agreed to, necessitating perhaps years of further litigation over the threshold issue of personal jurisdiction in an already-thirteen-year-old case. When they first purchased shares in the Funds, nearly all Defendants executed a Subscription Agreement with a forum selection clause consenting to suit in New York for any proceeding "with respect to" the Subscription Agreements and the Funds. Under New York law, that broad "with respect to" language requires nothing

35

more than a logical connection or association between a lawsuit and the Subscription Agreements. The claims here readily meet that standard, as they seek to recover fraudulently inflated redemption payments made to investors pursuant to the Subscription Agreements that set up the relationship between the investors and the Funds.

The courts below erroneously rejected that straightforward reasoning and instead held the Funds to a standard that is different and much than New York law imposes, effectively requiring them to establish that their claims "arise under" the Subscription Agreements. The courts rested that mistaken interpretation on an equally mistaken assumption that the parties could not have wanted to channel most disputes between investors and the Funds to courts in New York. That is exactly the purpose of broad forum selection clauses in contracts governing cross-border investments: to efficiently litigate Fund-related disputes involving numerous investors around the globe in one central and agreed forum. The district court further erred in supposing that its restricted reading of the clause was necessary to avoid rendering part of the clause superfluous. The Liquidators' straightforward reading of the clause gives effect to all words of the clause by ensuring that it applies only to disputes

36

that have a logical connection to both the Subscription Agreements and the Funds. Indeed, it is the district court's own reading that creates a superfluity problem by seemingly obviating the need for the clause to refer to "the Funds" at all.

The decisions below also flout the presumption against extraterritoriality and disregards the basic purpose of Chapter 15 to facilitate, not frustrate, the efforts of foreign liquidators in U.S. courts. The district court applied a *domestic* safe harbor to preclude meritorious *foreign* avoidance claims—claims that could have proceeded under both BVI law and in U.S. courts before Chapter 15 was enacted. To overcome the strong presumption against extraterritorial application of U.S. law, Congress must clearly and unambiguously declare its intent to apply domestic law abroad. That longstanding principle reflects the values of comity and respect for foreign law that undergird the international system of cross-border litigation. If Congress has not clearly overcome the presumption, courts may apply the statute only domestically, by making sure that the conduct relevant to the statute's "focus" occurred in the United States, not abroad.

37

Here, the analysis should have been simple. On its face, the safe harbor of Section 546(e) of the Bankruptcy Code shields only *domestic* transfers from avoidance claims brought under *domestic* law. It does not affect claims to avoid *foreign* transfers under *foreign* law. Although Section 561(d) states that the safe harbor applies to limit avoidance powers "to the same extent" in Chapter 15 proceedings as in Chapter 7 and 11 proceedings, that simply mandates equal treatment (and limitation) of *domestic* avoidance powers, regardless of who wields them, whether a domestic trustee or a foreign representative. Section 561(d) says nothing, let alone anything clear and unambiguous, about applying the safe harbor extraterritorially to limit *foreign* avoidance claims targeting *foreign* transfers. Applying Section 561(d) extraterritorially would be contrary to the equal-treatment mandate, as it would mean applying the safe harbor to a *greater* extent in Chapter 15 proceedings.

The district court nonetheless applied the safe harbor extraterritorially based on the mistaken belief that foreign representatives lack domestic avoidance powers, and, thus, applying the safe harbor to foreign avoidance powers is the only way to give Section 561(d) any effect. The premise for that reasoning is flat wrong.

38

In reality, Congress *did* grant foreign representatives domestic avoidance powers in certain circumstances, a point the district court simply overlooked. The statute therefore has effect even with a purely domestic scope, and there was no warrant for allowing concerns about superfluity to trump the presumption against extraterritoriality.

Likewise, there was no basis for the district court to conclude that applying the safe harbor to the *foreign* avoidance powers of a *foreign* representative was a permissible *domestic* application of the statute. Both the Supreme Court and this Court have held that the "focus" of the safe harbor is the transaction sought to be avoided, not (as the district court circularly assumed) "to limit the foreign representative's avoidance power in the United States court." And because all relevant transactions occurred overseas and are avoidable under BVI law, applying the safe harbor to shield them would constitute an impermissible extraterritorial application of the statute, not a permissible domestic one. The district court also misconstrued BVI law in concluding that the Liquidators' claims do not fall under the safe harbor's exception for intentional fraudulent transfers.

39

Third, the decisions below made a hash of the Liquidators' Contract and Common Law Claims, which provide an independent basis for recouping Defendants' inflated returns and equitably distributing them among innocent investors. The BVI's highest judicial authority has held that when valuation of the assets in the calculation of NAV is dishonest, then the NAV certification is not binding, and a claim for restitution is available. Likewise, the Funds' Articles of Association require that NAVs be certified in good faith to be binding. But far from certifying the NAVs in good faith, the Funds' agent, Citco, committed rampant fraud by knowingly certifying fraudulent NAVs. Thus, under binding BVI precedent—and regardless of the applicability of the bankruptcy safe harbor to the *statutory* avoidance claims—the Liquidators should have been able to proceed with their Common Law and Contract Claims on the ground that the NAV was fraudulently calculated.

The district court improperly brushed all that aside. In fact, the district court avoided even engaging with the substance of governing BVI precedent, purporting to dodge the issue by citing the genuine-documents provision of the BVI Companies Act. But that provision is irrelevant here: It governs the validity or genuineness of a company document, not

40

whether a fraudulently calculated NAV is binding under the terms of a contract. The district court also flatly ignored binding precedent when it erroneously applied the BVI common law doctrine of *ex turpi*. That doctrine does not apply here for a host of reasons, including that there is no predicate illegal act to trigger the doctrine, the Articles' good-faith requirement contracted around the doctrine, and application of the doctrine would serve no purpose other than to harm innocent creditors. The district court's conclusion that requiring NAVs to be certified in *good* faith to be binding does not mean that NAVs certified in *bad* faith are not binding is also nonsensical and renders the Articles' good-faith-certification requirement a nullity. The twisted net result of these errors was to leave the foreign liquidators with far less authority than the SIPC trustee, and innocent investors in the foreign feeder funds with far greater losses than their domestic counterparts. That result cannot be reconciled with common sense or the whole thrust of Chapter 15, which was to facilitate foreign bankruptcies, not frustrate them.

Finally, the bankruptcy court erred in dismissing a subset of the Liquidators' BVI avoidance claims, brought under Section 246 of the BVI Insolvency Act, for failure to state a claim. Section 246 allows plaintiffs

41

to avoid "undervalue transactions," including those where the consideration exchanged was significantly less than the money received—like Defendants' exchange of essentially worthless shares for billions of dollars in redemption payments. The bankruptcy court held that Section 246 reaches only Defendants who knew or should have known at the time of redemption that the shares were undervalued. But that knowledge requirement is found nowhere in the text of Section 246 of the BVI Insolvency Act, and it is flatly inconsistent with leading precedent from the United Kingdom House of Lords. That precedent squarely holds that courts must look at the "reality" of the transfers at issue, not the parties' perceptions. The undeniable "reality" here is that Defendants exchanged shares of negligible value for billions of dollars, which the Liquidators should have been able to avoid under Section 246.

This Court should reverse and allow the Liquidators' meritorious claims to proceed.

## STANDARD OF REVIEW

This Court reviews decisions to grant motions under Rule 12(b)(2) and 12(b)(6) de novo. *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 81 (2d Cir. 2018). "In so doing, [the Court] accept[s] as true the

42

factual allegations of the complaint, and construe[s] all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff." *Arar v. Ashcroft*, 585 F.3d 559, 567 (2d Cir. 2009) (assessing dismissal under Rule 12(b)(2)); *Palmer v. Amazon.com, Inc.*, 51 F.4th 491, 503 (2d Cir. 2022) (Rule 12(b)(6)). In an appeal from a district court's review of a bankruptcy court decision, this Court's review of legal issues is de novo without deference to either court, while this Court accepts the bankruptcy court's findings of fact, if any, "unless they are clearly erroneous and reviewing its conclusions of law de novo." *In re LATAM Airlines Grp. S.A.*, 55 F.4th 377, 382 (2d Cir. 2022) (quoting *In re Teligent, Inc.*, 640 F.3d 53, 57 (2d Cir. 2011)). Here, there are no relevant fact findings, and so review is de novo.

## ARGUMENT

## I. The Forum Selection Clause Creates Personal Jurisdiction Over Defendants In New York Courts.

The lower courts erred in holding that the Subscription Agreements did not establish personal jurisdiction over the hundreds of Defendants who consented to sue and be sued in New York as a condition of investing

43

in the Funds.[5]   The district court's ruling not only defies the plain language of the Subscription Agreements, but also subverts the certainty and efficiency aims of forum selection clauses generally, particularly in cross-border bankruptcies.   The ramifications are severe:   The Liquidators must continue to expend precious resources litigating personal jurisdiction individually against dozens (and potentially hundreds) of Defendants more than *twelve years* into this litigation.

"[F]orum selection clauses constitute an 'indispensable element in international trade, commerce, and contracting.'" *Martinez v. Bloomberg LP*, 740 F.3d 211, 218 (2d Cir. 2014) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 630 (1985)).  Such clauses give cross-border parties certainty about where they can sue and be sued, "promote uniformity of result," and "further vital interests of the justice system, including judicial economy and efficiency." *Id.* at 219.

As a condition of investing in the Funds, the Defendants all executed Subscription Agreements, in which they "agree[d] that any suit,

---

[5] The district court essentially adopted the bankruptcy court's forum-selection-clause analysis in *Fairfield I*—with the notable exception of (correctly) overruling the bankruptcy court's misreading of *Migani, see* n.4, *supra*—so we refer to the district court's opinion throughout the rest of Part I.

action or proceeding ('Proceeding') with respect to this Agreement and the Fund may be brought in New York." Compl. ¶ 23. For the avoidance of any doubt, the forum selection clause added that the Defendants "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any Proceeding," "consent[ed] that service of process as provided by New York law may be made upon Subscriber in such Proceeding," and agreed "not [to] claim that a Proceeding has been brought in an inconvenient forum." Compl. ¶ 23.

That broad forum selection clause plainly creates jurisdiction over the Defendants with respect to the Liquidators' claims. It is well established under New York law that the phrase "with respect to" in a forum selection clause is "expansive." *See, e.g.*, *ACE Cap. Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 30 (2d Cir. 2002). "With respect to" is synonymous with such capacious phrases as "in connection with," "related to," and "associated with," and means simply "connected by reason of an established or discoverable relation." *Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128-29 (2d Cir. 2001); *accord, e.g.*, *Hansard v. Fed. Ins. Co.*, 46 N.Y.S.3d 163, 167 (N.Y. Sup. Ct. 2017) (holding that the term "an 'employment-related Wrongful Act'" means "a

45

Wrongful Act 'connected by reason of an established or discoverable relation to the act of employing or the state of being employed'").

Thus, when a forum selection clause states that it encompasses claims or lawsuits "with respect to" an underlying agreement, courts interpret that language "broadly" to encompass claims "connected" to the agreement "by reason of an established or discoverable relation." *Carlyle Inv. Mgmt. LLC v. Moonmouth Co. SA*, 779 F.3d 214, 220 (3d Cir. 2015) (quoting *Coregis Ins. Co.*, 241 F.3d at 128-29); *accord Huffington v. T.C. Grp., LLC*, 637 F.3d 18, 22-23 (1st Cir. 2011). By contrast, when a forum selection clause uses the more "narrow" phrase "aris[ing] under"—encompassing only those lawsuits or claims that "arise under" a contract—the claim must actually "originate from" or have "a causal connection" with the underlying contract. *ACE Cap.*, 307 F.3d at 30; *cf. Phillips v. Audio Active Ltd.*, 494 F.3d 378, 389 (2d Cir. 2007).

Here, while the Liquidators' claims are grounded in various sources of law, they are all "with respect to"—"associated with," "related to"—both the Subscription Agreements and the Fund, bringing them within the broad scope of the forum selection clause. The Subscription Agreements created the legal relationship between the Funds and

46

Defendants, who invested in the Funds pursuant to the Agreements. In fact, the Subscription Agreements are the only documents that Defendants executed, and the only documents that bound Defendants to the Funds' Articles of Association, which established the mechanics for processing Fund redemptions. *See* JA 2189 (Dkt. 1595, Ex. A ¶ 1) (binding investors to "the Fund Documents," including the Articles of Association). The Liquidators' claims, which seek to avoid or recover the redemption of shares issued pursuant to the Subscription Agreements, are necessarily "connected" to both the Subscription Agreements and the Funds under any reasonable reading of the expansive forum selection clause. *Coregis*, 241 F.3d at 128.[6]

Rejecting that straightforward analysis, the district court offered a tortured reading of the forum selection clause. To begin, the district court

---

[6] Indeed, courts conducting a personal jurisdiction "contacts" analysis in related litigation brought by BLMIS have ruled that the same clause is a "contact" supporting personal jurisdiction—even though BLMIS is not even a party to the Subscription Agreements. *See, e.g., Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* 2022 WL 4390915, at *3-4 (Bankr. S.D.N.Y. Sept. 22, 2022); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 2022 WL 4542915, at *3-4 (Bankr. S.D.N.Y. Sept. 28, 2022) (same for Barfield Nominees); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 2022 WL 6237071, at *5 (Bankr. S.D.N.Y. Oct. 7, 2022) (same for the collective Société Générale Defendants).

47

erroneously determined that, for the clause to apply, the Liquidators' claims must "implicate[]" specific provisions of the Subscription Agreements. SPA 23. But that essentially erases the broad "with respect to" language that the parties agreed to and replaces it with narrower "arising under" language that the parties did not use. Indeed, under the district court's crabbed reading, the forum selection clause effectively applies only to "pure breaches of [the Subscription Agreements] containing the clauses." *See, e.g.*, *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1361 (2d Cir. 1993); *see also Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 226 (2d Cir. 2001). That judicial rewriting of the parties' agreement was error. When parties agree to sue and be sued "with respect to" an underlying agreement, there need be only a "discoverable relation" between the agreement and the claim; the parties are not required to show that a particular provision was breached. *See Coregis*, 241 F.3d at 128. The district court should have found that "discoverable relation" standard readily satisfied here by the relationship between the Liquidators' claims and the Subscription Agreement.

Compounding its error, the district court purported to buttress its atextually narrow reading of the forum selection clause by observing,

48

disapprovingly, that a broad reading would channel "almost any" dispute between the Funds and Defendants to New York. SPA 24. But that is a feature of the clause, not a bug. Particularly when "a security is being offered to a range of customers," it is more than reasonable to infer that one "purpose" of an expansive forum selection clause is to "concentrate all related litigation in a single forum" and avoid numerous lawsuits in different fora around the globe. *Huffington*, 637 F.3d at 23. As this Court has recognized, forum selection clauses are critical in international transactions for precisely that reason. *Martinez*, 740 F.3d at 218. The complexity of this decade-plus-long case illustrates the point: Absent a clause concentrating cross-border litigation over billions of dollars in redemption payments in a single forum, the Liquidators would have to slog through expensive and time-consuming discovery and litigation against hundreds of individual Defendants at the threshold, just to establish personal jurisdiction. Contrary to the district court's belief, it makes perfect sense that the parties chose a broad forum selection clause to avoid just that outcome.

Finally, the district court also erroneously concluded that giving full effect to the expansive language of the clause "would render the

49

'Agreement' in the clause superfluous." SPA 24. It does no such thing. The forum selection clause excludes claims that have no connection to the Funds and the Subscription Agreements, such as disputes that have nothing to do with shares or redemption payments under to the Subscription Agreements. If, for example, the Funds' directors breached an employment agreement with one of the Funds, the claim for breach of the employment contract would be "with respect to the Fund," but not with respect to the Subscription Agreements. Likewise, if a bank invested in one of the Funds through a Subscription Agreement and separately provided banking services to the Fund, any dispute over the banking services would be "with respect to the Fund," but not with respect to the Subscription Agreements. Giving the forum selection clause's language its full effect thus creates no superfluity.

In fact, and ironically, it is the district court's narrow reading that creates superfluity. If, as the district court concluded, a claim must effectively arise from the Subscription Agreements to come within the scope of the forum selection clause, and the Subscription Agreements necessarily relate to the Funds, then it is not clear what independent work the reference to "the Fund" could be doing in the clause. In any

50

event, the district court was wrong to reject an appropriately broad reading of the clause based on supposed superfluity.

Defendants agreed to be sued in New York "with respect to" the Subscription Agreements and the Fund. The U.S. Redeemer Actions easily meet that standard. This Court should reverse the district court's erroneous personal jurisdiction ruling and allow the claims against all Defendants to proceed on the merits.

## II. The Bankruptcy Code Safe Harbor Does Not Apply Extraterritorially To Bar The Liquidators' Foreign Avoidance Claims.

The decisions below also erred in concluding that the safe harbor in Section 546(e) of the Bankruptcy Code applies extraterritorially to bar the Liquidators from avoiding foreign transactions under foreign law. "It is a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *EEOC v. Arab Am. Oil Co.*, 499 U.S. 244, 248 (1991) ("*Aramco*") (quoting *Foley Bros. v. Filardo*, 336 U.S. 281, 285 (1949)). This presumption against extraterritoriality "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *Id.*; *see also*

51

*F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004) (the strength of the presumption serves to "avoid unreasonable interference with the sovereign authority of other nations").

To determine whether a statute has extraterritorial application, courts use "a two-step framework." *RJR Nabisco, Inc. v. Euro. Cmty.*, 579 U.S. 325, 337 (2016). First, the court "ask[s] whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." *Id.* Importantly, only a "clear statement of extraterritorial effect" may trigger extraterritorial application of a domestic statute. *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 265 (2010). If a statute clearly covers only domestic conduct, that is the end of the analysis. A court "need not choose between" "competing interpretations" in deciding the extraterritoriality question. *Aramco*, 499 U.S. at 250. Rather, if "statutory language is 'ambiguous,'" the result is clear: The court "will not infer extraterritorial jurisdiction." *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 420 (D.C. Cir. 2005) (quoting *Aramco*, 499 U.S. at 250). In short: "When a statute gives no clear indication of an

52

extraterritorial application, it has none." *City of New York v. Chevron Corp.*, 993 F.3d 81, 100 (2d Cir. 2021).

"If the statute is not extraterritorial, then at the second step" the court determines "whether the case involves a domestic application of the statute," which it does "by looking to the statute's 'focus.'" *RJR Nabisco*, 579 U.S. at 337. "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.*

Here, the district court erred at both steps of the inquiry.[7] Far from clearly and affirmatively indicating that the Section 546(e) safe harbor should apply extraterritorially, Congress plainly designed it to apply to domestic avoidance claims only. At the very least, the Bankruptcy Code is ambiguous on the question, leaving the presumption against extraterritorial application in place. Nor would applying the safe harbor

---

[7] As in Part I, we refer to the district court's opinion throughout the rest of Part II, except to the extent the district court relied on different reasoning than the bankruptcy court.

53

to the *foreign* avoidance powers of a *foreign* representative be a permissible *domestic* application of the statute. Just the contrary: All relevant transactions occurred overseas and should be avoidable under BVI law.[8]

More broadly, the district court's erroneous decision subverts the core aims of Chapter 15—"to maximize assistance to [a] foreign court conducting the main proceeding," *In re Fairfield Sentry Ltd. Litig.*, 458 B.R. 665, 679 (Bankr. S.D.N.Y. 2011), and to "protect[] and maximiz[e] the value of the debtor's assets," 11 U.S.C. § 1501(a)(4). By applying a domestic safe harbor to foreign avoidance claims, the district court's ruling severely undermines BVI law, which contains no comparable safe harbor for avoidance transactions. *Contra, e.g.*, *In re SPhinX, Ltd.*, 351 B.R. 103, 112 (Bankr. S.D.N.Y. 2006) (Chapter 15 must be applied "in light of principles of international comity and respect for the laws and judgments of other nations"), *aff'd,* 371 B.R. 10 (S.D.N.Y. 2007); *see also RJR Nabisco*, 579 U.S. at 325 (the presumption against extraterritoriality is at its "apex" when there is "risk of conflict" between

---

[8] The bankruptcy court did not get to the second step. But, as explained below, the statute does not apply extraterritorially (step one) and this case does not involve a domestic application (step two) as a matter of law.

U.S. and foreign law). And by precluding meritorious avoidance claims for a substantial sum of ill-gotten gains, the district court not only torpedoed the value of the assets the Liquidators are seeking to recover, but protected some creditors at the expense of other innocent creditors. *Contra* 11 U.S.C. § 1501(a)(3) (core aim of Chapter 15 is to ensure "fair and efficient administration of cross-border insolvencies that protects the interests of *all* creditors" (emphasis added)). The decision should be reversed.

### A. The Bankruptcy Code Does Not Clearly and Affirmatively Rebut the Presumption Against Applying the Domestic Safe Harbor Extraterritorially.

The district court found the presumption against extraterritorial application overcome for the safe harbor in Section 546(e) because (the court concluded) "Congress has expressed a clear intent to apply § 546(e) extraterritorially through § 561(d)." SPA 31. But Congress has done no such thing. Instead, when it amended the Bankruptcy Code to add Section 561(d), Congress left foreign representatives' existing foreign avoidance powers fully intact and simply applied the Section 546(e) safe harbor to foreign representatives' new *domestic* avoidance powers. That

is clear from the language and structure of the Code and the purpose of Chapter 15.

As explained, different provisions of the Bankruptcy Code govern domestic and foreign bankruptcy proceedings, respectively. In the domestic sphere, the Code "creates both a system for avoiding transfers and a safe harbor from avoidance—logically these are two sides of the same coin." *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 894 (2018). On one side is the power of a domestic trustee to bring certain avoidance claims under "sections 544, 545, 547, 548(a)(1)(B), and 548(b)" of the Code. 11 U.S.C. § 546(e). On the other side is Section 546(e), which establishes a "safe harbor [that] operates as a limit to the general avoiding powers of a bankruptcy trustee." *Merit Mgmt.*, 138 S. Ct. at 888.

By its terms, the Section 546(e) safe harbor applies to—and limits— only *domestic* avoidance powers. Section 546(e) is located in Chapter 5 of the Code, which applies only in "a case under [C]hapter 7, 11, 12, or 13." 11 U.S.C. § 103(a). Each of those Chapters governs only *domestic* bankruptcy proceedings. Section 546(e) also states that it applies to "the trustee," which is a defined term for the representative of a debtor's estate in a *domestic* proceeding. *See* 11 U.S.C. §§ 701-04 (trustee in

56

Chapter 7), 1104 (trustee in Chapter 11).  And, as explained, when a *domestic* trustee exercises avoidance powers in a bankruptcy proceeding, those powers are confined to claims brought under *domestic* law that target *domestic* transfers, for the simple reason that *domestic trustees possess no foreign avoidance powers.  See supra.* It follows, therefore, that the Section 546(e) safe harbor, standing alone, applies to, and limits, the *domestic* avoidance powers of *domestic* trustees only.

Because Section 546(e) by its own terms applies only to domestic avoidance powers and expresses no intention to apply extraterritorially, the only question (as the district court recognized) is whether Section 561(d) expresses a clear intention to apply the Section 546(e) safe harbor to extraterritorial conduct.  The answer is plainly no.

1. To begin, Section 561(d) makes no mention of "foreign" or "extraterritorial" application, or of any reach "beyond the United States," in connection with limiting avoidance powers.  All it says is that "provisions of this title relating to securities contracts" (which obviously includes Section 546(e)) "shall apply in a case under [C]hapter 15," i.e., a case involving a foreign bankruptcy representative, "to limit avoidance powers *to the same extent*" as in a domestic proceeding.  11 U.S.C. § 561(d)

57

(emphasis added). Section 561(d) thus gives a kind of "equal treatment" mandate with respect to the relevant avoidance powers. *See Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 768 (2019); *see also Krys v. Farnum Place, LLC* (*In re Fairfield Sentry Ltd.*), 768 F.3d 239, 245-46 (2d Cir. 2014) (describing the term "to the same extent" in a different provision in Chapter 15 as an "express statutory command" of equal treatment (emphasis omitted)). As a result, whatever scope the Section 546(e) safe harbor has in domestic bankruptcy proceedings, it also has in proceedings authorized by Chapter 15, by operation of Section 561(d).

But, as just explained, "the extent" of Section 546(e)'s safe harbor in domestic bankruptcy proceedings is limited to *domestic avoidance powers* that are confined to claims brought under *domestic* law targeting *domestic* transfers. It thus follows that in proceedings authorized by Chapter 15, the Section 546(e) safe harbor also reaches *only domestic avoidance powers*—i.e., avoidance claims brought by foreign representatives under domestic law and targeting domestic transfers. Giving any wider scope to the safe harbor in Chapter 15 proceedings would mean applying it *not* "to the same extent" as in a domestic proceeding, as Section 561(d) commands, but to some greater extent.

58

Equal treatment of domestic trustees and foreign representatives means applying the same purely domestic safe harbor to both, not expanding the safe harbor to reach foreign avoidance claims grounded in foreign law and targeting foreign transfers. In short, there is no basis for reading Section 561(d) as an indication—let alone a "clear" and unambiguous indication, *see Morrison*, 561 U.S. at 265—that Congress intended to apply the safe harbor extraterritorially to limit foreign avoidance claims.

In concluding otherwise, the district court misconceived how the relevant provisions of the Code interact. In the court's telling, foreign representatives "cannot seek to avoid transfers under the United States bankruptcy law," and thus possess no domestic avoidance powers that could be limited by the safe harbor. SPA 27. Thus, in the court's view, the only way to give Section 561(d) any effect was to apply the safe harbor to foreign representatives' *foreign* avoidance powers.

But the court's major premise was flat wrong. Chapter 15 expressly authorizes foreign representatives to bring domestic avoidance claims targeting domestic transfers—exactly what the district court thought a foreign representative could not do. In concluding otherwise, the district court observed that Section 1521(a)(7) ordinarily prevents a foreign

59

representative from invoking the trustee's enumerated domestic avoidance powers. That is true—but it is not the end of the story. The Code goes on in Section 1523 to expressly allow foreign representatives to assert those very domestic avoidance powers when a foreign representative, acting under the power of Chapter 15, initiates or participates as a party-in-interest in a Chapter 7 or 11 proceeding: "Upon recognition of a foreign proceeding, the foreign representative has standing in a case concerning the debtor pending under another chapter of this title to initiate actions under sections 522, 544, 545, 547, 548, 550, 553, and 724(a)." 11 U.S.C. § 1523(a); *see also* 11 U.S.C. § 1511(a) (foreign representative "may commence" a case under Chapter 7 or 11).

The district court's reasoning thus falls apart. As Section 1523(a) makes clear, there was no need to apply the Section 546(e) safe harbor to foreign avoidance claims just to ensure that Section 561(d) has some effect. Section 561(d) has effect by directing that, when a foreign representative exercises an avoidance power that it shares with a domestic trustee—as under Section 1523(a)—the safe harbor's limitations apply. The district court simply elided this interplay among the relevant provisions of the Code.

60

The statutory history confirms this reading of the plain language of Section 561(d).[9]  Under former Section 304 of the Bankruptcy Code—Chapter 15's predecessor—a foreign representative lacked any power to bring domestic avoidance claims under the Code.  *In re A. Tarricone, Inc.*, 80 B.R. 21, 23 (Bankr. S.D.N.Y. 1987).  The foreign representative was limited to asserting "those avoiding powers vested in him by the law applicable to the foreign estate."  *In re Metzeler*, 78 B.R. 674, 677 (Bankr. S.D.N.Y. 1987); *accord In re Condor*, 601 F.3d at 329.  And because Section 561(d) had not yet been enacted, those foreign avoidance powers were indisputably not subject to the Section 546(e) safe harbor, which (as discussed) by its terms applies only to domestic avoidance claims.  *See Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334 (2d Cir. 2011); *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 357 (2d Cir. 1992).  Thus, under the Code as it existed before 2005, Congress was evidently comfortable with foreign representatives exercising foreign

---

[9] "[S]tatutory history" is "the record of *enacted* changes Congress made to the relevant statutory text over time, the sort of textual evidence everyone agrees can sometimes shed light on meaning."  *BNSF Ry. Co. v. Loos*, 139 S. Ct. 893, 906 (2019) (Gorsuch, J., dissenting).  It "is relevant regardless of whether the statute is ambiguous."  *Mei Xing Yu v. Hasaki Rest., Inc.*, 944 F.3d 395, 418 (2d Cir. 2019) (Calabresi, J., dissenting).

61

avoidance powers unlimited by the safe harbor that applied to domestic trustees.

In 2005, Congress adopted Chapter 15, which (among other things) repealed Section 304 and enacted Section 1523(a), granting foreign representatives domestic avoidance powers in certain circumstances. In the same legislation that added Chapter 15 and Section 1523(a), Congress enacted Section 561(d)'s limited application of the Section 546(e) safe harbor to foreign representatives "to the same extent" as it applied to domestic trustees. Congress thereby simply ensured that the safe harbor would apply evenly to domestic avoidance powers regardless of who exercised them—a domestic trustee or a foreign representative. Nothing in the design or history of those amendments to the Code suggests that Congress also meant to apply the safe harbor— for the first time—extraterritorially, to foreign avoidance claims arising under foreign law and targeting foreign transfers.

2. All of that should have been more than enough for the district court to conclude that Section 561(d) comes nowhere near expressing a clear intent to apply the Section 546(e) safe harbor extraterritorially. But even apart from that straightforward statutory analysis, the district

court fundamentally erred in thinking that it needed to stretch Section 561(d) to give it any "effect." Section 561(d) still would have effect in Chapter 15 cases even if Section 1523(a) were repealed.

Ironically, the bankruptcy court's decision on this makes that clear. As explained above, the bankruptcy court's ruling on this issue rested on the parenthetical at the end of Section 561(d): "such enforcement [is] not to be limited based on the presence or absence of assets of the debtor in the United States." The bankruptcy court thought this parenthetical refers to the "enforcement" of certain close-out rights, which are referenced earlier in the same subsection and in Section 561(a)—not to avoidance powers at all. *Fairfield II*, 596 B.R. at 310-11.

Imagining a statute *without* Section 1523 shows the folly of concluding that Section 561(d) is meaningless unless Section 546(e) applies extraterritorially. Absent Section 1523(a), Section 561(d) would make sense as applying only to a particular kind of avoidance power not at issue in this case—namely, the power of *domestic* trustees to avoid "close-out" or "netting" transactions. The overall concern of Section 561 is with close-out transactions, and, in that context (and absent Section 1523), Section 561(d) would simply require equal treatment of and limits

63

on the power of domestic trustees to avoid close-out transfers, whether those powers are exercised in cases under Chapter 15 or Chapters 7 and 11. There would be no question of applying the general Section 546(e) safe harbor to *foreign* avoidance powers exercised in Chapter 15 cases.[10]

So, even putting Section 1523 aside, the absolute *least* that can be said is that Section 561(d) can *plausibly* be read as not extending Section 546(e) to foreign transfers. And that is sufficient to leave the presumption against extraterritoriality in place. *See Validus Reinsurance, Ltd. v. United States*, 786 F.3d 1039, 1041 (D.C. Cir. 2015) ("Because both parties offer plausible interpretations, we conclude that the text of the statute is ambiguous with respect to its application to wholly foreign retrocessions. The ambiguity is resolved upon applying the presumption against extraterritoriality because there is no clear

---

[10] Beyond the bankruptcy court's self-defeating demonstration of how Section 561(d) may concern close-out transfers—which no party contends are at issue in this litigation—its reasoning fails of its own accord. The "enforcement" parenthetical refers to the *enforcement* of close-out contracts and rights, not to *limitations on avoidance* powers. What is more, the parenthetical was intended to solve an uncertainty about *in rem* jurisdiction, not to signal U.S. code application to foreign transfers. *See, e.g., Haarhuis v. Kunnan Enters., Ltd.*, 177 F.3d 1007, 1010-12 (D.C. Cir. 1999); *cf. United States v. Prado*, 933 F.3d 121, 137 (2d Cir. 2019). None of that approaches the sort of clear statement needed to rebut the *Morrison* presumption *as to Section 546(e).*

indication by Congress that it intended the excise tax to apply to premiums on wholly foreign retrocessions.").

Indeed, even apart from *that* reading (which itself doubly confirms that the district court erred in ruling that the statute reaches extraterritorially to foreign transfer), and assuming *arguendo* that Section 561(d) applies the Section 546(e) safe harbor to avoidance claims brought under foreign law in Chapter 15 cases, it *still* would not be necessary to read Section 561(d) as applying the safe harbor to foreign *transfers* in order to give it "effect." The safe harbor could shield *domestic transfers* sought to be avoided by *foreign representatives* under *foreign sources of law*, without also shielding *foreign transfers* from avoidance. That reading would both give Section 561(d) "effect" and be more consistent with the statute's equal treatment mandate. Again, whether or not that is the statute's best reading, at a minimum it underscores the lack of a clear statement rebutting the presumption against applying the statute extraterritorially to reach foreign transfers.

3. Looking more broadly, the district court's erroneous interpretation of Section 561(d) also clashes with the larger aims of Congress as expressed and embodied in Chapter 15. When it enacted

65

Chapter 15, Congress was clear that it intended to provide a new forum for claims related to foreign bankruptcy cases, but did not intend to alter foreign substantive law. The statute is designed to promote "cooperation between courts of the United States" and "the courts and other competent authorities of foreign countries involved in cross-border insolvency cases." 11 U.S.C. § 1501(a)(1). Congress expressly provided that "additional assistance to a foreign representative" was to be "consistent with the principles of comity." 11 U.S.C. § 1507. Indeed, "in revising Chapter 15's predecessor, § 304, Congress elevated comity from a factor under § 304(c) to the introductory text of § 1507 'to make it clear that it is the central concept to be addressed.'" *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1064 (5th Cir. 2012) (quoting H.R. Rep. No. 109-31, pt. 1, at 109 (2005)). The "importance of comity in cross-border insolvency proceedings" is thus "a central tenet of Chapter 15." *In re Cozumel Caribe, S.A. de CV*, 482 B.R. 96, 113 (Bankr. S.D.N.Y. 2012).

Comity in a Chapter 15 proceeding requires "respect for the laws and judgments of other nations." *SPhinX*, 351 B.R. at 112. The decision below flouts that principle. By reading the safe harbor to cover foreign law claims and foreign transactions, the district court in essence refused

66

to apply foreign law as adopted and enforced by a foreign sovereign. Instead of applying BVI law—which contains no safe harbor for securities settlement payments—to foreign transfers made by BVI entities, the district court applied a safe harbor grounded in U.S. law and aimed at domestic transaction. That was a substantive departure from BVI law, contrary to the fundamental commitments of Chapter 15. *See In re Condor*, 601 F.3d at 327 ("Congress did not intend to restrict the powers of the U.S. court to apply the law of the country where the main proceeding pends.").

\* \* \*

Section 561(d) comes nowhere near making a "clear statement" that the Section 546(e) safe harbor has "extraterritorial effect." *Morrison*, 561 U.S. at 265. The text, structure, and history of the Code indicate that Congress enacted Section 561(d) simply to ensure that the safe harbor that already applied to domestic avoidance claims asserted by domestic trustees would likewise apply to foreign representatives' newly granted power to assert those same domestic avoidance claims. In ruling otherwise, the district court ruled overlooked the domestic avoidance powers that the Code grants foreign representatives and also ignored the

67

crucial function of the foreign avoidance mechanism in the larger scheme of Chapter 15. At a minimum, the statute is ambiguous about the application of the safe harbor to foreign avoidance powers—and that alone leaves the presumption against extraterritoriality in place.

### B. Applying the Section 546(e) Safe Harbor to Foreign Avoidance Claims Is Not a Domestic Application.

The district court doubled down on its error in holding that, even if the presumption against extraterritorial application were not overcome, "the application of § 546(e) here is a domestic one that passes step two." SPA 31. If a statute does not clearly rebut the presumption against extraterritorially, then a court must "determine whether the case involves a domestic application of the statute" by "looking to the statute's 'focus.'" *RJR Nabisco*, 136 S. Ct. at 2101. "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.*

Here, the answer should have been straightforward. As the Supreme Court has explained, "the focus of the § 546(e) safe-harbor

68

inquiry [is] on the transfer." *Merit Mgmt.*, 138 S. Ct. at 895-96. That makes sense, given that the point of the safe harbor is to ensure that certain settled domestic securities transfers would not be unwound and cause "displacement" in securities markets "in the event of a major bankruptcy." *Enron*, 651 F.3d at 334; *accord In re Tribune* 499 B.R. at 317 (Congress enacted Section 546(e) "to enhance the stability of the nation's financial markets"). And, here, the relevant transfers that the Liquidators seek to avoid occurred abroad—which means that "the conduct relevant to the focus" of the statute "occurred in a foreign country." *RJR Nabisco*, 136 S. Ct. at 2101. Extending the protection of the domestic safe harbor to those foreign transfers would thus be an impermissible extraterritorial application of a domestic statute. *See id.*

Rather than follow that straightforward reasoning and give effect to the Supreme Court's clear holding, however, the district court took a circuitous path to conclude that the focus of the safe harbor is "to limit the foreign representative's avoidance power in the United States court." SPA 34. That conclusion fails for a number of reasons. At the outset, it essentially begs the question of extraterritoriality—the whole issue at step one was whether the statute indeed applies the domestic safe harbor

69

to limit a foreign representative's avoidance powers. In any event, the district court purported to distinguish the Supreme Court's discussion of the focus of the safe harbor on the ground that *Merit Management* did not address extraterritoriality. SPA 34. But that is just because it had no reason to discuss extraterritoriality and very good reasons to discuss the "focus" of the safe harbor. And "focus" is not some kind of chameleon that changes for extraterritoriality purposes as opposed to purposes of "ordinary" statutory construction. Applying the presumption against extraterritoriality is just a species of statutory construction, and a statute's focus is a statute's focus. "The focus of a statute is the object of its solicitude, which can include the conduct it seeks to regulate, as well as the parties and interests it seeks to protect or vindicate." *WesternGeco LLC V. ION Geophysical Corp.*, 138 S. Ct. 2129, 2137 (2018) (alterations accepted; quotation marks omitted). *Merit Management*'s conclusion that the "object" of the safe harbor is the transfer to be avoided therefore provides the answer to the extraterritoriality "focus" inquiry; that the dispute in *Merit Management* was not itself about extraterritoriality is irrelevant.

70

The district court also brushed aside this Court's recent decision in *In re Picard*, 917 F.3d 85 (2d Cir. 2019), which addressed the "focus" of the Bankruptcy Code's avoidance provisions in the context of an extraterritoriality inquiry. In accord with *Merit Management*, this Court held that the "focus" of the Code's substantive avoidance powers is the site of the initial transfer—which, again, was overseas for the transfers relevant to this dispute. *Id.* at 97-100. The district court purported to distinguish *Picard*, this time because it dealt with the Bankruptcy Code's substantive avoidance provisions rather than the safe harbor. SPA 34-35. That is even less of a difference than the thin reed on which the court rested its distinction of *Merit Management*. After all, substantive avoidance powers and the safe harbor are "two sides of the same coin." *Merit Mgmt.*, 138 S. Ct. at 894. Thus, Congress' "focus" in the safe harbor is logically the same as its "focus" in the substantive avoidance powers—namely, the site of the transfer.

Taken together, *Picard* and *Merit Management* should have led the district court to conclude that the "focus" of the statute in this case was the site of the foreign transfers that the Liquidators are seeking to avoid. Instead, in concluding that the focus of the statute is "to limit the foreign

71

representative's avoidance power in the United States court," SPA 34, the court relied entirely on an inapposite case, *Force v. Facebook*, 934 F.3d 53 (2d Cir. 2019), interpreting an unrelated statute, namely Section 230 of the Communications Decency Act. The district court apparently thought that *Force* adopted a categorical rule that *any* provision limiting liability has the forum court as its "focus." SPA 33-34. But *Force* did no such thing. In fact, *Force* went out of its way *not* to adopt a categorical rule regarding "statutes that merely limit civil liability," and instead "conclude[d] *from the text of Section 230*, [and] particularly the words 'shall be treated,' that" the conduct regulated by that statute ("the litigation of civil claims in federal courts") "occurs entirely domestically in its application here." 934 F.3d at 74 (emphasis added). That textual analysis has zero application to this case, and for the simplest of reasons: The phrase "shall be treated," which formed the basis of the *Force* decision, appears nowhere in Section 546(e) or Section 561(d).

That is not the only problem with the district court's conclusion. A categorical rule that the "focus" of all statutes governing the scope of powers in U.S. courts necessarily is the forum court would be in severe tension with Supreme Court precedent. As the Supreme Court held in

72

*Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013), the focus of the

Alien Tort Statute, which provides that "[t]he district courts shall have

original jurisdiction" over certain matters, is the location *of the actionable*

*conduct*, not the court.  *Id.* at 113, 124-25.

Even putting that complication aside, the district court simply

ignored the fact that, unlike in *Force*, extraterritorial application of the

safe harbor here would "increase the possibility of international friction."

934 F.3d at 73.  As explained, applying the safe harbor to foreign claims

and extraterritorial transactions would impose substantive limits on

foreign law when foreign representatives seek to enforce it in U.S. courts.

Foreign bankruptcy courts would lose the United States as a cooperative

ally and instead see meritorious foreign law claims by foreign debtors to

avoid foreign transfers between foreign entities dismissed in U.S. courts

because of U.S. policy on the U.S. securities markets.  Such unfavorable

treatment of foreign sovereigns is precisely what *Force* sought to avoid.

In sum:  The focus of the Section 546(e) safe harbor is on the

transfer sought to be avoided.  The relevant transfers occurred in a

foreign jurisdiction.  The Bankruptcy Code's domestic safe harbor

73

therefore cannot be applied extraterritorially to that foreign conduct. The district court's erroneous ruling otherwise should be reversed.

### C. Even If the Safe Harbor Applied, the Liquidators' Claims Would Fall Within the Exception for Intentional Fraudulent Transfers.

Even if the safe harbor could apply extraterritorially to foreign avoidance powers (it cannot), the decision below still should be reversed for the independent reason that the Liquidators' claims fall within the exception to the safe harbor for intentional fraudulent transfers.

The Section 546(e) safe harbor provision expressly creates an exception to its protective scope for claims "under section 548(a)(1)(A) of [the Code]." 11 U.S.C. § 546(e). Section 548(a)(1)(A) in turn allows "[t]he trustee [to] avoid any transfer" if "the debtor voluntarily or involuntarily … made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was … indebted." 11 U.S.C. § 548(a)(1)(A). As the district court explained, this exception extends to foreign law claims for intentional fraudulent transfers. SPA 36-37; *accord Bankr. Est. of Norske Skogindustrieer ASA v. Cyrus Cap. Partners, L.P. (In re Norske*

74

*Skogindustrier ASA*), 2021 WL 1687903, at \*36 (Bankr. S.D.N.Y. Apr. 29, 2021).

The Liquidators' BVI avoidance claims allege actual fraud and therefore fall within the exception to the safe harbor. Their complaints alleged that the redemption payments were transferred with the intent to hinder, delay, or defraud the Funds' creditors because the Citco Administrator had motive (exorbitant fees calculated as a percentage of the inflated NAVs certified by the Citco Administrator itself, *see* Compl. ¶¶ 67-68) and opportunity (authority to determine the NAVs, *see* Compl. ¶¶ 36, 45) to commit—or, at minimum, turn a blind eye to—fraud. Those allegations easily satisfy the various tests for sufficiently pleading intentionally fraudulent transfers. *See Emps.' Ret. Sys. of Gov't Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015); *see also In re Lyondell Chem. Co.*, 554 B.R. 635, 652 (S.D.N.Y. 2016).

There is no dispute that the Liquidators pled the Citco Administrator's fraudulent intent; nor is there a dispute that the Citco Administrator's fraudulent intent is attributable to the Funds, which authorized the transfers. Despite those allegations of fraudulent intent,

75

the district court undertook an excessively formalistic analysis to hold that the Liquidators' claims do not fall within the safe harbor exception because (it concluded) claims for unfair preference under Section 245 of the BVI Insolvency Act or undervalue transactions under Section 246 of the same do not have actual fraudulent intent as an element. That parsing of BVI statutes by a U.S. court fails to accord comity to foreign law.

For one thing, it misstates foreign law. Claims under Section 246 of the BVI Insolvency Act *cannot proceed* if the debtor entered a transaction in "good faith." BIA § 246(1); *see also Derry v. Peek* [1889] 14 App. Cas. 337 (HL), 374 (fraud does not constitute good faith); *Royal Brunei Airlines v. Tan* [1995] 2 A.C. 378 (PC), 389-90 (dishonesty does not constitute good faith). As a broader matter, rather than create a U.S. forum for foreign law claims in aid of foreign bankruptcy proceedings, the district court's reading turns Chapter 15 cases into a mechanism for enforcing only foreign law that precisely corresponds to claims under the U.S. Bankruptcy Code. It also turns the United States into a safe harbor even for *intentional* fraudulent transactions, contrary to Congress' intent—as illustrated by the fact that Congress has included a carve-out

76

for intentional fraudulent transfers in every version of Section 546(e) since the predecessor to that statute was first enacted in 1978. *See* Pub. L. No. 95-598, 92 Stat. 2549 (1978); Pub. L. No. 97-222, 96 Stat. 235 (1982); Pub. L. No. 98-353, 98 Stat. 333, 377 (1984); Pub. L. No. 101-311, 104 Stat. 267 (1990); Pub. L. No. 109-8, 119 Stat. 23 (2005); Pub. L. No. 109-390, 120 Stat. 2692, 2697-98 (2006).

Against that backdrop, the district court's reading implies that Congress decided, without explanation, that intentional fraudulent transfers would not be voidable when challenged under a foreign law with elements that do not correspond exactly to a claim under U.S. law. Such a reading would "lend a measure of protection to debtors to hide assets in the United States out of the reach of the foreign jurisdiction," *In re Condor*, 601 F.3d at 327," and would "risk the U.S. … providing a safe haven for looters and fraudsters of foreign company assets that are transferred to the U.S. and who use banks or brokers to help carry out their schemes," *Norske*, 2021 WL 1687903, at *36 & n.38.[11]

---

[11] The bankruptcy court's somewhat different reasoning on this issue suffers from the same basic defects. The bankruptcy court thought that only a Section 548(a)(1)(A) claim falls into the exception, and that such a claim is not available here. *Fairfield III*, 2020 WL 7345988, at *6-9. But

An approach that better serves the comity goals underlying Chapter 15, the policies behind the safe harbor exception, and the statutory requirements of Section 546(e) would be to allow foreign law avoidance claims when the facts alleged in support of those claims include actual intent to hinder, delay, or defraud creditors.  *See* 11 U.S.C. § 1507(b)(3) (comity concerns of Chapter 15 include "prevention of preferential or fraudulent dispositions of property of the debtor"). Assuming that the safe harbor applies to foreign law claims or foreign transactions at all (it does not), this approach gives at least some effect to foreign law in the most egregious situation: cases of intentional fraud.

Under this approach, the Liquidators' complaint easily falls within the exception to the safe harbor.  In addition to alleging plausible claims under BVI law, it alleges the intentionally fraudulent transfers executed by the Citco Administrator and attributed to the Funds.  Because the Liquidators' avoidance claims fall within the exception to the safe harbor,

---

that not only raises the same comity concerns, it takes an exception focused on whether a *transfer* is fraudulent and narrows it to just the label on a claim, even though the Code elsewhere focuses specifically on certain types of claims.  The fact that Congress used "cause of action" elsewhere in the Code confirms that its decision *not to* here has meaning.

the decisions of the courts below should be reversed, regardless of this Court's determination regarding extraterritoriality.

### III. The District Court Erred In Affirming The Dismissal Of The Liquidators' BVI Common Law And Contract Claims.

As noted at the outset, in addition to asserting avoidance claims under BVI statutory law, the Liquidators also brought a number of BVI Common Law and Contract Claims. Those claims were predicated on allegations that Citco, Fairfield's agent, fraudulently authorized redemptions based on NAVs that it knew were massively inflated. *Fairfield II*, 596 B.R. at 289; JA 457-58, 464 (Mot. to Amend at 13-14, 20). The BVI Common Law and Contract Claims provide a wholly independent basis for recovering investor funds: Even if (contrary to the arguments above) the district court were correct to apply the domestic bankruptcy safe harbor to the *statutory* avoidance claims, it still should have allowed the BVI Common Law and Contract Claims to proceed and enable the Liquidators to recover the fraudulently inflated returns.

The reason is simple: Under a decision known as *Weavering II*—on-point precedent from the BVI's highest judicial authority—NAVs that were fraudulently inflated by a fund's agent are not binding, and fraudulently inflated redemption payments may be disgorged under BVI

79

contract and common law (to which the bankruptcy safe harbor does not apply). *See Skandinaviska Enskilda Banken AB (Publ) v. Conway (as Joint Official Liquidators of Weavering Macro Fixed Income Fund Ltd.)* [2019] UKPC 36 ("*Weavering II*"), SPA 417-66; SPA 36, 40. Despite that precedent, the district court affirmed dismissal of the Liquidators' Common Law and Contract Claims, based on an unsustainable reading of BVI law. This Court should reverse and reinstate the BVI Common Law and Contract Claims regardless of how it decides the bankruptcy safe harbor issue.[12]

*Weavering II* plainly dictates that the Liquidators' Common Law and Contract Claims should have been allowed to proceed. In *Weavering II*, the directors of a Cayman Island fund delegated the authority to determine the NAVs to the fund manager. SPA 420, 423, 429 ¶¶ 5, 11, 24. The fund manager had "fraudulently inflat[ed] the net asset value … of the [fund] by entering into interest rate swaps he knew to be worthless," which gave "the impression of sustained growth when in reality the [fund] was suffering large losses." SPA 420 ¶ 5. By the

---

[12] The Privy Council decided *Weavering II* after the bankruptcy court decision in question, so we focus in the remainder of Part III on the district court's handling of that dispositive decision.

time the directors discovered the fraud, the fund had more than $220 million of redemption requests outstanding that it could not pay in full. *Id.* The fund was placed into liquidation, SPA 423 ¶ 11, and the liquidators sought to recover redemptions. A central issue in the case was "whether the NAV was binding" in the face of fraud, given that the articles of association stated that the valuations were "binding on all persons." SPA 428, 430 ¶¶ 21, 27. The Privy Council held that because the "valuation of the assets" in the NAVs was "dishonest," the NAVs were not "binding." SPA 430 ¶ 27. Thus, under *Weavering II*, when there is "fraud … internal to the company which is seeking to rely on the contract," "such a fraudulent determination [of a NAV] could not bind redeeming shareholders." SPA 430 ¶ 27.[13]

That holding controls here. There is no debate that the Liquidators have plausibly alleged that Citco, which was authorized to determine NAVs and issue redemption payments, committed egregious

---

[13] *Weavering II* dealt only with statutory claims, but the Privy Council determined that common law restitution governed the recovery for such preferences under the statute, which did not itself provide for a remedy. SPA 305-07 ¶¶ 74-81. Here, to the extent relevant, the Liquidators have done what *Weavering II* said was required: They have sued the relevant redeeming shareholders and notified all shareholders, and they seek to distribute all overpayments to the relevant creditors. *See* SPA 431 ¶ 30.

81

fraud: Upper management at Citco silenced anyone who raised the specter of Madoff's fraud, *see* Compl. ¶¶ 50-55, and after identifying red flags that raised its own suspicions, Citco stopped trying to verify the existence of the Funds' assets, minimized its own exposure to BLMIS, *see* Compl. ¶¶ 57-65, and negotiated an 800% increase in its custodian fees—directly profiting from its ongoing fraudulently certified NAVs, Compl. ¶¶ 67-68. Nor is there any debate that the rampant fraud committed by the Funds' agent was internal to the Funds. *See* JA 1295 (Mortimore Decl. I ¶ 74) (Defendants' expert describing the "alleged bad faith of Citco, [the Directors'] agent," as "fraud … internal" to the Funds). Under *Weavering II*, therefore, the NAVs are not binding, full stop, and the Liquidators' Common Law and Contract Claims should be allowed to proceed. SPA 430, 448, 457-58, 461 ¶¶ 27, 80, 111, 124.

In ruling otherwise, the district court concluded that *Weavering II* gave way to Section 31(1)(e) of the BVI Companies Act, which provides, in relevant part, that a company "may not assert against a person dealing with the company" that "a document issued on behalf of a company by a director, employee or agent of the company with actual or usual authority to issue the document is not valid or not genuine." SPA 286. In the

82

district court's view, Section 31(1)(e) means that the Liquidators cannot challenge whether the NAVs that Citco fraudulently certified are binding. SPA 44. But BVI courts *have already rejected that very argument*; in fact, they have held Section 31 inapplicable *to these very Liquidators' claims.* In earlier litigation in the BVI courts, a number of BVI Defendants presented the same argument that the district court accepted here to the Eastern Caribbean Court of Appeals—and lost. SPA 82, (*ABN AMRO Fund Servs. (Isle of Man) 24 Nominees Ltd. v. Krys*, Nos. BVIHCMAP: 11-16, 23-28 of 2016 (Dkt. 1603) at 30) ¶ 47. That should have been the end of the matter. After all, neither Defendants, their expert, the district court, nor the bankruptcy court cited *any* authority applying Section 31 to analogous claims—because none exists.

The BVI courts' rejection of this argument makes perfect sense. Section 31(1)(e) only limits companies from asserting that documents issued "with actual or usual authority" are "not valid or not genuine." SPA 286. Here, the relevant documents are the NAV certificates that Citco, the Funds' Administrator, certified. But the Liquidators challenge *neither* whether Citco acted with authority *nor* whether the certificates were valid or genuine. Instead, the Liquidators challenge only whether

83

Citco certified the NAVs in "good faith," as required to make the certificates "binding." And neither "valid" nor "genuine" means "binding." Indeed, the BVI Companies Act elsewhere uses the word "binding" *right next to the word* "*valid*," demonstrating that the terms are not synonymous. *See, e.g.*, BCA § 103(2) (providing when a contract "is valid and is binding on the company"); BCA § 66(4)(a) (providing when a mortgage is "valid and binding on the company"). Because BVI law "treat[s] words as adding something rather than as mere surplusage," "valid" and "genuine" must mean something different than "binding." *S.A. Mar. et Commerciale of Geneva v. Anglo-Iranian Oil Co.* [1954] 1 W.L.R. 492 at 495. The district court's contrary conclusion is wrong.[14]

It also yields absurd results. If a bank employee issued a statement mistakenly crediting a client money, the district court's reading would not allow the bank to challenge that error. That cannot be, and is not, BVI law. Section 31 prevents a company from disputing whether something like a governing document shown to a counterparty to

---

[14] American law mandates the same result: When "Congress uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." *Mary Jo C. v. N.Y. State & Loc. Ret. Sys.*, 707 F.3d 144, 156 (2d Cir. 2013) (quoting *Cruz-Miguel v. Holder*, 650 F.3d 189, 196 (2d Cir. 2011)).

84

consummate a transaction is real. *E.g.*, SPA 281-82 (*Potential Might Grp.
Ltd. v. GST Int'l Mgmt. Ltd.* [2011] Claim No: BVIHC (COM) 2011/0120)
¶ 22. It does not render every corporate document, including those issued
in bad faith, binding.

Making matters worse, the district court's holding misunderstands
what Section 31 of the BVI Companies Act is all about. Section 31 is
modeled after the "indoor management rule." SPA 167-68 (*IsZo Capital
LP v. Nam Tai Prop. Inc. et al.* [2022] Claim No. BVIHC (COM)
2020/0165) ¶ 12; *see* Ontario Business Corporations Act, 1982 § 19
(provision materially similar to BCA § 31, titled "[i]ndoor management
rule"). That rule provides that a third party is "not bound to make any
inquiry into the authority of [an] agent if compliance with the
corporation's documents would have given the agent such authority."
Yedidia Z. Stern, *Corporate Liability for Unauthorized Contracts—
Unification of the Rules of Corporate Representation*, 9 U. Pa. J. Int'l Bus.
L. 649, 657 (1987); 1 Digest of Commercial Laws of the World § 8:27
("[T]he 'indoor management rule[]' … provides that a corporation may not
assert against a person dealing with the corporation that … a person held
out by the corporation as a[n] … agent of the corporation has not been

85

duly appointed or does not have authority to exercise powers and perform duties."). Again, the Liquidators do not challenge Citco's authority to issue NAV certificates; they challenge whether the NAVs are binding in light of Citco's fraud and bad faith. Under *Weavering II*, they are not.

Contrary to the district court's ruling, the *ex turpi* doctrine does not change that conclusion. In general, *ex turpi* prevents a court from allowing a plaintiff to recover when the cause of action is based on an illegal or immoral act. JA 1751.49 (Moss Decl. II ¶ 93). It applies flexibly, not "mechanistically," to ensure that the application is in "the public interest." SPA 215 (*Patel v. Mirza*, [2016] UKSC 42 ¶ 101); JA 1751.50-51 (Moss Decl. II ¶ 97). The district court concluded that *ex turpi* prevents the Liquidators from "benefit[ing]" from the fraud of the Funds' agent Citco. SPA 44, 47. That conclusion was erroneous for a host of reasons—not least of which that the Liquidators' claims do not entail "benefiting" from the fraud of Citco, which means that *ex turpi* is wholly inapplicable. JA 1751.49-50 (Moss Decl. II ¶ 95). No one would say that a bankruptcy trustee "benefits" from the fraud underlying a fraudulent transfer, even though the fraud is what makes the transfer avoidable. The same common-sense principle underlies *Weavering II*. As the Privy

Council held in *Weavering II*, "the fact that the directing mind of the Company was guilty of fraud does not render illegal *the liquidators'* attempts to recover payments made unlawfully in the lead up to insolvency." SPA 461 ¶ 124 (emphasis added). Because the Liquidators' claims seek the same brand of restitutionary relief as did the liquidators in *Weavering II*, *ex turpi* is wholly inapplicable.

Moreover, even if *ex turpi* were somehow relevant, BVI courts will not apply the doctrine when doing so would be contrary to the public interest—and, here, "public policy dictates that the courts should assist the liquidators" in recovering for innocent creditors. SPA 461 ¶ 124. The Funds are in liquidation; any recovery is thus for the benefit of innocent creditors. And, as the Privy Council explained in *Weavering II*, "the law requires the repayment of the money to the liquidators" to avoid the "injustice" of redeeming investors "benefiting from the [over]payment at the expense of the [fund's] creditors." SPA 448 ¶ 80. In cases such as this one, then, restitution is "necessary to complete the process of undoing the unfair advantage" that redeemers obtained at non-redeemers' expense. SPA 448 ¶ 80. Because the public interest supports

87

the Liquidators' recovery, the *ex turpi* doctrine cannot stand in the way—as numerous BVI cases confirm.[15]

That is why *Kingate Global Fund v. Kingate Mgmt. Ltd.* [2015] SC (Bda) 65 Com, [157], the one case the district court cited in support of its *ex turpi* holding, is unavailing. Unlike in that case, the Liquidators here are not "tak[ing] advantage of [the Funds'] own breach"; they are seeking to recover solely for the benefit of the fraud's victims: innocent creditors. That is also why the American doctrine of *in pari delicto* is off-base. *Contra* SPA 44 n.37. As described above, *ex turpi* is a flexible doctrine that takes the public interest into account, unlike the *in pari delicto*

---

[15] *See, e.g., Jetivia SA v. Bilta (UK) Ltd. (in liquidation)* [2015] UKSC 23 ¶ 129 (Lords Toulson & Hodge) ("The context is always important. In the present case the public interest which underlies the duty that the directors of an insolvent company owe for the protection of the interests of the company's creditors … requires axiomatically that the law should not place obstacles in the way of its enforcement."); SPA 288 (*In re Stanford Int'l Bank (In Liquidation)* [2015] Claim No: ANUHCV2009/0149 ¶ 157) (allowing liquidators for the bank to bring claims to recover for creditors "even if *ex turpi causa*" could properly be raised against the bank because "[t]here is no room for an *ex turpi causa* defence in respect of claims arising from the breach of duties owed to the primary victims of the fraud").

doctrine. And because the Liquidators here are seeking to recover for innocent creditors, the public interest favors their recovery.[16]

Finally, *ex turpi* does not apply here because parties may contract around it, as the parties did here by making good faith a condition precedent to the NAVs being binding in the Funds' Articles of Association. The Articles expressly state that "[a]ny certificate as to the [NAV] … given in good faith by or on behalf of the Directors shall be binding on the parties." JA 272 (Articles § 11(1)). Thus, any certificates as to the NAV not given in good faith—like those fraudulently certified by Citco—are not binding under the express terms of the parties' agreements.

Despite that clear statement, the district court thought that it "is not obvious from the contract" that "NAVs given in bad faith shall not be binding," and the court thus declined to "write [those] terms into Article 11." SPA 45 n.38. It further concluded that, "even assuming that under

---

[16] In any event, the U.S. Supreme Court has recognized the "the inappropriateness of invoking broad common-law barriers to relief where," as here, "a private suit serves important public purposes." *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 138 (1968), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984).

89

Article 11, the NAVs issued in bad faith are not binding, it only addresses the legal effect of bad faith NAVs; it says nothing about Citco's authority to issue those NAVs." SPA 45. The first conclusion is erroneous, and the second actually supports the Liquidators.

First, the district court's interpretation of Article 11 defies logic and basic principles of interpretation. BVI courts imply terms in contracts when the term "is so obvious so as to go without saying" or "where the contract would lack 'commercial or practical coherence' without that term." JA 1751.41 (Moss Decl. II ¶ 82) (quoting *Marks & Spencer plc v. BNP Paribas Secs. Servs. Tr. Co. (Jersey) Ltd.* [2015] UKSC 72, ¶ 21); JA 1311 (Mortimore Decl. I ¶ 120). So it is here. Under the district court's contrary interpretation, all NAVs would be binding—including those issued in bad faith—and the Articles' statement concerning NAVs "given in good faith" would have no significance. BVI law (not to mention common sense) prohibits such an interpretation. *See* SPA 400-01 (*Tillman v Egon Zehnder Ltd.* [2019] UKSC 32) ¶¶ 52-53 (declining counsel's invitation to read contract term as "casual surplusage"); *S.A.*

*Mar. et Commerciale of Geneva v. Anglo-Iranian Oil Co.* [1954] 1 W.L.R. 492 at 495 (same).[17]

Second, the fact that Article 11 "only addresses the legal effect of bad faith NAVs" and "says nothing about Citco's authority to issue those NAVs," SPA 44-45, *is the Liquidators' point.* Because the legal effect of the NAVs is that they are not binding, the Liquidators are entitled under *Weavering II* to recover fraudulently inflated redemptions under BVI law regardless of whether Citco had authority to issue the NAVs. *See* SPA 430, 446-48 ¶¶ 27, 74-81.

\* \* \*

The district court wrongly brushed aside binding BVI precedent, based on a misreading of a BVI statute and a misapplication of the BVI common law doctrine of *ex turpi.* Adding insult to injury, the district court failed to "protect[] and maximiz[e] the value of the debtor's assets," 11 U.S.C. § 1501(a)(4), failed "to maximize assistance to a foreign court conducting the main proceeding," *In re Fairfield Sentry Ltd. Litig.*, 458 B.R. at 679, *and* failed to accord "comity and respect for the judgments

---

[17] So does American law. *See, e.g.*, *Manley v. AmBase Corp.*, 337 F.3d 237, 250 (2d Cir. 2003) (rejecting interpretations that "render contract provisions meaningless or superfluous").

and laws of other nations," *In re Cozumel Caribe*, 482 B.R. at 114. This Court should reverse these basic errors, which not only run counter to the parties' agreements and the core purpose of Chapter 15 cases, but perniciously grant some creditors a windfall at the sole expense of others.

## IV. The Bankruptcy Court Erred In Ruling That The Liquidators Failed To State A Claim Under Section 246 Of The BVI Insolvency Act.[18]

The Liquidators plainly stated a Section 246 claim. Section 246 of the BVI Insolvency Act allows a liquidator to avoid an undervalue transaction, i.e., a transaction in which the transferor received nothing or "significantly less" in exchange for the value it transferred. BVI Insolvency Act §246(1)(b).

In the bankruptcy court's telling, Section 246 is analogous "to a constructive fraudulent transfer under state and federal law." *Fairfield II*, 596 B.R. at 302. That is true as far as it goes—but it does not go nearly as far as the bankruptcy court took it. Contrary to the bankruptcy court's ruling, BVI law does not require that a defendant "knew or should have known" that the redemption transactions were undervalued. *Id.* at 305. Binding BVI precedent is inconsistent with the

---

[18] The district court did not reach this issue.

92

bankruptcy court's conclusion that a claim will lie under Section 246 of the BVI Insolvency Act only when "the value of [a transaction] was uncertain at the time it was given, and a post transaction event resolved the uncertainty and rendered [the transaction] worthless." *Id.* at 304.

The bankruptcy court reached the opposite conclusion only by misreading *Phillips v. Brewin Dolphin Bell Lawrie* [2001] BCC 864. In the bankruptcy court's telling, *Phillips*—which undisputedly held that judicial officers may "consider events that occurred after the closing [of a transaction] which shed light on the value of the consideration given at the time of the closing"—was a limited decision that "did not establish a general rule that a court may value an asset with the benefit of hindsight." 596 B.R. at 304. But *Phillips* is not so fact-bound. On the contrary, Lord Scott held unequivocally that, under Section 246, "reality should … be given precedence over speculation" when considering "the valuation of the consideration for which a company has entered into a transaction." *Phillips* ¶ 22. And while the circumstances of that case involved allegations of fraud (as does this case), nothing in Lord Scott's decision limited the scope of the rule he adopted to cases in which a

93

defendant knew or should have known that a transaction was undervalued.

When it comes to undervalue transactions, BVI law looks to reality with the benefit of hindsight.  Because the bankruptcy court declined to do so based on a half-baked analogy to domestic law, its decision that the Liquidators failed to state a Section 246 claim cannot stand.

## CONCLUSION

For the foregoing reasons, the Court should reverse and remand.

Dated:  January 27, 2023                    Respectfully submitted,

|  |  |
|---|---|
| | /s/ Paul D. Clement |
| CAITLIN J. HALLIGAN | PAUL D. CLEMENT |
| DAVID ELSBERG | MATTHEW D. ROWEN |
| ANDREW R. DUNLAP | CLEMENT & MURPHY, PLLC |
| MICHAEL DUKE | 706 Duke Street |
| MAX H. SIEGEL | Alexandria, Virginia 22314 |
| SELENDY GAY | (202) 742-8900 |
| ELSBERG PLLC | |
| 1290 Avenue of the Americas | – and – |
| New York, New York 10104 | |
| (212) 390-9000 | DAVID J. MOLTON |
| | MAREK P. KRZYZOWSKI |
| | BROWN RUDNICK LLP |
| | Seven Times Square |
| | New York, New York 10036 |
| | (212) 209-4800 |

94

# CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

I hereby certify that:

1. This brief complies with the type-volume limitation of Local R. 32.1(a)(4)(A) because it contains 19,251 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Word 2016.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Century Schoolbook 2016 in 14-point font.

January 27, 2023

/s/Paul D. Clement
Paul D. Clement
