# 22-2101-bk(L),

## 22-2104-bk(CON),
## 22-2107-bk(CON),
## 22-2108-bk(CON),
## 22-2109-bk(CON), 22-2111-bk(CON), 22-2112-bk(CON),
## 22-2113-bk(CON), 22-2114-bk(CON), 22-2115-bk(CON),
## 22-2116-bk(CON), 22-2117-bk(CON), 22-2119-bk(CON),
## 22-2120-bk(CON),

*(For Continuation of Docket Numbers See Inside Cover)*

# United States Court of Appeals
*for the*
# Second Circuit

In Re: Fairfield Sentry Limited

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR APPELLANTS

DAVID J. MOLTON
MAREK P. KRZYZOWSKI
BROWN RUDNICK LLP
Seven Times Square
New York, New York 10036
(212) 209-4800

PAUL D. CLEMENT
MATTHEW D. ROWEN
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, Virginia 22314
(202) 742-8900

*Attorneys for Appellants*

22-2121-bk(CON), 22-2122-bk(CON), 22-2123-bk(CON),
22-2125-bk(CON), 22-2126-bk(CON), 22-2127-bk(CON),
22-2128-bk(CON), 22-2129-bk(CON), 22-2130-bk(CON),
22-2131-bk(CON), 22-2132-bk(CON), 22-2133-bk(CON),
22-2134-bk(CON), 22-2135-bk(CON), 22-2136-bk(CON),
22-2137-bk(CON), 22-2138-bk(CON), 22-2139-bk(CON),
22-2140-bk(CON), 22-2141-bk(CON), 22-2142-bk(CON),
22-2143-bk(CON), 22-2144-bk(CON), 22-2145-bk(CON),
22-2146-bk(CON), 22-2147-bk(CON), 22-2148-bk(CON),
22-2149-bk(CON), 22-2150-bk(CON), 22-2151-bk(CON),
22-2152-bk(CON), 22-2153-bk(CON), 22-2156-bk(CON),
22-2157-bk(CON), 22-2158-bk(CON), 22-2159-bk(CON),
22-2161-bk(CON), 22-2162-bk(CON), 22-2163-bk(CON),
22-2164-bk(CON), 22-2165-bk(CON), 22-2166-bk(CON),
22-2167-bk(CON), 22-2168-bk(CON), 22-2169-bk(CON),
22-2170-bk(CON), 22-2171-bk(CON), 22-2172-bk(CON),
22-2173-bk(CON), 22-2174-bk(CON), 22-2175-bk(CON),
22-2176-bk(CON), 22-2177-bk(CON), 22-2179-bk(CON),
22-2180-bk(CON), 22-2181-bk(CON), 22-2183-bk(CON),
22-2185-bk(CON), 22-2186-bk(CON), 22-2188-bk(CON),
22-2189-bk(CON), 22-2190-bk(CON), 22-2192-bk(CON),
22-2193-bk(CON), 22-2194-bk(CON), 22-2195-bk(CON),

22-2196-bk(CON), 22-2197-bk(CON), 22-2199-bk(CON),
22-2200-bk(CON), 22-2201-bk(CON), 22-2202-bk(CON),
22-2203-bk(CON), 22-2204-bk(CON), 22-2205-bk(CON),
22-2207-bk(CON), 22-2208-bk(CON), 22-2209-bk(CON),
22-2210-bk(CON), 22-2211-bk(CON), 22-2212-bk(CON),
22-2213-bk(CON), 22-2214-bk(CON), 22-2215-bk(CON),
22-2216-bk(CON), 22-2218-bk(CON), 22-2219-bk(CON),
22-2221-bk(CON), 22-2222-bk(CON), 22-2223-bk(CON),
22-2227-bk(CON), 22-2228-bk(CON), 22-2229-bk(CON),
22-2230-bk(CON), 22-2233-bk(CON), 22-2234-bk(CON),
22-2235-bk(CON), 22-2236-bk(CON), 22-2237-bk(CON),
22-2238-bk(CON), 22-2239-bk(CON), 22-2240-bk(CON),
22-2241-bk(CON), 22-2242-bk(CON), 22-2243-bk(CON),
22-2244-bk(CON), 22-2245-bk(CON), 22-2246-bk(CON),
22-2247-bk(CON), 22-2248-bk(CON), 22-2249-bk(CON),
22-2250-bk(CON), 22-2251-bk(CON), 22-2252-bk(CON),
22-2253-bk(CON), 22-2254-bk(CON), 22-2255-bk(CON),
22-2256-bk(CON), 22-2257-bk(CON), 22-2258-bk(CON),
22-2259-bk(CON), 22-2260-bk(CON), 22-2261-bk(CON),
22-2262-bk(CON), 22-2263-bk(CON), 22-2264-bk(CON),
22-2265-bk(CON), 22-2266-bk(CON), 22-2267-bk(CON),
22-2268-bk(CON), 22-2269-bk(CON), 22-2270-bk(CON),
22-2271-bk(CON), 22-2272-bk(CON), 22-2273-bk(CON),

22-2275-bk(CON), 22-2276-bk(CON), 22-2277-bk(CON),
22-2278-bk(CON), 22-2279-bk(CON), 22-2280-bk(CON),
22-2281-bk(CON), 22-2284-bk(CON), 22-2285-bk(CON),
22-2286-bk(CON), 22-2287-bk(CON), 22-2288-bk(CON),
22-2289-bk(CON), 22-2290-bk(CON), 22-2291-bk(CON),
22-2292-bk(CON), 22-2293-bk(CON), 22-2294-bk(CON),
22-2299-bk(CON), 22-2300-bk(CON), 22-2302-bk(CON),
22-2303-bk(CON), 22-2304-bk(CON), 22-2305-bk(CON),
22-2306-bk(CON), 22-2308-bk(CON), 22-2309-bk(CON),
22-2311-bk(CON), 22-2314-bk(CON), 22-2333-bk(CON),
22-2334-bk(CON), 22-2336-bk(CON), 22-2338-bk(CON),
22-2339-bk(CON), 22-2340-bk(CON), 22-2341-bk(CON),
22-2342-bk(CON), 22-2343-bk(CON), 22-2344-bk(CON),
22-2345-bk(CON), 22-2346-bk(CON), 22-2347-bk(CON),
22-2348-bk(CON), 22-2349-bk(CON), 22-2350-bk(CON),
22-2351-bk(CON), 22-2352-bk(CON), 22-2353-bk(CON),
22-2354-bk(CON), 22-2355-bk(CON), 22-2356-bk(CON),
22-2357-bk(CON), 22-2358-bk(CON), 22-2359-bk(CON),
22-2360-bk(CON), 22-2361-bk(CON), 22-2362-bk(CON),
22-2363-bk(CON), 22-2364-bk(CON), 22-2365-bk(CON),
22-2366-bk(CON), 22-2367-bk(CON), 22-2368-bk(CON),
22-2369-bk(CON), 22-2370-bk(CON), 22-2371-bk(CON),
22-2372-bk(CON), 22-2373-bk(CON), 22-2374-bk(CON),

22-2375-bk(CON), 22-2376-bk(CON), 22-2380-bk(CON),
22-2381-bk(CON), 22-2382-bk(CON), 22-2383-bk(CON),
22-2384-bk(CON), 22-2385-bk(CON), 22-2386-bk(CON),
22-2387-bk(CON), 22-2388-bk(CON), 22-2389-bk(CON),
22-2390-bk(CON), 22-2391-bk(CON), 22-2392-bk(CON),
22-2393-bk(CON), 22-2394-bk(CON), 22-2395-bk(CON),
22-2396-bk(CON), 22-2398-bk(CON), 22-2399-bk(CON),
22-2401-bk(CON), 22-2404-bk(CON), 22-2405-bk(CON),
22-2407-bk(CON), 22-2408-bk(CON), 22-2409-bk(CON),
22-2410-bk(CON), 22-2411-bk(CON), 22-2412-bk(CON),
22-2413-bk(CON), 22-2414-bk(CON), 22-2415-bk(CON),
22-2416-bk(CON), 22-2417-bk(CON), 22-2418-bk(CON),
22-2419-bk(CON), 22-2420-bk(CON), 22-2421-bk(CON),
22-2422-bk(CON), 22-2423-bk(CON), 22-2424-bk(CON),
22-2425-bk(CON), 22-2426-bk(CON), 22-2427-bk(CON),
22-2428-bk(CON), 22-2429-bk(CON), 22-2431-bk(CON),
22-2432-bk(CON), 22-2433-bk(CON), 22-2434-bk(CON),
22-2435-bk(CON), 22-2436-bk(CON), 22-2437-bk(CON),
22-2440-bk(CON), 22-2441-bk(CON), 22-2442-bk(CON),
22-2443-bk(CON), 22-2444-bk(CON), 22-2445-bk(CON),
22-2446-bk(CON), 22-2448-bk(CON), 22-2450-bk(CON),
22-2451-bk(CON), 22-2453-bk(CON), 22-2455-bk(CON),
22-2456-bk(CON), 22-2457-bk(CON), 22-2458-bk(CON),

22-2459-bk(CON), 22-2460-bk(CON), 22-2461-bk(CON),
22-2462-bk(CON), 22-2463-bk(CON), 22-2466-bk(CON),
22-2467-bk(CON), 22-2468-bk(CON), 22-2470-bk(CON),
22-2472-bk(CON), 22-2473-bk(CON), 22-2474-bk(CON),
22-2475-bk(CON), 22-2477-bk(CON), 22-2478-bk(CON),
22-2479-bk(CON), 22-2481-bk(CON), 22-2482-bk(CON),
22-2483-bk(CON), 22-2484-bk(CON), 22-2485-bk(CON),
22-2486-bk(CON), 22-2488-bk(CON), 22-2489-bk(CON),
22-2491-bk(CON), 22-2492-bk(CON), 22-2493-bk(CON),
22-2494-bk(CON), 22-2495-bk(CON), 22-2496-bk(CON),
22-2497-bk(CON), 22-2498-bk(CON), 22-2499-bk(CON),
22-2500-bk(CON), 22-2501-bk(CON), 22-2502-bk(CON),
22-2503-bk(CON), 22-2504-bk(CON), 22-2506-bk(CON),
22-2507-bk(CON), 22-2508-bk(CON), 22-2509-bk(CON),
22-2510-bk(CON), 22-2511-bk(CON), 22-2512-bk(CON),
22-2513-bk(CON), 22-2514-bk(CON), 22-2515-bk(CON),
22-2516-bk(CON), 22-2517-bk(CON), 22-2518-bk(CON),
22-2520-bk(CON), 22-2521-bk(CON), 22-2522-bk(CON),
22-2523-bk(CON), 22-2524-bk(CON), 22-2525-bk(CON),
22-2526-bk(CON), 22-2528-bk(CON), 22-2529-bk(CON),
22-2532-bk(CON), 22-2534-bk(CON), 22-2535-bk(CON),
22-2536-bk(CON), 22-2538-bk(CON), 22-2539-bk(CON),
22-2540-bk(CON), 22-2541-bk(CON), 22-2545-bk(CON),

22-2548-bk(CON), 22-2549-bk(CON, 22-2551-bk(CON),
22-2552-bk(CON), 22-2553-bk(CON), 22-2554-bk(CON),
22-2555-bk(CON), 22-2556-bk(CON), 22-2557-bk(CON),
22-2558-bk(CON), 22-2559-bk(CON), 22-2560-bk(CON),
22-2562-bk(CON), 22-2565-bk(CON), 22-2566-bk(CON),
22-2567-bk(CON), 22-2568-bk(CON), 22-2570-bk(CON),
22-2571-bk(CON), 22-2572-bk(CON), 22-2573-bk(CON),
22-2574-bk(CON), 22-2575-bk(CON), 22-2576-bk(CON),
22-2577-bk(CON), 22-2579-bk(CON), 22-2580-bk(CON),
22-2581-bk(CON), 22-2582-bk(CON), 22-2583-bk(CON),
22-2585-bk(CON), 22-2586-bk(CON), 22-2587-bk(CON),
22-2589-bk(CON), 22-2590-bk(CON), 22-2591-bk(CON),
22-2592-bk(CON), 22-2593-bk(CON), 22-2594-bk(CON),
22-2595-bk(CON), 22-2596-bk(CON), 22-2597-bk(CON),
22-2598-bk(CON), 22-2602-bk(CON), 22-2603-bk(CON),
22-2604-bk(CON), 22-2606-bk(CON), 22-2607-bk(CON),
22-2608-bk(CON), 22-2611-bk(CON), 22-2612-bk(CON),
22-2613-bk(CON), 22-2614-bk(CON), 22-2615-bk(CON),
22-2617-bk(CON), 22-2618-bk(CON), 22-2619-bk(CON),
22-2622-bk(CON), 22-2626-bk(CON), 22-2631-bk(CON),
22-2641-bk(CON), 22-2642-bk(CON), 22-2643-bk(CON),
22-2644-bk(CON), 22-2645-bk(CON), 22-2654-bk(CON)
23-687-bk(CON), 23-695-bk(CON), 23-697-bk(CON),
23-715-bk (CON)

# <u>TABLE OF CONTENTS</u>

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 1

ARGUMENT ................................................................................ 5

I.     The Forum Selection Clause Creates Personal Jurisdiction Over Defendants In New York Courts .............. 5

II.    The Bankruptcy Code Safe Harbor Does Not Apply Extraterritorially To Bar The Liquidators' Foreign Avoidance Claims ................................................................. 15

      A.    The Bankruptcy Code Does Not Preclude a Foreign Representative From Avoiding Foreign Transfers Under Foreign Law, Let Alone Overcome the Presumption Against Applying the Domestic Safe Harbor Extraterritorially ................... 15

      B.    Applying the Section 546(e) Safe Harbor to Foreign Avoidance Claims Is Not a Domestic Application ................................................................ 25

      C.    Even If §561(d) Reached Foreign Transfers, the Liquidators' Avoidance Claims Would Fall Within the Exception for Intentional Fraudulent Transfers ................................................................. 33

III.   The District Court Erred In Affirming The Dismissal Of The Liquidators' BVI Common Law And Contract Claims ................................................................................ 41

      A.    The Bankruptcy Code Safe Harbor Does Not Bar the Liquidators' BVI Common Law Claims ............... 42

      B.    Neither the Funds' Articles nor BVI Law Bars the Liquidators' BVI Common Law Claims ...................... 45

IV.   The Bankruptcy Court Erred In Ruling That The Liquidators Failed To State A Claim Under §246 Of The BVI Insolvency Act ........................................ 61

V.   The Liquidators' Claims Are Not Precluded By The Prior BVI Proceedings .......................................... 65

    A.   BVI Law Governs the Preclusion Issue Here ............. 65

    B.   Under BVI Law, There Is No Preclusion Here ........... 67

    C.   Even Under Federal Law, There Would Be No Preclusion ................................................... 71

VI.   DB Cayman Cannot Evade Liability By Claiming That It Was Acting As A Disclosed Agent .................................... 73

CONCLUSION ........................................ 78

# TABLE OF AUTHORITIES

## Cases

*ACE Cap. Re Overseas Ltd. v. Cent. United Life Ins. Co.*,
    307 F.3d 24 (2d Cir. 2002) ........................................................ 6, 10, 11

*Al-Kurdi v. United States*,
    25 Cl. Ct. 599 (Cl. Ct. 1992) .................................................. 44

*Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*,
    170 F.3d 349 (2d Cir. 1999) .................................................. 76

*Anwar v. Fairfield Greenwich, Ltd.*,
    728 F.Supp.2d 372 (S.D.N.Y. 2010) ...................................... 70

*AP Servs., LLP v. Silva*,
    483 B.R. 63 (S.D.N.Y. 2012) .................................................. 44

*Blazevska v. Raytheon Aircraft Co.*,
    522 F.3d 948 (9th Cir. 2008) .................................................. 33

*Carlyle Inv. Mgmt. LLC v. Moonmouth Co. SA*,
    779 F.3d 214 (3d Cir. 2015) .................................................. 7, 11, 12

*Chase Manhattan Bank, N.A. v. Celotex Corp.*,
    56 F.3d 343 (2d Cir. 1995) .................................................... 71

*Cho v. Blackberry Ltd.*,
    991 F.3d 155 (2d Cir. 2021) .................................................. 71, 72

*City of New York v. Chevron Corp.*,
    993 F.3d 81 (2d Cir. 2021) .................................................... 16

*Cooper v. Ruane Cunniff & Goldfarb Inc.*,
    990 F.3d 173 (2d Cir. 2021) .................................................. 8, 9

*Coregis Ins. Co. v. Am. Health Found., Inc.*,
    241 F.3d 123 (2d Cir. 2001) .................................................. *passim*

*Cortlandt St. Recovery Corp. v. Bonderman*,
    155 N.Y.S.3d 61 (N.Y. Sup. Ct. 2021) ................................... 7

iii

*Doe v. Trump Corp.*,
6 F.4th 400 (2d Cir. 2021)....................................................................71

*Enron Creditors Recovery Corp v. Alfa, S.A.B. de C.V.*,
651 F.3d 329 (2d Cir. 2011) ...............................................................27

*Fairfield Sentry Ltd. v. UBS AG N.Y.*,
No. 23-517 (2d Cir.)..............................................................................43

*Force v. Facebook*,
934 F.3d 53 (2d Cir. 2019) ..........................................................31, 32

*Hansard v. Fed. Ins. Co.*,
46 N.Y.S.3d 163 (N.Y. Sup. Ct. 2017)...................................................7

*HMS Holdings Corp. v. Moiseenko*,
29 N.Y.S.3d 847 (N.Y. Sup. Ct. 2015)...................................................7

*Huffington v. T.C. Grp., LLC*,
637 F.3d 18 (1st Cir. 2011) .....................................................7, 11, 12

*In re Bernard L. Madoff Inv. Sec. LLC*,
721 F.3d 54 (2d Cir. 2013) ..................................................................58

*In re Condor Ins. Ltd.*,
601 F.3d 319 (5th Cir. 2010).......................................................37, 45

*In re Coudert Bros. LLP*,
673 F.3d 180 (2d Cir. 2012) ........................................................65, 66

*In re Fairfield Sentry Ltd. Litig.*,
458 B.R. 665 (S.D.N.Y. 2011) .....................................................20, 45

*In re Fairfield Sentry Ltd.*,
2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020)....................43, 44

*In re Fairfield Sentry Ltd.*,
2021 WL 771677 (Bankr. S.D.N.Y. Feb. 23, 2021)............................44

*In re Fairfield Sentry Ltd.*,
596 B.R. 275 (Bankr. S.D.N.Y. 2018) ......................................... *passim*

iv

*In re Gaston & Snow*,
  243 F.3d 599 (2d Cir. 2001) ............................................................. 66

*In re M. Fabrikant & Sons, Inc.*,
  447 B.R. 170 (Bankr. S.D.N.Y. 2011) ............................................... 73

*In re Nine W. LBO Sec. Litig.*,
  482 F.Supp.3d 187 (S.D.N.Y. 2020) .................................................. 44

*In re Norske Skogindustrier ASA*,
  629 B.R. 717 (Bankr. S.D.N.Y. 2021) ............................................... 35

*In re Picard*,
  917 F.3d 85 (2d Cir. 2019) ............................................... 26, 27, 28, 30

*In re Tribune Co. Fraudulent Conveyance Litig.*,
  946 F.3d 66 (2d Cir. 2019) ............................................................... 44

*In re Tribune Co. Fraudulent Conveyance Litig.*,
  499 B.R. 310 (S.D.N.Y. 2013) .......................................................... 27

*Kim v. Co-op. Centrale Raiffeisen-Boerenleebank B.A.*,
  364 F.Supp.2d 346 (S.D.N.Y. 2005) .................................................. 66

*Kiobel v. Royal Dutch Petroleum Co.*,
  569 U.S. 108 (2013) .......................................................................... 31

*Kirschner v. KPMG LLP*,
  938 N.E.2d 941 (N.Y. 2010) ............................................................. 58

*Lerner v. Amalgamated Clothing and Textile Workers Union*,
  938 F.2d 2 (2d Cir. 1991) ................................................................. 76

*Liberty Synergistics Inc. v. Microflo Ltd.*,
  718 F.3d 138 (2d Cir. 2013) ............................................................. 74

*Loginovskaya v. Batratchenko*,
  764 F.3d 266 (2d Cir. 2014) ............................................................. 33

*Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*,
  252 F.3d 218 (2d Cir. 2001) ............................................................. 11

*Martinez v. Bloomberg LP,*
   740 F.3d 211 (2d Cir. 2014) ............................................................ 13

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.,*
   138 S.Ct. 883 (2018) ...................................................... 25, 26, 31

*Morrison v. Nat'l Australia Bank Ltd.,*
   561 U.S. 247 (2010) ........................................ 18, 19, 23, 28

*Necchi S.p.A. v. Necchi Sewing Mach. Sales Corp.,*
   348 F.2d 693 (2d Cir. 1965) ........................................................ 8, 9

*Phillips v. Audio Active Ltd.,*
   494 F.3d 378 (2d Cir. 2007) ........................................................... 14

*Rimini St., Inc. v. Oracle USA, Inc.,*
   139 S.Ct. 873 (2019) .................................................................... 21

*RJR Nabisco, Inc. v. Euro. Cmty.,*
   579 U.S. 325 (2016) ................................................................. *passim*

*Shekoyan v. Sibley Int'l,*
   409 F.3d 414 (D.C. Cir. 2005) ...................................................... 16

*United States v. Quinones,*
   317 F.3d 86 (2d Cir. 2003) ............................................................ 67

*WesternGeco LLC v. ION Geophysical Corp.,*
   138. S.Ct. 2129 (2018) ............................................................ 26, 30

## **Statutes**

11 U.S.C. §546 .............................................................................. 34, 42

11 U.S.C. §548 ................................................................................... 34

11 U.S.C. §561 ................................................................ 17, 20, 23, 35

11 U.S.C. §1501 ................................................................ 24, 27, 38

11 U.S.C. §1504 ................................................................................. 20

11 U.S.C. §1508 ................................................................................. 24

11 U.S.C. §1511 ........................................................................ 20

11 U.S.C. §1523 ........................................................................ 20

BVI Companies Act ................................................................... 55

BVI Insolvency Act .............................................................. 39, 61

**Other Authorities**

Brett M. Kavanaugh, *Fixing Statutory Interpretation*,
129 Harv. L. Rev. 2118 (2016) ........................................... 21

*DD Growth Premium 2X Fund v. RMF Mkt. Neutral
Strategies (Master) Ltd.*, [2017] UKPC 36......................... 50

*Fairfield Sentry Ltd. (in Liquidation) v. Migani*, [2014] UKPC 9 ......... 46

Graham Virgo, *Good Consideration Provided by the Defendant*,
The Principles of the Law of Restitution (3d ed. 2015)...................... 52

*Joiner v. George*, [2003] BCC 298 .......................................... 63

Lincoln Caylor & Martin S. Kenney, *In Pari Delicto and
Ex Turpi Causa*, 18 Bus. L. Int'l 259 (2017) ................................... 58

*Montgomerie v UK Mutual Steamship Ass'n*, [1891] 1 QB 370.............. 74

*OJSC Oil Co. Yugraneft v. Abramovich*, [2008] EWHC 2613 ............... 68

Opposition, *Fairfield Sentry Ltd. v. UBS AG N.Y.*,
No. 23-517 (2d Cir. Apr. 17, 2023)....................................... 43

*Patel v. Mirza*, [2016] UKSC 42 .............................................. 58

*Phillips v. Brewin Dolphin Bell Lawrie*, [2001] BCC 864 (HL)........ 63, 64

Reply, *Fairfield Sentry Ltd. v. Citibank NA London*,
No. 19-cv-03911 (S.D.N.Y. Apr. 23, 2020), Dkt.361 ..................... 52

*Skandinaviska Enskilda Banken AB (Publ) v. Conway
(as Joint Official Liquidators of Weavering Macro
Fixed Income Fund Ltd.)*, [2019] UKPC 36....................................... 42

*Merriam-Webster Dictionary*, https://archive.ph/wip/1S34U
   (last visited June 9, 2023)....................................................................54

*Virgin Atl. Airways Ltd v. Zodiac Seats UK Ltd.*,
   [2013] UKSC 46 ...........................................................................69, 70

## <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

Chapter 15 of the Bankruptcy Code exists to enable foreign bankruptcy representatives like the Liquidators to obtain assistance from U.S. courts in cross-border bankruptcies. In this case, the Liquidators sought that assistance to recover over $6 billion in fraudulently inflated payments and equitably redistribute them to the innocent victims of Bernie Madoff's infamous Ponzi scheme. The decisions below, however, make it all but impossible for the Liquidators to recover those payments—and do so by flouting the established presumption against extraterritoriality and by misapplying both federal and British Virgin Islands ("BVI") law. None of Defendants' attempts to defend those decisions is remotely persuasive.

First and foremost, the district court fundamentally misconstrued the Bankruptcy Code by applying a limitation on *domestic* avoidance powers to curtail the Liquidators' claims under *foreign* law seeking to avoid *foreign* transactions. That ruling cannot be squared with the relevant statutory text, the presumption against extraterritoriality, or the broader purpose of Chapter 15. The text itself precludes Defendants' reading: §546(e) applies only to *domestic* avoidance claims that could

1

harm domestic markets, and §561(d) limits the avoidance powers of a foreign liquidator in Chapter 15 cases "to the same extent" as in Chapter 7 and Chapter 11 cases, i.e., it precludes avoiding certain domestic transfers that could harm domestic markets. To the extent foreign law gives a foreign liquidator powers to target *foreign* transfers, nothing in §561(d), §546(e), or anything else in the Code stands as an obstacle. The history and expressed purpose of Chapter 15 confirm that understanding, as the point of Chapter 15 is to facilitate foreign liquidations, not to erect artificial barriers to exercising avoidance powers that do not directly affect domestic transfers or domestic markets. At a bare minimum, nothing in the statutory text so clearly and unambiguously requires the extraterritorial application of §546(e) to frustrate the efforts of foreign liquidators and the overriding purpose of Chapter 15.

Defendants cannot evade the presumption against extraterritoriality by calling this case a "domestic" application of §546(e) and §561(d). Defendants' assertion that the application is domestic just because the proceeding below was in a U.S. court would nullify the presumption against extraterritoriality completely, and contravenes binding precedent from both the Supreme Court and this Court making

2

clear that the focus of these very statutes is on the transaction being avoided, not the court in which the claim is brought. Applying the Code to limit the efforts of foreign liquidators to use foreign law to avoid foreign transfers is an extraterritorial application by any measure.

And even if §561(d) extended limits on a domestic trustee targeting domestic transfers to foreign liquidators targeting foreign transfers, the Liquidators' claims would still survive because they involve claims of intentional fraud. A domestic trustee's avoidance powers reach domestic securities-related transfers if they involve intentional fraud, and §561(d) limits a foreign liquidator's avoidance powers "to the same extent" as a domestic trustee's. Whether a foreign liquidator comes within the terms of the specific statutory provision empowering a domestic trustee to avoid such intentionally fraudulent transfers is beside the point, as the foreign liquidator's avoidance power comes from foreign law and is limited only "to the extent" necessary to align it with the powers of a domestic trustee, which plainly include the authority to avoid intentionally fraudulent transfers.

Defendants' remaining arguments are equally unavailing. The plain language of the parties' forum selection clause and governing law

3

make clear that Defendants are subject to personal jurisdiction here, which explains why Defendants leave their response on this threshold issue for last. Neither the Code nor BVI law bars the Liquidators' contract and common law claims, nor do Defendants' meritless preclusion arguments (all of which were either forfeited or properly rejected below) assist their efforts to minimize the recoveries of victims of Madoff's fraud. Defendants' assertion that their redemptions were not "undervalue" likewise defies BVI law (and common sense), as it is hard to imagine anything more "undervalue" than the worthless shares Defendants exchanged for $6 billion. One need only compare those full pay-outs, including phantom "profits" taken from their fellow investors' principal, with the plight of victims hoping to recover pennies on the dollar to understand the undervaluation and unfairness here.

Defendants would leave foreign liquidators with less power than domestic trustees, less power than they enjoy under the law of their home countries, and no power to avoid even intentionally fraudulent securities-related transfers. None of that can be reconciled with the purpose of Chapter 15, principles of comity, the presumption against extraterritoriality, or common sense. The foreign liquidators here seek

4

no more or less than the SIPC trustee has already obtained—namely, a measure of justice for innocent victims of Madoff's fraud. Defendants' attempts to stymie those efforts at every turn should be squarely rejected.

## ARGUMENT

### I. The Forum Selection Clause Creates Personal Jurisdiction Over Defendants In New York Courts.

The Subscription Agreements are unequivocal: "[A]ny suit, action or proceeding ('Proceeding') with respect to this Agreement and the Fund may be brought in New York," and the Defendants executing those agreements "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any proceeding." Compl. ¶23. That language plainly establishes personal jurisdiction in New York for the Liquidators' claims here, and the lower courts plainly erred by concluding otherwise—an error that would force the Liquidators to litigate defendant- and fact-specific personal jurisdiction questions as to dozens (and potentially hundreds) of Defendants more than *twelve years* into this protracted litigation. Pls.Br.43-51.

Defendants have only one response, which they tellingly bury at the back of their brief: According to Defendants, the Liquidators' claims are not "with respect to" the Subscription Agreements, because those claims

5

arise under the Articles rather than directly under the Subscription Agreements themselves. Defs.Br.74-88. That argument cannot be squared with the plain language of the Agreements or controlling law. As this Court has recognized, the phrase "with respect to" is "expansive," and does not impose a narrow arising-under test. *ACE Cap. Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 30, 32 (2d Cir. 2002). Instead, that phrase requires only that the claims and the Subscription Agreements be "related to," "associated with," or "connected by reason of an established or discoverable relation" to one another—a standard that is plainly met here, given that the Subscription Agreements created the legal relationship between the Funds and Defendants and bound the Defendants to the Articles in the first place. *Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128 (2d Cir. 2001); *see* Pls.Br.45-47. None of Defendants' counterarguments is remotely persuasive.

1. Defendants begin with a straw man, asserting that the Liquidators define the phrase "with respect to" by "a 'but-for' test." Defs.Br.76. They then spend the next six pages attacking that test. Defs.Br.77-82. That attack misses the mark entirely, because the Liquidators do *not* rely on a "but-for" test—which is why the phrase "but-

6

for" appears nowhere in their brief. Instead, the Liquidators define "with respect to" precisely as this Court, the New York courts, and others define it: as "synonymous with" phrases such as "in connection with," "related to," and "associated with," and so requiring simply "an established or discoverable relation." *Coregis*, 241 F.3d at 128-29; *see, e.g.*, *Cortlandt St. Recovery Corp. v. Bonderman*, 155 N.Y.S.3d 61 (N.Y. Sup. Ct. 2021), *aff'd in relevant part*, 2023 WL 2875490 (N.Y. App. Div. Apr. 11, 2023); *Hansard v. Fed. Ins. Co.*, 46 N.Y.S.3d 163, 167 (N.Y. Sup. Ct. 2017); *HMS Holdings Corp. v. Moiseenko*, 29 N.Y.S.3d 847 (N.Y. Sup. Ct. 2015); *see also, e.g.*, *Carlyle Inv. Mgmt. LLC v. Moonmouth Co. SA*, 779 F.3d 214, 220 (3d Cir. 2015); *Huffington v. T.C. Grp., LLC*, 637 F.3d 18, 21-22 (1st Cir. 2011).

That standard is amply met here, where the Agreements created the legal relationship between the Funds and Defendants and where the claims at issue seek to recover proceeds from the redemption of shares issued pursuant to the Agreements. Pls.Br.46-47. Indeed, Defendants concede that the Agreements are what "binds [each Defendant] to [its] subscription and to the terms of the Fund Documents," including the Articles, Defs.Br.83, and one Defendant's supplemental brief underscores

the point, *see* Deutsche Bank (Cayman) Ltd. Supp. Br. ("DBC.Br.") at 3, 7 (stating that the Subscription Agreements "control the relationship" between the Funds and Defendants and "[t]he Articles do not"). That makes it difficult to understand Defendants' insistence that the Agreements are somehow a "separate contract" from the Articles, *see, e.g.*, Defs.Br.75, 78, 85, particularly when the former explicitly incorporated the latter, *see* JA.2189 ("Subscriber subscribes for the Shares pursuant to... [the] Articles of Association"). In any event, there is nothing "attenuated" about the connection between the Agreements and the Liquidators' claims here, and nothing "limitless" about applying the plain language of the parties' agreed-upon forum selection clause to recognize personal jurisdiction. *Contra* Defs.Br.77.

Defendants argue that this Court has "twice rejected a 'but-for' approach," Defs.Br.77—but again, the Liquidators are not asserting any but-for standard. Regardless, the cases that Defendants cite do not help them. *Contra* Defs.Br.77 (citing *Necchi S.p.A. v. Necchi Sewing Mach. Sales Corp.*, 348 F.2d 693 (2d Cir. 1965), and *Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173 (2d Cir. 2021)). In *Necchi*, the parties agreed to arbitrate all disputes "arising out of or in connection with" an exclusive

8

distributorship agreement. 348 F.2d at 695. This Court found it "clear" that two of the parties' disputes were arbitrable, because they arose from provisions in the agreement. *Id.* at 697 & n.2. By contrast, the other disputes had "nothing to do with" the distributorship agreement, which was obvious as a matter of pure chronology, and so were not covered by the arbitration provision. *Id.* at 697-68. One involved a "distinct and separate" contract that *predated the distributorship agreement by three years*, and the rest concerned other independent aspects of the parties' "working relationship," which *predated the distributorship agreement by more than a decade. Id.* Nothing in *Necchi* remotely "parallels" this case. *Contra* Defs.Br.78.

Cooper is even farther afield. There, the plaintiff sued his employer for alleged ERISA violations, and the employer invoked an agreement to arbitrate "employment-related legal disputes." *Cooper*, 990 F.3d at 177-78. This Court declined to compel arbitration, explaining that "none of the facts relevant to the merits of [the plaintiff's] claims … relate[d] to his employment," and other individuals "who were never [the company's] employees could have brought" identical claims. *Id.* at 183-84. Nothing there suggests that the relationship between the

claims and the Subscription Agreements here is insufficient to invoke the parties' forum selection clause, and neither do the various out-of-circuit cases that Defendants cite. *Contra* Defs.Br.80-81.[1]

2. Because they cannot prevail under the established meaning of "with respect to," Defendants attempt to redefine that broad phrase, arguing that the Liquidators' claims "derive from" and "are governed by" the Articles rather than the Subscription Agreements. Defs.Br.75-76; *see* Defs.Br.78 ("governed by the Articles"); Defs.Br.82 (same); Defs.Br.84 ("depended on … the Articles"). That is, in Defendants' view, the claims are not "with respect to" the Agreements because they do not arise out of the Agreements themselves. But this Court has explicitly rejected that approach, explaining that "with respect to" and its synonyms are "broader in scope than the term 'arising out of.'" *Coregis*, 241 F.3d at 128-29; *see Huffington*, 637 F.3d at 21-22 (same); *ACE Cap.*, 307 F.3d at 32 (similar).

---

[1] Defendants' waiver arguments are equally misguided. The Liquidators' interpretation of "with respect to" in the forum selection clause does not "contradict" their position that BVI law governs their claims such that the BVI court could authorize service, *contra* Defs.Br.83 & n.37, and the Liquidators' decision not to raise *other* arguments on appeal does not somehow waive the arguments they *do* raise, *contra* Defs.Br.85.

Defendants have no response to this Court's repeated decisions explaining that expansive phrases like "with respect to" reach more than just claims arising under a particular agreement, and cover any claims with a "discoverable relation" to the agreement at issue. *Coregis*, 241 F.3d at 128; *see ACE Cap.*, 307 F.3d at 32; *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 226 (2d Cir. 2001). Defendants relegate those cases to a footnote, arguing that they involved different contexts. Defs.Br.81 n.35. But that is no answer to the *principle* those cases explain: that phrases like "with respect to" require only some connection or relation between the claim and the agreement.

Nor do Defendants have any real response to *Huffington* and *Carlyle*. *Contra* Defs.Br.81-82. Defendants suggest that these cases apply a "'but-for' test," Defs.Br.81, but that is flatly incorrect. In fact, both cases *explicitly* apply this Court's test from *Coregis*, explaining that "with respect to" is a broad term meaning "connected by reason of an established or discoverable relation." *Huffington*, 637 F.3d at 22 (quoting *Coregis*, 241 F.3d at 128-29); *Carlyle*, 779 F.3d at 220 (same). Both cases also interpreted forum selection clauses in investment-fund subscription agreements—the precise type of agreement at issue in this case—and

11

held that disputes that were related to but did not arise under the
subscription agreements were "with respect to" the agreements. *Carlyle*,
779 F.3d at 220; *Huffington*, 637 F.3d at 22.[2]

Defendants' attempt to narrow the scope of "with respect to" also
violates the canon against superfluity, since on their view any claim "with
respect to the … Agreement" would also be "with respect to … the Fund."
Pls.Br.50-51. Their only response—tucked into the second paragraph of
a footnote—is to assert that a claim "by the Fund for rescission of a
Subscription Agreement" might not "relate to … the Fund," which is its
own *reductio ad absurdum*. *Contra* Defs.Br.86 n.39. Conversely,
Defendants have no meaningful response to the Liquidators' illustrations
that the *normal* meaning of "with respect to" does *not* create superfluity
here. *See* Pls.Br.50. The best Defendants can muster is to suggest that
the Liquidators' reading makes "the Agreement" superfluous in any

---

[2] Defendants observe that *Huffington* and *Carlyle* involved claims relating to the purchase of shares in the fund, rather than redemption. Defs.Br.82. That is a distinction without a difference; the dispositive point in both cases was that the claims were *related to* the subscription agreement, even though they were not directly governed by that agreement and could be pleaded without mentioning it. *Huffington*, 637 F.3d at 21-22; *Carlyle*, 779 F.3d at 220. That is equally true of a front-end purchase or a back-end redemption.

"investment-related dispute"—but that is just because the phrase exists to address *other* disputes. *Contra* Defs.Br.86 n.39.[3]

3. Finally, Defendants have no answer to the serious practical problems that their interpretation would create. As this Court has recognized, forum selection clauses exist precisely to promote certainty, "uniformity of result," and "judicial economy and efficiency," by ensuring in advance that the relevant claims can all be brought in the specified jurisdiction. *Martinez v. Bloomberg LP*, 740 F.3d 211, 219 (2d Cir. 2014). Defendants' interpretation would destroy that result here, forcing the Liquidators to devote substantial effort to litigating personal jurisdiction as to numerous individual Defendants, and potentially litigate near-identical claims against different Defendants in different jurisdictions— exactly the opposite of the outcome the parties' forum selection clause was designed to ensure. *Contra* Defs.Br.86-88. Notably, Defendants make no attempt to defend the district court's puzzling (and erroneous) assertion that the forum selection clause should not be read to "channel

---

[3] Defendants also invoke the principle that "equivocal contract provisions" are construed against the drafters. Defs.Br.75. But under the precedents already discussed, there is nothing "equivocal" about the term "with respect to" in a forum selection clause. *See supra* pp.5-7; *Coregis*, 241 F.3d at 129 (finding "related to" to be "clear and unambiguous").

13

'almost any' dispute between the Funds and Defendants to New York." Pls.Br.48-49 (quoting SPA.24). In fact, that is precisely what the clause was intended to do: ensure that widespread and complex disputes like this one could be resolved in a single forum without the need for time-consuming and expensive litigation over personal jurisdiction. Pls.Br.48-49.

Defendants are right about this much: a forum selection clause "is a creature of contract" that should be enforced in accordance with the contractual text. Defs.Br.86 (quoting *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 387 (2d Cir. 2007)). But it is Defendants who "essentially seek a judicial rewriting" of the clause at issue here, *id.* at 85; they wish to strike the expansive "with respect to" phrase that the parties used, which under established law requires only some discoverable relationship between the claims and the Subscription Agreements, and replace it with a more stringent arising-under requirement. This Court should reject Defendants' attempt to atextually narrow the parties' forum selection clause, and to force the Liquidators more than twelve years into this suit to spend valuable resources individually litigating personal jurisdiction to which Defendants have already consented.

14

II.    **The Bankruptcy Code Safe Harbor Does Not Apply Extraterritorially To Bar The Liquidators' Foreign Avoidance Claims.**

Defendants' merits arguments fare no better.  Defendants' reading of the Code would leave foreign liquidators in U.S. courts in a far worse position than either domestic trustees or foreign liquidators in their own courts, upending the purpose of Chapter 15 and preventing foreign liquidators from avoiding transfers that would otherwise be recoverable under both U.S. and BVI law.

A.    **The Bankruptcy Code Does Not Preclude a Foreign Representative From Avoiding Foreign Transfers Under Foreign Law, Let Alone Overcome the Presumption Against Applying the Domestic Safe Harbor Extraterritorially.**

The district court went wrong right from the start, finding that the presumption against extraterritoriality was overcome at the first step because (it believed) Congress expressed a "clear intent" that §546(e) should apply extraterritoriality.  But §546(e) says no such thing, and limits domestic trustees only when it comes to domestic transfers in order to protect domestic securities markets.  Section 561(d) does no more than extend the same domestic limits to foreign liquidators, without imposing any limits on foreign liquidators targeting foreign transfers under foreign law.  Thus, §561(d) is inapplicable to the transfers here by its terms, and

15

certainly cannot overcome the presumption against extraterritoriality. Defendants' arguments to the contrary cannot be reconciled with statutory text or settled law.

1. At the first step of the extraterritoriality inquiry, a court must determine whether the statutory text provides "a clear, affirmative indication that it applies extraterritorially." *RJR Nabisco, Inc. v. Euro. Cmty.*, 579 U.S. 325, 337 (2016). Only a clear statement will do: "When a statute gives no clear indication of an extraterritorial application, it has none." *City of New York v. Chevron Corp.*, 993 F.3d 81, 100 (2d Cir. 2021). If the "statutory language is 'ambiguous,'" a court "will not infer extraterritorial jurisdiction." *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 420 (D.C. Cir. 2005).

Section 546(e) by its own terms does not include any clear statement of extraterritorial application, and protects only certain domestic transfers and domestic markets. Pls.Br.56-57. The courts below did not suggest otherwise. Instead, they believed that the necessary clear statement lay in §561(d)—the fourth subsection of a statutory provision dealing with so-called "close-out" or "netting" transactions. In particular, the district court concluded that in declaring

16

that "[a]ny provisions of this title relating to securities contracts … shall apply in a case under chapter 15 … to limit avoidance powers to the same extent as in a proceeding under chapter 7 or 11," 11 U.S.C. §561(d), Congress unambiguously provided that the limitations on avoidance of securities contracts in §546(e) should apply to claims under foreign law to avoid foreign transfers.  SPA.31.

That conclusion simply misreads §561(d).  The plain text of §561(d) says nothing whatsoever about "foreign" or "extraterritorial" application, let alone limiting foreign liquidators' authority under foreign law (especially where that authority has no direct analog in the powers of a domestic trustee).  Instead, §561(d) states only that provisions like §546(e) should apply in cases under Chapter 15 "to the same extent as in a proceeding under chapter 7 or 11."  That is perfectly consonant with the normal presumption that our laws have a domestic focus: §546(e) applies in Chapter 7 and Chapter 11 cases to limit *domestic* avoidance powers of *domestic* trustees in order to protect *domestic* markets, and §561(d) ensures that those avoidance powers apply "to the same extent" in Chapter 15 cases.  Nothing in the statutory text clearly instructs that limitations on avoidance powers should apply *to a greater extent* in

17

Chapter 15 cases than in Chapter 7 and Chapter 11 cases, or otherwise projects §546(e) extraterritorially to limit foreign avoidance claims grounded in foreign law and targeting foreign transfers. Pls.Br.58-59.

Because §561(d) "gives no clear indication of an extraterritorial application" that would extend §546(e) to foreign avoidance claims, "it has none." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010). That understanding also accords with the relevant statutory evolution, which makes clear that Congress was comfortable allowing foreign representatives to exercise foreign avoidance powers without any §546(e) limitation, a point Defendants do not meaningfully address. *See* Pls.Br.61-62.

2. None of Defendants' responses hold water—which is presumably why Defendants try to avoid the issue by jumping ahead to the second step of the extraterritoriality inquiry. *See* Defs.Br.19-20. When they finally address the first step, they shift their attention from §561(d) to §546(e) and claim that §546(e) *itself* applies extraterritorially to limit foreign avoidance claims targeting foreign transfers, even in Chapter 7 and Chapter 11 cases, on the theory that §546(e) "encompasses all forms of avoidance under all sources of law." Defs.Br.29. But neither court

18

below embraced that argument, and with good reason: That argument simply ignores the presumption against extraterritoriality, whose entire import is that a statute that is "silent as to [its] extraterritorial application" must be presumed to have none. *Morrison*, 561 U.S. at 255. Because §546(e) says nothing about its extraterritorial application, it cannot come close to providing the requisite clear indication that it applies extraterritorially. Indeed, the majority of courts have held that a domestic trustee's avoidance powers do not extend extraterritorially in the first place, *see* Pls.Br.9 & n.2 (citing cases), and thus *a fortiori* a limit on those powers, such as §546(e), does not apply extraterritorially, let alone reflect a clear intent for purposes of the first step of the extraterritoriality inquiry.

Next, Defendants (like the district court) assert that §561(d) cannot be read to extend §546(e) only to domestic avoidance powers in Chapter 15 cases, because (Defendants say) foreign representatives have no domestic avoidance powers under Chapter 15. Defs.Br.34. That argument suffers multiple flaws, starting with the text. Foreign liquidators plainly have domestic avoidance powers in some cases arising under Chapter 15. For example, Defendants do not dispute that Chapter

15 authorizes foreign representatives to "commence" a "voluntary case under section 301 or 302" or "an involuntary case under section 303," 11 U.S.C. §1511(a), and recognize that Chapter 15 authorizes foreign representatives to "initiate actions under [the Code's avoidance sections]" in such cases. *Id.* §1523(a). Defendants assert that any case initiated under §1511(a) or avoidance action initiated under §1523(a) would not constitute the use of avoidance powers "in a case under chapter 15," *id.* §561(d), and so §561(d) would be inapplicable. Defs.Br.31-33. But such a case would plainly be "a case under chapter 15," as Chapter 15 is what empowers a foreign liquidator to bring the avoidance action. Indeed, Chapter 15 itself makes clear that "a case under this chapter" is one "commenced by the filing of a petition for recognition of a foreign proceeding under section 1515." 11 U.S.C. §1504. Everything that follows that filing in the U.S. courts is "a case under Chapter 15," even if the provisions of Chapter 15 empower foreign liquidators to use authorities under other chapters. *See, e.g.*, 11 U.S.C. §1511(a). Not surprisingly, courts routinely (and correctly) refer to such §1511(a) proceedings as existing "within a Chapter 15 case." *See, e.g.*, *In re Fairfield Sentry Ltd. Litig.*, 458 B.R. 665, 679, 680 (S.D.N.Y. 2011).

Thus, Defendants' real claim is that a foreign liquidator's use of domestic avoidance powers under Chapter 7 and 11 would be limited by §546(e) directly, and so §561(d) must impose some additional limit on foreign liquidators. But this appeal to the superfluity canon is no match for the substantive presumption against extraterritoriality. The superfluity canon is a notoriously weak guide to statutory construction. *See, e.g.*, *Rimini St., Inc. v. Oracle USA, Inc.*, 139 S.Ct. 873, 881 (2019); Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2161-62 (2016). It is essentially a negative inference from another provision, and the presumption against extraterritoriality demands a "clear, affirmative indication," not an ambiguous negative inference. *RJR Nabisco*, 579 U.S. at 337. Regardless, §561(d)'s extension of limits on a trustee's avoidance powers to foreign liquidators in a case under Chapter 15 is not superfluous. Section 546(e) by its terms applies only to a "trustee," not a foreign representative or liquidator, and unlike §561(d) it does not explicitly limit every exercise of "avoidance powers." Thus, §561(d) eliminates ambiguities that would persist about whether and to what extent §546(e) alone would limit a foreign representative's authority to seek avoidance under §1523(a)—underscoring that §561(d)

21

has work to do even if it is limited to domestic rather than extraterritorial application.

Indeed, that work goes beyond eliminating ambiguity, as there are at least two *other* applications of §561(d) that would give that section independent effect. First, §561(d) can limit the power of *domestic* trustees to avoid "close-out" transactions, which is the focus of §561 as a whole. Pls.Br.62-64. Defendants barely respond, asserting only in a footnote that domestic trustees cannot bring Chapter 15 cases. Defs.Br.35 n.16. But there is no bar to a domestic trustee participating in a proceeding initiated by a foreign representative under Chapter 15, and §561(d) would make clear that a domestic trustee could not avoid close-out transfers in that proceeding.

Second, §561(d) precludes foreign liquidators from avoiding a domestic transfer involving securities absent proof of intentional fraud, i.e., the precise universe of transfers that are off-limits to domestic trustees. Pls.Br.65. Once again, Defendants have no meaningful response, asserting only that "foreign law would rarely, if ever, govern a domestic transfer." Defs.Br.34. But that is demonstrably not true, as the laws of foreign nations reflect a variety of approaches to whether and

22

when to reach transfers in the United States. Indeed, in *this very case*, Defendants insist that some of *their own transfers* are domestic transfers targeted by foreign-law avoidance claims. *See* Defs.Br.26 n.11.

3. Defendants next seek the requisite clear and affirmative indication of extraterritoriality in the final parenthetical of §561(d), which provides that the enforcement of securities contracts is "not to be limited based on the presence or absence of assets of the debtor in the United States." 11 U.S.C. §561(d); *see* Defs.Br.35-37. But that language just proves that Congress knows how to use language sufficient to overcome the presumption against extraterritoriality and *did so* as to debtors whose assets are solely outside the United States, but *not* as to foreign avoidance claims targeting foreign transfers. Pls.Br.64 n.10. Congress' express direction that §561(d) applies to *some* extraterritorial circumstances only underscores the *absence* of that express direction as to the circumstances here. *See Morrison*, 561 U.S. at 265 ("[W]hen a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms."). Moreover, Defendants do not dispute that this parenthetical was inserted to resolve an uncertainty about *in rem* jurisdiction, not to indicate

23

broader extraterritorial application, further undermining its relevance. Pls.Br.64 n.10; *contra* Defs.Br.37 n.17.

4.    Finally, Defendants cannot avoid the conflict between their interpretation and the principles of international comity that Congress enshrined in Chapter 15.  Pls.Br.65-67.  Instead, Defendants claim those principles are "irrelevant" and "unmoored from any statutory text." Defs.Br.37.  But the text of Chapter 15 instructs that it must be read consistent with "its international origin" and "the application of similar statutes adopted by foreign jurisdictions," 11 U.S.C. §1508, and explicitly invokes principles of comity and international cooperation in multiple provisions, *see, e.g.*, *id.* §§1501, 1507(b), 1509(b)(3).  Moreover, the whole point of Chapter 15 is to facilitate the efforts of foreign liquidators to protect creditors.  It makes no sense to read the Code to frustrate those efforts for a class of cases where foreign law empowers the foreign trustee to avoid foreign transfers and there is no material threat to domestic transfers or domestic markets.  Thus, Defendants' interpretation runs afoul of the presumption against extraterritoriality, the presumption in favor of international comity, and the whole thrust of Chapter 15.

**B.**     **Applying the Section 546(e) Safe Harbor to Foreign Avoidance Claims Is Not a Domestic Application.**

Defendants' preferred argument that the application of §546(e) here is a domestic one fares no better.  Both logic and precedent dictate that §546(e)—like the avoidance provisions with which it interacts—is focused on the underlying transfers, and applying §546(e) to shield foreign transfers is therefore an extraterritorial application.

1.  The second step of the extraterritoriality inquiry turns on where "the conduct relevant to the statute's focus occurred."  *RJR Nabisco*, 579 U.S. at 337.  If that conduct "occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory."  *Id.*

That makes this case straightforward, because the Supreme Court has *already concluded* that "the focus of the §546(e) safe-harbor inquiry [is] on the transfer."  *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S.Ct. 883, 895-96 (2018).  While *Merit Management* did not identify the focus of §546(e) for the specific purpose of the *RJR Nabisco* analysis, the focus of a statute does not shift.  Under that binding decision, because the transfers that the Liquidators seek to avoid occurred abroad, applying §546(e) to those foreign transfers via §561(d) would plainly be a

25

prototypical (and impermissible) extraterritorial application. *RJR Nabisco*, 579 U.S. at 337.[4]

This Court's decision in *In re Picard*, 917 F.3d 85 (2d Cir. 2019), reinforces that conclusion. Applying the same extraterritoriality inquiry, *Picard* held that the "focus" of the Code's substantive avoidance provisions is the "initial transfer that fraudulently depletes the estate." *Id.* at 98-99. *Picard* likewise explained that when assessing the "focus" of a statutory provision, a provision that "works in tandem with other provisions … must be assessed in concert with those other provisions." *Id.* at 96 (quoting *WesternGeco LLC v. ION Geophysical Corp.*, 138. S.Ct. 2129, 2137 (2018)). That rule controls here: The Code's avoidance powers and the §546(e) limitation on those powers are "two sides of the same coin," *Merit Mgmt.*, 138 S.Ct. at 894, and so have the same focus on the underlying transfer. Applying §546(e) to protect foreign transfers that

---

[4] Defendants suggest in a footnote that some of the transfers here may be considered domestic for extraterritoriality purposes because they were made to domestic recipients. Defs.Br.25 n.11. But just as transfers made from the United States by domestic entities are domestic for extraterritoriality purposes regardless of the recipient, *Picard*, 917 F.3d at 99-100, transfers made from abroad by foreign entities plainly implicate the basic rationale for the presumption against applying U.S. law to foreign transactions.

would otherwise be subject to avoidance based on foreign law is therefore an extraterritorial application of the statute.

That conclusion accords not only with governing precedent, but with the purpose of §546(e) and the "especially important" demands of international comity in bankruptcy proceedings. *Picard*, 917 F.3d at 103. Section 546(e) exists to protect the *domestic* securities markets from "displacement ... in the event of a major bankruptcy," not to protect foreign markets or regulate foreign securities-related transfers. *Enron Creditors Recovery Corp v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334 (2d Cir. 2011); *see In re Tribune Co. Fraudulent Conveyance Litig.*, 499 B.R. 310, 317 (S.D.N.Y. 2013) (section 546(e) seeks "to enhance the stability of the nation's financial markets"). Applying §546(e) to prevent foreign representatives from bringing foreign claims to avoid foreign transfers would turn the United States from a cooperative partner in cross-border bankruptcy proceedings into a needless obstacle, creating exactly the international friction that Chapter 15 was designed to alleviate. Pls.Br.73; *see* 11 U.S.C. §1501(a).

2. Defendants have no meaningful response to any of this. They begin by calling it "clear" that §561(d) "is being applied domestically,"

27

because it "applies only when, as here, a foreign representative comes to the United States seeking a U.S. court's assistance." Defs.Br.20. That makes no sense. The mere fact that a statute is being applied "in a U.S. proceeding" is a necessary precondition for a U.S. court to consider whether the presumption against extraterritoriality even applies; it thus falls far short of showing that the statute is "being applied domestically" under step two of the extraterritoriality inquiry. *Contra* Defs.Br.20. Otherwise, asserting *any* statute in a U.S. court would automatically be a domestic application of that statute—making the second step of the *RJR Nabisco* test dispositive in every case, rendering the first step superfluous and the presumption against extraterritoriality "a craven watchdog indeed." *Morrison*, 561 U.S. at 266.

The key question is not whether statute is being invoked in a domestic court, but instead whether "the conduct relevant to the [statute's] focus" occurred abroad, *RJR Nabisco*, 579 U.S. at 337—that is, the "transactions that the statute seeks to 'regulate.'" *Morrison*, 561 U.S. at 267. And that analysis looks not just at §561(d) in isolation, but "in concert with" the other provisions with which it "works in tandem," such as §546(e). *Picard*, 917 F.3d at 96. When those statutes are being applied

28

to limit foreign avoidance claims targeting a foreign transfer, the application is clearly extraterritorial.

Defendants invoke legislative history. Defs.Br.21-22. But the Supreme Court has already determined the focus of §546(e) by reference to the statutory text, rendering this attempted resort to legislative history distinctly unavailing. Regardless, nothing in Defendants' legislative history suggests that when §546(e) and §561(d) are being used to limit a foreign representative's ability to bring foreign claims targeting foreign transfers, that application is somehow domestic. *Contra* Defs.Br.21-22.[5]

Defendants have equally little response to the binding precedents that resolve this case. As to *Merit Management*, they suggest that it is inapposite because it "discusses only Section 546(e)," not §561(d). But §561(d) extends provisions like §546(e) to Chapter 15 proceedings "to the

---

[5] At most, Defendants' legislative history indicates that historical context and some "statements by the Executive Branch, members of Congress, and industry groups" suggested Congress *should* apply §546(e) to foreign transactions. Defs.Br.21-22. But whether Congress has chosen to apply a statute extraterritorially is the question at step *one*, not step two—and the legislative history here provides nothing like the "clear, affirmative indication" of extraterritorial application required at that step. *RJR Nabisco*, 579 U.S. at 337.

same extent" they apply under other chapters, so the focus and extraterritoriality of §546(e) remain dispositive. Indeed, even without an express to-the-same-extent linkage, precedent requires considering the focus of the statutes with which a provision "works in tandem." *Picard*, 917 F.3d at 96; *see, e.g.*, *WesternGeco*, 138 S.Ct. at 2137-38 (determining focus of damages remedy under 35 U.S.C. §284 by focus of the underlying infringement provision). Alternatively, Defendants (like the district court) say that *Merit Management* is distinguishable because it assessed the focus of §546(e) for other purposes. Defs.Br.26. But a statute's focus is its focus, *see* Pls.Br.70, and Defendants (like the district court) have no basis for their puzzling suggestion that §546(e) might have one focus for some purposes and a different focus for extraterritoriality purposes. Given the thrust of the presumption, the focus certainly should not change to give a statute a greater effect on foreign transactions.

As to *Picard*, Defendants concede its holding that the focus of the Code's avoidance powers is the "initial transfers sought to be avoided," Defs.Br.25, and do not dispute that it requires assessing a "statutory provision [that] works in tandem with other provisions … in concert with those other provisions," *Picard*, 917 F.3d at 96 (quoting *WesternGeco*, 138

30

S.Ct. at 2137). That gives the game away, since it is undisputed (and indisputable) that the Code's avoidance provisions and its limitations on avoidance operate in tandem—indeed, are "two sides of the same coin." *Merit Mgmt.*, 138 S.Ct. at 894. Given that statutory context, Defendants cannot plausibly maintain that §546(e) and §561(d) somehow do not "regulate[] conduct" when they operate (like the Code's avoidance provisions themselves) to prevent foreign trustees from avoiding foreign transfers they could otherwise avoid. *Contra* Defs.Br.25.[6]

Defendants find no support in *Force v. Facebook*, 934 F.3d 53 (2d Cir. 2019). *Contra* Defs.Br.23-24. As Defendants acknowledge, *Force* is not about the Bankruptcy Code at all; it instead addressed §230(c)(1) of the Communications Decency Act, and made clear that its analysis was "confined to" that context. *Contra* Defs.Br.24. In fact, *Force* explicitly disclaimed any intent to establish a categorical rule about "statutes that

---

[6] Defendants also plainly misread *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013). *Contra* Defs.Br.27. While *Kiobel* did not explicitly discuss the "focus" of the Alien Tort Statute, its analysis makes crystal clear that a suit in U.S. court based on conduct abroad is an extraterritorial application of that statute. *See* 569 U.S. at 117-24; Pls.Br.72-73. That cannot be squared with Defendants' position that applying a statute "in a U.S. proceeding" automatically implies a domestic application. *Contra* Defs.Br.20.

merely limit civil liability." 934 F.3d at 74. It emphasized instead that its analysis turned on "the text of Section 230, particularly the words 'shall be treated'"—words that are nowhere to be found in either §546(e) or §561(d). *Id.* Defendants err in reading *Force* to stand for broad principles that the decision expressly disclaimed.

Notably, the principles of comity that *Force* considered point in exactly the opposite direction here. *Force* noted that the same "international discord that can result when U.S. law is applied to conduct in foreign countries" could also arise from "[a]llowing a plaintiff's [federal] claim to go forward because the cause of action applies extraterritorially, while then applying the presumption to block a different provision setting out [federal] defenses to that claim." *Force*, 934 F.3d at 73. Here, by contrast, the question is not whether to apply a federal defense to a federal claim, but whether to extend a *domestic* limitation to hamstring a *foreign* claim that is authorized by foreign law. In this context, unlike *Force*, the demands of comity and the basic purpose of Chapter 15 weigh heavily against reading a federal statute to apply a domestic limitation, which does not exist under foreign law, to a

foreign representative asserting a foreign claim against a foreign fraudulent transfer.[7]

In short, both binding precedent and common sense confirm that the focus of §546(e) and §561(d) is on the underlying transfers at issue. Because the transfers in this case occurred abroad, applying those statutes to limit the avoidance of those transfers would be an impermissible extraterritorial application. This Court should reverse the district court's incorrect contrary holding.

## C. Even If §561(d) Reached Foreign Transfers, the Liquidators' Avoidance Claims Would Fall Within the Exception for Intentional Fraudulent Transfers.

Even if §561(d) were read to extend §546(e) extraterritorially to limit foreign avoidance claims directed at foreign transfers, it would do so only "to the same extent" that domestic transfers are shielded from avoidance. A domestic trustee can avoid intentionally fraudulent transfers even when they involve securities transactions. Thus, nothing in §561(d) limits the power of foreign liquidators to avoid intentionally

---

[7] Defendants gain nothing by relying on *Blazevska v. Raytheon Aircraft Co.*, 522 F.3d 948 (9th Cir. 2008). *Contra* Defs.Br.24-25. That case "was decided prior to *Morrison* and, therefore, carries little (if any) clout." *Loginovskaya v. Batratchenko*, 764 F.3d 266, 272 n.5 (2d Cir. 2014).

fraudulent transfers like those at issue here. Defendants' efforts to evade that obvious conclusion are unavailing.

1. Section 546(e) does not shield intentionally fraudulent transfers from avoidance; it excludes from its protective scope any avoidance claims "under section 548(a)(1)(A)," which covers transfers made "with actual intent to hinder, delay, or defraud." 11 U.S.C. §§546(e), 548(a)(1)(A). That precisely describes the transfers at issue here. As alleged in the Liquidators' complaints, Citco intentionally used fraudulently inflated NAVs as the basis for the redemption payments (and pocketed exorbitant fees based on those fraudulently inflated NAVs to boot). *See* Pls.Br.75. Those allegations are more than sufficient to plead actual and intentional fraud, and Defendants make no serious attempt to contend otherwise. *See* SPA.37 (recognizing that the Liquidators "have specifically alleged that the Redemption Payments were fraudulent due to Citco's bad faith").

Instead, Defendants raise a much broader (albeit meritless) argument: They contend that the exception to §546(e) for intentional fraud claims applies only to claims that literally arise "under section 548(a)(1)(A)," and so that exception cannot preserve *any* avoidance claims

34

brought under foreign law (whether or not they allege intentional fraud). Defs.Br.38. That is, on Defendants' view, §561(d) extends §546(e)'s limits without extending §548(a)(1)(A)'s exception, such that §561(d) bars *all* foreign avoidance claims in connection with securities contracts, with no exception for claims based on intentional fraudulent transfers. Defs.Br.38-39.

As even the district court recognized, the argument "makes no sense." SPA.37. If §561(d) applies §546(e) extraterritorially to limit foreign avoidance claims at all, it does so only "to the same extent" that §546(e) limits domestic avoidance claims. 11 U.S.C. §561(d). Defendants' approach would instead apply §546(e) to "limit avoidance powers *to a broader extent*" for foreign avoidance claims than for domestic avoidance claims, by extending §546(e)'s general prohibition without its qualifying exception. *In re Norske Skogindustrier ASA*, 629 B.R. 717, 762 (Bankr. S.D.N.Y. 2021) (rejecting Defendants' position). That "clearly is not what Congress intended," SPA.37, and would squarely conflict with Congress' consistent practice of declining to shield intentionally fraudulent transfers from avoidance, *see* Pls.Br.76-77. Defendants' reading also contravenes the basic purpose of Chapter 15—namely, facilitating the

35

efforts of foreign liquidators in U.S. courts—by leaving them helpless to avoid intentional fraudulent transactions that are avoidable under both foreign and U.S. law and that domestic trustees could readily avoid.[8]

2. Despite correctly recognizing that the statutory exception to §546(e) allows foreign representatives to avoid intentional fraudulent transfers, the district court nevertheless concluded that the Liquidators' avoidance claims fell outside that exception because the "legal basis" for those claims did not "contain a fraud element"—i.e., because the BVI statutes under which the Liquidators' claims arise do not formally make intentional fraud an element of those claims. SPA38. That analysis improperly demands that foreign causes of action conform to domestic preconceptions, in contravention of the purpose of Chapter 15 and principles of international comity. *See* Pls.Br.76-78. Instead, the correct inquiry is whether the foreign avoidance claims at issue actually allege

---

[8] Defendants argue that §546(e)'s statutory exception cannot reach all intentional fraud claims, because courts "routinely" apply §546(e) to dismiss state-law fraud claims. Defs.Br.38-39. But as the district court explained, those state claims are barred "because they are preempted" by §546(e) and the federal §548(a)(1)(A) remedy. SPA.36. There is no such preemption (or alternative federal remedy) for foreign claims, "making the analogy inapposite." SPA.36; *see infra* p.44.

that the challenged transfer was tainted by intentional fraud—a standard that the Liquidators' allegations here readily meet.

Defendants have no response to the manifold problems with the district court's categorical focus on the elements of foreign causes of action rather than the facts alleged about the challenged transfer. In particular, Defendants do not (and cannot) explain why Congress would want to insulate intentional fraudulent transfers from challenge whenever a foreign avoidance statute does not specifically enumerate fraudulent intent as a distinct element, a rule that would only encourage fraudsters to "hide assets in the United States out of the reach of the foreign jurisdiction." *In re Condor Ins. Ltd.*, 601 F.3d 319, 327 (5th Cir. 2010); *see* Pls.Br.77.

For instance, if a foreign jurisdiction chose to distill all its fraudulent conveyance rules into a single statute making all undervalued transactions voidable regardless of intent, Defendants' approach would bar *ever* applying that foreign statute to avoid a securities-related transfer, even in cases of egregious and deliberate fraud. *See* SPA.38 (holding the foreign avoidance claim must "contain a fraud element"). That cannot be reconciled with either Congress' decades-long emphasis

37

on avoiding any protection for intentional fraud under §546(e) in the domestic arena or §561(d)'s "to the same extent" language. *See* Pls.Br.76-77. Nothing in §561(d) limits the avoidance powers of foreign liquidators under foreign law to some preconceived notion that the power to avoid intentionally fraudulent transfers must be separately codified. Rather, at most, §561(d) limits a foreign liquidator from avoiding a securities-related transfer that would be off-limits to a domestic trustee applying domestic law. Applying that provision faithfully does not require disrespecting foreign avoidance powers that do not sufficiently conform to U.S. law or a preconceived notion that the ability to target intentional fraud should be separately codified with distinct elements. The district court's contrary approach disrespects foreign jurisdictions' choices about how to structure their fraudulent transfer laws, invites international friction, and undermines the "effective mechanisms for dealing with cases of cross-border insolvency" that Chapter 15 is designed to provide. 11 U.S.C. §1501(a).

Rather than defend the district court's approach, Defendants assert that the Liquidators "expressly disclaimed that they were bringing intentional fraud claims" and so "did not plead the elements of such a

claim." Defs.Br.40 (emphasis omitted). That assertion is inexplicable. Nothing in the record pages that Defendants cite includes any such "express[] disclaime[r]," *contra* Defs.Br.40 (emphasis omitted), and in fact the Liquidators' pleadings are replete with allegations showing intentional fraud, *see generally* JA.4634-43. In fact, Defendants eventually appear to recognize that the Liquidators pleaded "factual allegations of fraud"; they argue only that those allegations should be ignored because intentional fraud is not a separate element of the Liquidators' claims, Defs.Br.40-41, which just begs the question of whether the statutory exception turns on foreign-law elements or factual allegations.

Any insistence that "intentional fraud" be a formal element of an avoidance action is particularly misplaced here, given that a §246 claim "cannot proceed if the debtor entered a transaction in good faith," Pls.Br.76 (emphasis omitted), because (as Defendants concede) a transaction is not undervalue if "the company enters into the transaction in good faith," BVI Insolvency Act §246(2); *see* Defs.Br.41-42. That requirement explains why the Liquidators' complaint *does* allege facts showing intentional fraud, as those facts underscore the absence of good

faith. JA.4634-43; *see* SPA.37 n.31 ("Under BVI law, 'bad faith' and 'fraud' are governed by the same criteria, making the two terms interchangeable in use."); JA.1307 (Defendants' expert equating "bad faith" with "deceit or fraudulent misrepresentation"). Regardless, Defendants' focus on whether actual fraud is "an *element* of a Section 246 claim," Defs.Br.42, misses the point, as the proper inquiry does not turn on the formal elements of the foreign cause of action. Pls.Br.75-78; *see supra* pp.36-38.[9]

\* \* \*

In sum, even if §561(d) were read to extend §546(e) to apply extraterritorially to foreign avoidance claims targeting foreign transfers, the claims here would still go forward because they fall within the statutory exception for intentional fraud. Applying §546(e) extraterritorially without its statutory exception, or only to the extent foreign statutory avoidance powers conformed to U.S. law, would impose

---

[9] Defendants suggest that to satisfy their test, the Liquidators should have brought their avoidance claims under §81 of the BVI Conveyancing and Law of Property Act. The fact that Defendants would demand a foreign liquidator to proceed under the Conveyancing and Law of Property Act, rather than the Insolvency Act, runs counter to the basic thrust of Chapter 15 and is a strong hint that their standard is wrong.

40

a bizarre asymmetry with no support in §561(d). The avoidance powers of foreign representatives would be limited to a greater extent than domestic trustees, and a chapter of the Bankruptcy Code designed to encourage comity and cooperation in cross-border insolvencies would be repurposed to force foreign law to fit a preconceived American mold.

## III. The District Court Erred In Affirming The Dismissal Of The Liquidators' BVI Common Law And Contract Claims.

The district court also erred in dismissing the Liquidators' BVI Common Law and Contract Claims. Those claims, which provide an independent basis for recovery even if §546(e) limits the Liquidators' avoidance powers, seek to recapture over $6 billion in inflated redemption payments that were based on fraudulent NAVs in order to equitably redistribute the proceeds to all the defrauded investors. Defendants resist those claims, asserting that the fraudulent NAVs are "binding" on the Liquidators because the Liquidators "stand in the shoes of the Funds" and so (according to Defendants) are bound by the actions of the Funds' authorized agent even when those actions were fraudulent. Defs.Br.48. But the BVI's highest judicial authority—the Judicial Committee of the Privy Council—has ruled that where NAVs are fraudulently calculated by an investment fund's authorized agent, the

41

NAVs are *not* binding, and liquidators may recover the fraudulently inflated payments through contract and common law actions. *See Skandinaviska Enskilda Banken AB (Publ) v. Conway (as Joint Official Liquidators of Weavering Macro Fixed Income Fund Ltd.)*, [2019] UKPC 36 ("*Weavering II*"), SPA.417-66. None of Defendants' various attempts to evade *Weavering II* succeeds.

## A. The Bankruptcy Code Safe Harbor Does Not Bar the Liquidators' BVI Common Law Claims.

Defendants first try to avoid *Weavering II* altogether by advancing an argument that the district court rejected and that is the subject of a pending request for interlocutory appeal—namely, that §561(d) and §546(e) not only extend extraterritorially to restrict the Liquidators' ability to "avoid a transfer," 11 U.S.C. §546(e), but also override the Liquidators' ability to assert independent BVI common law claims. *See* Defs.Br.44-47. Defendants assert that because §546(e) has been interpreted to preempt certain *state* common law claims in Chapter 7 and 11 cases, it should also be applied "through Section 561(d)" to prohibit similar *foreign* claims in a Chapter 15 proceeding. Defs.Br.44. Both the bankruptcy court and the district court correctly rejected this argument, which would effectively project the Supremacy Clause extraterritorially

in complete derogation of principles of international comity.  *See* SPA.36, 39-40; *In re Fairfield Sentry Ltd.*, 2020 WL 7345988, at *9-10 (Bankr. S.D.N.Y. Dec. 14, 2020).  This Court should follow suit.[10]

First and fatally, Defendants' position is inconsistent with the text of §561(d), which instructs that §546(e) shall apply "to limit *avoidance powers*" in Chapter 15 cases (emphasis added).  Even if §561(d) could be read to extend extraterritorially to limit foreign *statutory avoidance* claims' application to foreign transfers, *but see supra* pp.15-24, it does not by its terms limit foreign *common law* claims.  As the bankruptcy court explained, the Liquidators' Common Law claims are not "avoidance claims"—even if the two sets of claims "may ultimately lead to the same result," namely, "a money judgment for the amount of the redemption payments"—because they "proceed on different theories and different

---

[10] Because the lower courts rejected this argument, they allowed the Liquidators' constructive trust claims to proceed against Defendants that allegedly knew of the Madoff fraud when they received their redemptions. *See Fairfield III*, 2020 WL 7345988, at *1, *9-10.  Those Defendants have filed 18 petitions for interlocutory appeal based ostensibly on this issue. *See, e.g.*, *Fairfield Sentry Ltd. v. UBS AG N.Y.*, No. 23-517 (2d Cir.).  Although those petitions remain pending—and should be denied, *see generally* Opposition, *Fairfield Sentry Ltd. v. UBS AG N.Y.*, No. 23-517 (2d Cir. Apr. 17, 2023), Dkt.10—the Liquidators address the issue here to the extent this Court considers it as an alternative basis for the decision below.

43

proof." *In re Fairfield Sentry Ltd.*, 2021 WL 771677, at *3 (Bankr. S.D.N.Y. Feb. 23, 2021).

Defendants emphasize that §546(e) has been read to implicitly preempt domestic trustees from bringing some state-law fraudulent transfer and unjust enrichment claims. *See* Defs.Br.44-45 (citing *In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 92 (2d Cir. 2019); *In re Nine W. LBO Sec. Litig.*, 482 F.Supp.3d 187, 207 (S.D.N.Y. 2020); *AP Servs., LLP v. Silva*, 483 B.R. 63, 71 (S.D.N.Y. 2012)). But those decisions depend on the clear rule supplied by the Supremacy Clause, which forces the law of inferior domestic sovereigns to yield to the law of the superior national sovereign. As the courts below recognized, those principles are simply "inapplicable to considerations of federal law versus *foreign* law," where assertions of supremacy could be a *casus belli* and give way to principles of respect and international comity. *Fairfield III*, 2020 WL 7345988, at *10 (emphasis added) (quoting *Al-Kurdi v. United States*, 25 Cl. Ct. 599, 601 n. 3 (Cl. Ct. 1992)); *accord* SPA.36-37, 40. Unsurprisingly, Defendants do not cite a single case conducting a preemption analysis as to foreign law.

Defendants' contention that "foreign law applies within the United States only as a matter of comity," Defs.Br.45, is inapposite here, because Chapter 15 expressly contemplates that U.S. courts will apply foreign law, including foreign contract and common law, in "act[ing] as an adjunct or arm of a foreign bankruptcy court." *In re Fairfield Sentry Ltd. Litig.*, 458 B.R. 665, 679 (S.D.N.Y. 2011); *accord* Defs.Br.45 (recognizing that "all the claims arise under foreign law" in this Chapter 15 case). Thus, because Chapter 15 makes foreign contract and common law presumptively applicable, and §561(d) provides the only plausible basis for displacing that law, and neither its text nor preemption principles displace foreign law, the courts below were correct to let those claims proceed. *See Condor*, 601 F.3d at 327 ("Congress did not intend [Chapter 15] to restrict the powers of the U.S. court to apply the law of the country where the main proceeding pends.").

## B. Neither the Funds' Articles nor BVI Law Bars the Liquidators' BVI Common Law Claims.

Defendants attempt to defend the dismissal of the Common Law and Contract Claims on four other grounds, asserting that: (1) under the Funds' Articles, "redemption payments are final and binding once completed"—even if based on fraudulently inflated NAVs, Defs.Br.49; *see*

45

*id.* at 54-59; (2) Defendants "provided good consideration" for their redemption payments, *see id.* at 63-65; (3) the Liquidators' claims are barred by §31 of the BCA, *see id.* at 50-53; and (4) the Liquidators' claims are precluded by the BVI common law doctrine of *ex turpi causa non oritur action* ("*ex turpi*"), *see id.* at 60-63. None of these arguments has merit.

1. Defendants' contention that the fraudulently inflated NAVs are "binding" under the Funds' Articles is based on *Fairfield Sentry Ltd. (in Liquidation) v. Migani*, [2014] UKPC 9, a 2014 Privy Council decision that addressed certain "preliminary issues" in the Liquidators' BVI Redeemer actions. Pls.Br.23; *see* Defs.Br.54-57. *Migani* held that the NAVs ascertained by Fairfield Sentry's Directors at the time of the redemption were "binding on the Fund under Article 11 of its Articles." SPA.153; *see* SPA.158, 160, 162 (where Fund's NAV is determined in accordance with Article 11(1), it is conclusive). But *Migani* addressed only the question of whether the NAVs were binding if they were made in good faith—i.e., in the "belief that the assets were as stated." SPA.153. It did not consider the factual question of whether the NAVs were indeed made in good faith, an issue on which the parties were not afforded

discovery; on the contrary, the proceedings in *Migani* expressly carved out all such factual issues, and preserved the parties' right to raise them in subsequent litigation. Pls.Br.23; *see* JA.223. As a result, nothing in *Migani* considered whether a *fraudulent* NAV is binding—an issue that was not raised in that case. SPA152-62; *see* Pls.Br.23-24.

That issue was instead addressed by the Privy Council's subsequent decision in *Weavering II*, which considered whether NAVs are binding if "prepared on a fraudulent basis by the person to whom the directors had given actual authority to carry out the valuations." SPA.430. *Weavering II* held that where NAVs have been *fraudulently* inflated by the fund's agent, they are *not binding*, and so the fraudulently inflated redemption payments may be disgorged. *Id.* That decision controls here, and makes clear that the Liquidators' contract and common law claims may proceed. Pls.Br.79-82.

Indeed, this case follows *a fortiori* from *Weavering II*. In *Weavering II*, the company's articles stated that NAVs were to be determined using "generally accepted accounting principles," and that any valuations made "pursuant to the[] articles" would be "binding on all persons." SPA.428. The Privy Council read these provisions to require a "good faith" (i.e.,

47

"honest") valuation of the company's assets, and so concluded that a fraudulent valuation was not binding. SPA.428, SPA.430. Here, the Articles *explicitly* provide that an NAV is "binding" only if "given in good faith," eliminating any doubt that a fraudulent NAV does not control. JA.274; *see* Pls.Br.81-82.

Defendants' attempt to paint this case as governed by *Migani* rather than *Weavering II* falls flat. To begin, Defendants' assertion that *Migani* considered "alleged misconduct" by an investment fund's agent is pure fiction. *Contra* Defs.Br.54. In fact, *Weavering II* expressly "considers [*Migani*] distinguishable" because it did *not* consider such allegations. SPA.429. Instead, the Privy Council explained, *Migani* assumed that "the redemption liabilities were determined by the [Funds'] directors in good faith, as the articles required." SPA.429. Here, by contrast, the allegations precisely mirror *Weavering II*: the NAVs "were prepared on a fraudulent basis by the person to whom the directors had given actual authority to carry out the valuations," SPA.430, and not prepared in good faith as the court assumed in *Migani*.

Defendants' assertion that the fraudulent NAVs in *Weavering II* were "binding on the company" and "voidable [only] at the option of [an]

48

innocent defendant-shareholder," Defs.Br.55-56, is also incorrect. Defendants base that assertion on the Privy Council's statement that the fraudulently inflated redemptions "became a liability of the company" on the redemption day. Defs.Br.55 (quoting SPA.434). That statement, however, merely reflects the Privy Council's view that the redemptions were "voidable" rather than void *ab initio*—i.e., that "it would be necessary for a party who wished to have the NAV avoided to bring proceedings to do so." SPA.431. While the Privy Council assumed (consistent with the limited record before it) that such proceedings would normally be brought by a defrauded shareholder, its holding that a fraudulent NAV "is not binding by reason of fraud" is not limited to shareholder suits. SPA.431.

Defendants contend that the principles of "finality, certainty, and workability" that motivated *Migani* should control "even in cases where—as here—liquidators allege misconduct or illegality." Defs.Br.56 (citing *In re Fairfield Sentry Ltd.* (*Fairfield II*), 596 B.R. 275, 295 (Bankr. S.D.N.Y. 2018). But *Weavering II* addressed this point as well, explaining that the interest in finality that controls when NAVs are rendered in good faith "must yield" where NAVs are fraudulent. SPA.430. By contrast,

49

the sole case that Defendants cite to claim that finality should control did not consider any allegations of deliberate fraud. *See DD Growth Premium 2X Fund v. RMF Mkt. Neutral Strategies (Master) Ltd.*, [2017] UKPC 36 ¶¶4, 58, 63 (considering payments that were "due to [the shareholder] under lawful transactions" but ran afoul of Cayman Islands corporate-solvency test). And the BVI courts have likewise refused to read *Migani* as foreclosing the Liquidators' claims of deliberate fraud, denying an application by certain Defendants under §273 of the BVI Insolvency Act to prevent the Liquidators from pursuing these claims on that basis. *See* JA.230.[11]

Finally, Defendants claim that it would require "imply[ing] a contractual term," "re-writing the Articles," and "import[ing] an unwritten contractual term" to conclude that a fraudulent NAV is not binding. Defs.Br.57-59. But the Articles explicitly provide that only NAVs "given in good faith … shall be binding," JA.274, which unmistakably means that NAVs given in *bad* faith are *not* binding. *See*

---

[11] Defendants briefly assert that *Weavering II* "did not address BVI law" because it arose "under Cayman Islands law," Defs.Br.55-56, but the Privy Council's articulation of English common law principles is fully applicable in either context. *See* SPA.158 (applicable principles of BVI law "[i]n every relevant respect … are the same as those of English law").

Pls.Br.89-91. And whatever the merits of Defendants' claim that an issuing fund cannot "rely on its own misconduct to void NAVs to the detriment of shareholders," Defs.Br.57, that concern is not remotely implicated here, where the Liquidators are seeking to recover fraudulently inflated payments (based on Citco's fraud) for the benefit of defrauded investors. Here as in *Weavering II*, the Liquidators' claims seek not to "benefit the [c]ompany, since in the winding up it has no beneficial interest in its assets," but to "undo[] the unfair advantage which [Defendants] obtained at [other investors'] expense." SPA.448. Barring those claims would leave the innocent shareholders whose investments funded Defendants' inflated returns with no practical way of voiding the fraudulent NAVs that injured them, a result that would turn both the Articles and BVI law on their heads.

2. Defendants briefly assert that the Liquidators' claims are "independently bar[red]" because Defendants purportedly exchanged "good consideration" (i.e., their shares in the Funds) for the redemption payments. *See* Defs.Br.63-64. That argument is neither independent nor meritorious. Instead, as *Migani* explained, whether the NAVs are binding and whether good consideration was provided "are closely related

and have to be considered together." SPA.153.[12]  Because *Migani* held that NAVs rendered in good faith were binding, it dismissed the liquidators' cross-appeal on the good-consideration issue.  *See* SPA.162. Here, because the fraudulent NAVs are *not* binding, the Defendants also failed to provide good consideration.

That follows directly from the logic of *Migani*.  As the Privy Council observed there, and Defendants conceded below, the doctrine of good consideration does not bar recovery of a payment that "exceeds the debt properly due."  SPA.158; *see* Reply at 22, *Fairfield Sentry Ltd. v. Citibank NA London*, No. 19-cv-03911 (S.D.N.Y. Apr. 23, 2020), Dkt.361 ("*Citibank Reply*").  It is undisputed that if the fraudulent NAVs are not binding, then the Funds owed Defendants only the true value of their nearly worthless shares—far less than the Funds paid.  *Citibank* Reply at 24; *see* JA.1751.10 (Moss Decl. ¶17).  As such, if the NAVs are not binding, the doctrine of good consideration does not bar recovery of the amounts

_____

[12] For that very reason, *Migani* did not leave the lower court's decision on the good-consideration issue "intact" and "binding."  *Contra* Defs.Br.64; *see, e.g.*, Graham Virgo, *Good Consideration Provided by the Defendant*, The Principles of the Law of Restitution 190 (3d ed. 2015) (confirming that *Migani* affirmatively decided the good-consideration issue).

by which the Funds' payments were fraudulently inflated. That doctrine thus poses no independent hurdle for the Liquidators' claims.

3. Defendants (like the district court) assert that the Liquidators' common law claims are barred by §31(1)(e) of the BVI Companies Act. Defs.Br.50-53. That argument has already been rejected by BVI courts and misunderstands BVI law. Pls.Br.82-86.

That is the lesson of *ABN AMRO Fund Servs. (Isle of Man) 24 Nominees Ltd. v. Krys*, where a number of BVI Defendants unsuccessfully advanced the same argument—that §31(1)(e) bars the Liquidators' claims—before the Eastern Caribbean Court of Appeals ("ECCA"). Pls.Br.83. Defendants do their best to run from that case, claiming that the ECCA "never addressed Section 31" and so its decision is irrelevant. Defs.Br.50-51. But the ECCA explained that it had "considered the arguments put forward by both sides," including Defendants' §31(1)(e) argument, and rejected Defendants' position that this argument made the Liquidators' claims somehow "hopeless" or "doomed to fail." SPA.91; *see* SPA.82 (acknowledging §31(1)(e) argument). The fact that the ECCA saw no need to discuss §31(1)(e) in more detail only confirms that it considered the argument meritless. That is hardly surprising, since—as

53

Defendants tacitly concede—*no* BVI court has *ever* applied §31(1)(e) to analogous claims. Pls.Br.83.

Defendants' interpretation of §31(1)(e) is also wrong. By its terms, that statute only prohibits a company from asserting that documents issued "with actual or usual authority" are "not valid or not genuine." SPA.286. That does not bar the Liquidators' claims, as the Liquidators do not argue that the certificates here were not valid or not genuine; they argue only that the certificates were not "given in good faith," as the Articles require to make them binding. JA.272.

Defendants would read §31(1)(e) far more expansively, to prohibit a company from raising *any* challenge to the binding force of any document its agent issues. Defs.Br.51-52. Defendants cite no authority for that interpretation, and for good reason: because the context makes clear that §31(1)(e) uses "valid" to mean "executed with the proper legal authority and formalities," not binding under all circumstances. *See* Valid, *Merriam-Webster Dictionary*, https://archive.ph/wip/1S34U (last visited June 9, 2023). That understanding accords with the other subparagraphs of §31(1), which likewise preclude a company from holding a person out as its representative and then challenging that

54

person's "authority to exercise a power" that such a representative would customarily have. BVI Companies Act §31(1)(b)-(d), SPA.286. Section 31(1)(e) similarly forbids a company from having its representative issue a document and then questioning whether the document was executed with the proper authority and formalities; it does not mean that the document "is to be treated as *conclusive* so as to preclude recovery of sums that would otherwise be recoverable" under contract or common law. JA.1751.39-40 (Moss Decl. ¶¶78-79).

Defendants' interpretation—reading "valid" in §31(1)(e) to mean "legally binding," Defs.Br.51-52—also conflicts with the rest of the BVI Companies Act, which routinely uses the term "valid" alongside the term "binding" and thereby confirms that the two are not synonymous. Pls.Br.84. Defendants claim that "binding" is needed in those other provisions "to make clear *who* is bound," but have no explanation for why a synonymous (and in Defendants' view, superfluous) "valid" would be needed as well. *Contra* Defs.Br.52. Nor is "valid and binding" merely a "redundant doublet," as evidenced by the numerous provisions of the Act that use one term but not the other. *Contra* Defs.Br.52 n.24.

Unlike Defendants' reading, the Liquidators' interpretation of §31(1)(e) harmonizes the provision with not only the rest of §31(1) and the BVI Companies Act, but also the common law "indoor management rule" that all agree the statute codifies. *See* Defs.Br.53 (acknowledging §31's origin in the indoor management rule). That common law rule allows parties doing business with a corporation to assume that corporate representatives possess the authority that they would customarily possess. *See* Pls.Br.85-86. The Liquidators' reading of §31(1)(e) accords with that rule, applying the same principle to documents issued by those corporate representatives. Defendants' reading, by contrast, would dramatically expand that rule, precluding companies from raising *any* challenge on *any* grounds to the legal force of any document their agents issue. Defs.Br.53. Defendants provide no reason to believe that §31(1)(e) was intended to work that massive change in the law.

Finally, Defendants have no answer to the absurd results their reading would cause. Under Defendants' interpretation, every document issued by a corporate agent—including those issued by mistake or by a rogue agent acting in bad faith—would be conclusive and binding on the company, even where a contractual or common law remedy would

56

otherwise be available. *See* Pls.Br.84-85. Defendants respond by quibbling with the details of the Liquidators' mistaken-bank-statement hypothetical, Defs.Br.52-53, but entirely miss the point. Whether the documents at issue are bank statements, stock certificates, contracts, or anything else, §31(1)(e) simply cannot be read to preclude companies from any challenge to the binding force of documents issued by their agents, especially challenges that have nothing to do with whether those documents are valid or genuine.[13]

4. Defendants (again, like the district court) also err in relying on the BVI common law doctrine of *ex turpi*, which generally prevents plaintiffs from bringing a cause of action based on their own illegal or immoral acts. Pls.Br.86-89; *see* Defs.Br.60-63.

Defendants begin by conflating *ex turpi* with the New York doctrine of *in pari delicto*. Defs.Br.60. While those doctrines may be "related," Defs.Br.60, their application is clearly distinct. Pls.Br.88-89. Under New

---

[13] Defendants' quibbles also go nowhere. The principle that banks may rectify mistakes within a reasonable time is just the kind of common law rule that Defendants claim §31(1)(e) is supposed to displace, *see* Defs.Br.53, and a bank customer's knowledge of her balance would be irrelevant unless the customer knew *the mistaken statement* was "not valid or not genuine," SPA.286.

York law, the *in pari delicto* doctrine is both "strong" and "inflexible"; it "applies even in difficult cases" and is not to be "weakened by exceptions." *Kirschner v. KPMG LLP*, 938 N.E.2d 941, 950 (N.Y. 2010). By contrast, *ex turpi* is a "flexible" doctrine that applies only where "the public interest would be harmed" if a claim "tainted by illegality" were allowed to proceed. SPA.215, 218-19, 221 (*Patel v. Mirza*, [2016] UKSC 42 ¶¶101, 109, 113, 120); *see also* Lincoln Caylor & Martin S. Kenney, *In Pari Delicto and Ex Turpi Causa*, 18 BUS. L. INT'L 259, 268 (2017) (noting "stark contrast" between Anglo-Canadian *ex turpi* jurisprudence and New York's *in pari delicto* jurisprudence); JA.1751.53 (Moss Decl. ¶101) (similar).

Defendants' *ex turpi* argument fails at the threshold, because (as Defendants apparently recognize) the Liquidators have never engaged in any "illegal or immoral acts" that would trigger it—and under BVI law, the Liquidators are not charged with Citco's alleged fraud. *Contra* Defs.Br.61. To be sure, under *New York* law, "[t]he debtor's misconduct is [generally] imputed to the trustee because, innocent as he may be, he acts as the debtor's representative." *In re Bernard L. Madoff Inv. Sec. LLC*, 721 F.3d 54, 63 (2d Cir. 2013); *accord* Caylor & Kenney, *supra*, at

58

268 (discussing the interaction between New York's rigid *in pari delicto* doctrine and its "extremely broad application of corporate imputation," including in bankruptcy proceedings). BVI courts, however, take a different approach. As the Privy Council explained in *Weavering II*, "[t]he fact that the directing mind of the Company was guilty of a fraud does not render illegal the liquidators' attempts to recover payments made unlawfully in the lead up to the insolvency." SPA.461 ¶124. Defendants have no response to this on-point analysis from the BVI's highest judicial authority—and tellingly, they do not cite a single BVI case imputing a corporate agent's wrongdoing to the corporation's liquidators. *See* Defs.Br.61-62.

Defendants also fail to identify any way in which the Liquidators have benefited from Citco's alleged misconduct. *Contra* Defs.Br.61-62. Defendants' submission that "the Funds benefitted from [Citco's] certification of the NAVs" because the NAVs were "necessary for the Funds' operation," Defs.Br.62, is beside the point: it does not show that the Funds benefited from the *fraudulent nature* of the certifications, let alone that the *Liquidators* benefited from Citco's actions in any way. *See* Pls.Br.86. In fact, Citco's fraud benefited *Defendants*, allowing them to

59

receive inflated redemption payments at the expense of innocent shareholders. *See* JA.1751.46-47 (Moss Decl. ¶91(c)-(e)); *accord* SPA.448 (*Weavering II*). Again, Defendants have no response, other than cases applying inapposite principles of New York law. *See* Defs.Br.62.

Defendants' treatment of the public interest fares no better. *Contra* Defs.Br.62-63. Notably, Defendants utterly fail to engage with the British and BVI common law cases and legal principles discussed in the Liquidators' opening brief. *Compare* Pls.Br.86, 88 & n.15 (discussing multiple BVI and U.K. Supreme Court cases), *with* Defs.Br.61-63 (ignoring them). The only such case Defendants mention is *Weavering II*, which squarely contravenes their position: contrary to Defendants' description, the case recognizes that "the public interest" favors liquidators' efforts to "protect[] creditors as a class" over redeemers' efforts to hold onto fraudulently inflated payments. *See* SPA.448 ¶80; SPA.457-58 ¶111; SPA.461 ¶124. Defendants also suggest that "[u]nder the liquidators' logic, *ex turpi causa* could never bar liquidators' claims." Defs.Br.62. But Defendants have not identified a single BVI case that *has* applied *ex turpi* to bar a liquidator's claim—and they come nowhere close to demonstrating that this case should be the first to do so,

especially when the parties here contracted around the *ex turpi* doctrine in any event.  Pls.Br.89; *contra* Defs.Br.63.

## IV. The Bankruptcy Court Erred In Ruling That The Liquidators Failed To State A Claim Under §246 Of The BVI Insolvency Act.

The bankruptcy court also erred in dismissing the Liquidators' claims under §246 of the BVI Insolvency Act, an issue that the district court did not address.  *See* Pls.Br.71-74.  As relevant here, §246 allows a liquidator to avoid a transaction if it is "undervalue," meaning that the transferor received "significantly less" in exchange for the value it transferred.  BVI Insolvency Act §246(1)(b).  The Liquidators plainly stated a claim under that standard:  they alleged that the Funds made fraudulently inflated payments to Defendants in exchange for near-worthless shares.  *See Fairfield II*, 596 B.R. at 303 (noting that "the true value of the Funds' assets and the shares were nil").  The bankruptcy court nevertheless dismissed the Liquidators' §246 claims, holding that those claims could only proceed if the Liquidators pleaded that each Defendant "had reason to believe that the NAVs were inflated," *id.* at 305—a brand-new scienter requirement that has no basis in the statutory text and that defies BVI law.  *See* Pls.Br.92-94.

Defendants make no attempt to defend the bankruptcy court's judicially invented scienter requirement based on the text of §246. *See* Defs.Br.71-74. Instead, Defendants swing for the fences, arguing that their redemption payments were "definitionally not 'undervalue'" because their shares "at the time of the transactions" were worth the full amount that Defendants received. Defs.Br.72; *see* Defs.Br.73-74 (claiming that "even in hindsight," the redemption payments "were not undervalued"). That argument quite literally ignores reality. It is undisputed that the actual value of Defendants' shares at the time of redemption—given the Madoff Ponzi scheme—was next to nothing. *See* Pls.Br.16-17. That makes the redemption transactions "undervalue," even assuming Defendants (like the Funds) were unaware that their shares were actually worthless.

To avoid that outcome, Defendants claim that the BVI courts assess value under §246 "at the time of the transfer, not with the benefit of hindsight," and consider only "the information that was reasonably available to an objective observer" at the time of the transfer. *See* Defs.Br.72-73. But Defendants do not identify a single BVI case articulating that purported "rule," relying instead on two paragraphs of

62

their expert's declaration. Defs.Br.72 (citing JA.1332, 1357). One of those paragraphs baldly asserts, without citation, that "[t]he BVI Court" assesses transactions "without intrusion of hindsight." JA.1332. The second paragraph cites a single English case, *see* JA.1357 n.218 (citing *Joiner v. George*, [2003] BCC 298 ¶¶68, 70), but that case did not interpret the English analog of §246, or even arise in the context of insolvency law; instead, it involved an alleged breach of a contractual warranty for a sale of shares. *See* JA.1751.100 (Moss Decl. ¶209). Defendants' unelaborated reference to *Joiner* comes nowhere near establishing that BVI law broadly forbids courts from assessing a transaction under §246 with the benefit of hindsight. *Contra* Defs.Br.72.

The key decision is instead *Phillips v. Brewin Dolphin Bell Lawrie*, [2001] BCC 864 (HL), which *did* address the English analog of §246—and held that under that statute, "reality should … be given precedence over speculation," and "ex post facto events" should "be taken into account." *Id.* ¶26; *see* Pls.Br.93. That decision expresses the governing rule, not a "narrow exception" to that rule. *Contra* Defs.Br.72; *see* JA.1751.100 (Moss Decl. ¶209) (*Phillips* "held that hindsight can be used in the context of insolvency law transaction avoidance"). And nothing in

63

*Phillips* adopts Defendants' rule that hindsight is relevant only where the value of the asset is known "at the time" to be "uncertain" or "precarious"—a rule that, notably, Defendants again cite only to their expert, not anything in *Phillips* itself. *Contra* Defs.Br.72-73 (citing only JA.1358).[14]

In short, Defendants provide no good reason to ignore the simple reality that the Funds paid them vastly more than their shares were worth, making the redemption transactions grossly "undervalue" under §246. And Defendants certainly provide no good reason for adopting the bankruptcy court's invented scienter requirement, which has no basis either in the text of §246 or BVI law. Here as in *Phillips*, it would be "unsatisfactory and unnecessary for the court to wear blinkers" by conducting the §246 inquiry while ignoring the reality of the transaction at issue. [2001] BCC 864 ¶26; *contra* Defs.Br.72-73.[15] The Liquidators' claims under §246 should be reinstated.

_____

[14] *Phillips* also acknowledges that rules about the use of hindsight "may not be uniform" in "different areas of the law," [2001] BCC 864 ¶26, explaining any difference between *Phillips* and *Joiner*.

[15] Defendants also briefly assert that the payments they received were not undervalued because tendering their shares made them "creditors of

**V.    The Liquidators' Claims Are Not Precluded By The Prior BVI Proceedings.**

Defendants' argument that *Migani* precludes the Liquidators' common law claims, which they relegate to the end of their challenge to those claims (and then repeat in a supplemental brief), likewise goes nowhere.   Defs.Br.65-71;  BVI.Defs.Supp.Br.6-14.   As the courts below correctly held, *Migani* has no preclusive effect on this litigation, because the relevant issues were not (and could not have been) raised or decided in that suit.  SPA.40-43.

**A.    BVI Law Governs the Preclusion Issue Here.**

Defendants begin by arguing that federal law rather than BVI law governs the preclusive effect of the BVI judgment in *Migani* on the Liquidators' BVI common law claims.    *Contra* Defs.Br.66-67; BVI.Defs.Supp.Br.6-9.  This Court, however, has repeatedly held that bankruptcy courts, like district courts sitting in diversity, must normally follow the choice-of-law rules of their forum state.  *See, e.g.*, *In re Coudert Bros. LLP*, 673 F.3d 180, 187-88 (2d Cir. 2012); *In re Gaston & Snow*, 243

---

the Funds in an amount established by the Funds' NAVs."  Defs.Br.73-74.  That is just a repackaged version of Defendants' argument that the fraudulent NAVs were binding, and fails for the same reasons.  *Supra* pp.46-51.

F.3d 599, 606-07 (2d Cir. 2001). Under New York choice-of-law rules, a foreign judgment's preclusive effect is governed by the law of the issuing jurisdiction—here, the BVI. *See Kim v. Co-op. Centrale Raiffeisen-Boerenleebank B.A.*, 364 F.Supp.2d 346, 349 (S.D.N.Y. 2005). BVI law rather than federal common law therefore controls here.

Defendants argue that in "non-diversity cases," federal courts "apply their own rule" to decide preclusion. Defs.Br.66-67; BVI.Defs.Supp.Br.6-8. But none of the cases they cite for that principle are bankruptcy cases—and in the bankruptcy context, this Court has held the opposite, explicitly "reject[ing]" the argument that federal law should apply just because "bankruptcy is a form of federal question jurisdiction." *Coudert*, 673 F.3d at 188 (citing *Gaston & Snow*, 243 F.3d at 605-06). Defendants attempt to distinguish *Coudert* as involving choice-of-law for state-law claims "originally brought in state court." Defs.Br.67 n.28; *see* BVI.Defs.Supp.Br.8. But *Coudert* applied *Gaston & Snow*, which broadly held that bankruptcy courts "should apply the choice of law rules of the forum state" rather than creating federal common law. *Gaston & Snow*, 243 F.3d at 601-02. Applying that rule here also respects the international comity concerns of Chapter 15, by

allowing BVI law (under New York choice-of-law rules) to govern the preclusive effect of a BVI judgment on BVI claims. The district court correctly held that BVI law governs.

### B.   Under BVI Law, There Is No Preclusion Here.

Apparently realizing the weakness of their choice-of-law position, Defendants try to argue that even under BVI law, *Migani* would preclude the Liquidators' claims. Defs.Br.70-71; BVI.Defs.Supp.Br.9 n.6. That argument is both forfeited and meritless.

As Defendants recognize, their only argument to the district court under BVI preclusion law was a "one-line footnote" conclusorily asserting that the Liquidators' claims were precluded by "BVI doctrines of issue estoppel." SPA.42 n.34; *see* Defs.Br.69 (citing footnote below). The district court correctly found that argument was "not properly briefed," and so deemed it forfeited and declined to address it. SPA.42 & n.34. This Court should do the same. *See, e.g.*, *United States v. Quinones*, 317 F.3d 86, 90 (2d Cir. 2003) ("argument mentioned only in a footnote" is not "adequately raised or preserved for appellate review").[16]

---

[16] Defendants also claim they "did not waive the preclusion issue by arguing it under the purportedly wrong law." Defs.Br.70. But preclusion

67

In any event, Defendants' forfeited argument is also meritless. To begin, BVI issue estoppel is "more restrictive" than its U.S. counterpart, because "it requires mutuality—either the same parties or their privies." *Fairfield II*, 596 B.R. at 292 (citing *OJSC Oil Co. Yugraneft v. Abramovich*, [2008] EWHC 2613 (Comm) ¶396); *see* JA.1751.18. It is thus "absolutely plain" that any Defendant who was not a party or privy to *Migani*—that is, anyone but the BVI Defendants—has "no prospect of success" under BVI issue estoppel. JA.1751.23; *see* JA.1751.23-26; *contra* Defs.Br.70-71.[17]

And there is no BVI issue estoppel here anyway. Under BVI law, "[i]n order for there to be an issue estoppel," an issue "decided in the former case … must be the same as the issue in the later case and must have been necessary for the earlier decision." *Fairfield II*, 596 B.R. at 292 (quoting *OJSC*, [2008] EWHC 2613 ¶396). That is, BVI issue estoppel is only available where the issue was actually "litigated and

---

under federal and BVI law is distinct—as Defendants recognize by now trying to argue both, *see* Defs.Br.67-71—and Defendants' arguments below under the former do not preserve the latter.

[17] Defendants' assertion that BVI preclusion law "does not impose a strict privity requirement," Defs.Br.70, simply "mis-state[s] or misunderst[ands] the law," JA.1751.5; *see* JA.1751.13-18 (Moss Decl. ¶¶26-32, 36) (refuting Defendants' authorities).

decided" in the prior action. *Id.*; *see* JA.1751.18. Here, Defendants do not dispute that the issue presented in these cases—whether the Liquidators can recover *fraudulently* inflated payments based on NAVs issued *in bad faith*—was never raised or decided in *Migani. See Weavering II*, SPA.429 ¶24 (*Migani* "did not address" issues involving "fraudulently inflated" NAVs). BVI issue estoppel therefore does not apply.

Defendants' only response is to claim, citing their expert, that BVI issue estoppel applies even to points "not raised in the earlier proceeding" if those points "could with reasonable diligence … have been raised." Defs.Br.70; *see* JA.1284 (quoting *Virgin Atl. Airways Ltd v. Zodiac Seats UK Ltd.*, [2013] UKSC 46 ¶22)). But as the bankruptcy court understood—and even the BVI Defendants' supplemental brief recognizes, *see* BVI.Defs.Supp.Br.9 n.6—the passage Defendants cite uses "issue estoppel" to refer to "[t]he English form of claim preclusion," *Fairfield II*, 596 B.R. at 291, which Defendants never raised at all in the district court.

And even if Defendants had preserved that claim preclusion argument, it would fail, because Citco's fraud could not "with reasonable

69

diligence … have been raised" in *Migani*. *Virgin Atl.*, [2013] UKSC 46 ¶22. As the district court explained (and Defendants ignore), the Liquidators "could not have raised the issue of Citco's bad faith" in *Migani* because "they only became aware of the evidence they now allege in 2014." SPA.42 n.35; *see* JA.483 ¶5; *see* Pls.Br.25-26. Defendants' assertion that the Liquidators were "well aware of the facts that they now allege," and consciously "chose not to" assert them in *Migani*, is simply false. *Contra* Defs.Br.68-69, 71.[18]

Defendants conclude by devoting all of two sentences to the BVI *Henderson* doctrine, claiming it broadly bars raising any "issue which could have been raised before." Defs.Br.71. But only in a "rare case" will *Henderson* apply to "an issue which has not previously been decided between the same parties or their privies," *Fairfield II*, 596 B.R. at 294— and as both courts below concluded, this is not that rare case, especially because the Liquidators could *not* have raised Citco's fraud in *Migani*. SPA.42-43 n.35; *Fairfield II*, 596 B.R. at 294-95.

---

[18] Notably, the district court specifically rejected Defendants' reliance on the Liquidators' involvement in *Anwar v. Fairfield Greenwich, Ltd.*, 728 F.Supp.2d 372 (S.D.N.Y. 2010), explaining that *Anwar* did not include the "very specific" allegations of fraud here. SPA.43 n.35.

## C. Even Under Federal Law, There Would Be No Preclusion.

Even if federal common law rather than BVI law governed the preclusion question here, Defendants' arguments would still fail. Defendants abandon the collateral estoppel (i.e., issue preclusion) arguments on which they relied below, *see* SPA.40; instead, they now assert only res judicata (i.e., claim preclusion). *See* Defs.Br.67-69. But Defendants never argued res judicata before the district court as to anyone but the BVI Defendants, *see* SPA.40, making their argument waived as to all other Defendants, *see, e.g.*, *Doe v. Trump Corp.*, 6 F.4th 400, 410 (2d Cir. 2021) (party "must present the relevant legal arguments in [district court] to preserve them for appellate review").

Defendants' res judicata arguments are also meritless. As to all Defendants other than the BVI Defendants, res judicata is not available because they are neither parties to *Migani* nor in privity with those parties. *See, e.g.*, *Cho v. Blackberry Ltd.*, 991 F.3d 155, 168-70 (2d Cir. 2021) (discussing privity requirement). Defendants' suggestion that privity reaches anyone with the same "incentives" takes the language they quote wildly out of context, *see Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 346 (2d Cir. 1995) (holding that two owners

of the same building were *not* in privity), and would make *Migani* binding even on Defendants who had no involvement in that case—a rule Defendants would surely reject if *Migani* had gone the other way. *Contra* Defs.Br.68-69. The mere fact that each Defendant independently engaged in similar transactions with the same Funds comes nowhere near establishing a "sufficiently close relationship" for privity. *Cho*, 991 F.3d at 169.

In any event, as Defendants acknowledge, res judicata is only available when the later claims "were, or could have been, raised in the prior action." Defs.Br.67; BVI.Defs.Supp.Br.10. It is undisputed that the claims here were not raised in *Migani*, and the district court correctly determined that the Liquidators "could not have raised" these claims in *Migani* because they "only became aware of the evidence they now allege [showing Citco's bad faith] in 2014." SPA.42 n.35; *see supra* pp.69-70. Defendants make no attempt to show clear error in that factual finding, and once again, they have nothing to support their flatly incorrect assertion that the Liquidators were "well aware" of the relevant facts but

"strategically chose" not to assert them earlier. *Contra* Defs.Br.68-69; *see* SPA.42-43 n.35 (rejecting Defendants' reliance on *Anwar*).[19]

## VI.  DB Cayman Cannot Evade Liability By Claiming That It Was Acting As A Disclosed Agent.

In a separate brief joined by no other party, Defendant Deutsche Bank (Cayman) Limited ("DB Cayman") seeks dismissal of all the Liquidators' claims against it on the ground that it "was acting at all times as an agent for disclosed principals." DBC.Br.1.  Under either BVI law or New York law, this defense fails.

1.  Both the district court and the bankruptcy court held (and no party disputes) that New York law governs the parties' Subscription Agreements with the Funds.  *See* SPA.18.  DB Cayman asserts that New York law also applies to its agency defense, on the ground that the Subscription Agreements "control" or "govern" its relationship with Fairfield Sentry.  DBC.Br.3, 6-7.  The relevant question here, however, is

---

[19] On top of all that, the claims here do not target the same payments at issue in *Migani*, and so do not involve the same "transaction or series of transactions." *Fairfield II*, 596 B.R. at 291-92; *see, e.g.*, *In re M. Fabrikant & Sons, Inc.*, 447 B.R. 170, 182 (Bankr. S.D.N.Y. 2011) (avoidance claims targeting separate transfers are treated as separate claims); *contra* BVI.Defs.Supp.Br.10-14.  For the same reason, the claims "may involve different evidence relating to Citco's bad faith." *Fairfield II*, 596 B.R. at 292; *contra* BVI.Defs.Supp.Br.11, 13.

what law gives rise to the Liquidators' claims. *See, e.g.*, *Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 155 n.19 (2d Cir. 2013) ("As a general matter, the substantive immunities and defenses available against a particular cause of action are governed by the same source of law that provides the cause of action."). As both the district court and the bankruptcy court held, all the Liquidators' claims arise under BVI law, *see* SPA.42, and the parties agree that BVI law governs other substantive defenses in the case, *see* Pls.Br.86-89; Defs.Br.60, 64-65. DB Cayman has no explanation for why its agency defense should be different.

DB Cayman also effectively concedes that if BVI law applies, its agency defense must fail. It musters only two sentences asserting that "[t]he doctrine of ministerial receipt" bars the Liquidators' actions. DBC.Br.7. That doctrine, however, applies only where "the 'real' parties to the transaction … are the payer and the recipient's principal." JA.1751.67 (Moss Decl. ¶125(c) (citing *Montgomerie v UK Mutual Steamship Ass'n*, [1891] 1 QB 370)). Here, under the Articles—by which DB Cayman expressly agreed to be bound, *see* SPA.154 ¶9; JA.2189 (Subscription Agreement §§1-2)—the Fund was explicitly authorized "to

74

treat the registered holder of any share," including DB Cayman, as "absolute owner thereof," relieving the Fund of any obligation "to recognise any equitable or other claim to, or interest in, such share on the part of any other person." JA.269; *see* DBC.Br.6-7 (conceding as much). As a result, DB Cayman was the entity to be paid the proceeds from any proper redemption of the shares, and the entity to which such payments were made. *See* Am. Compl. at 8-9 (¶19), 63 (Ex. A), *Fairfield Sentry Ltd. v. Deutsche Bank (Cayman)*, No. 10-ap-03746 (SMB) (Bankr. S.D.N.Y.), Dkt.32. DB Cayman was thus the real party to those transactions, regardless of any separate agreement it may have had with its asserted principals. *See* JA.1751.67 (Moss Decl. ¶125(c)); *see also Weavering II*, SPA.448-450 (rejecting the argument that a registered shareholder held shares "as a bare trustee" as "neither here nor there"). The "ministerial receipt" doctrine therefore does not apply.

2. Even under New York law, DB Cayman's defense would fare no better, as New York law also permits an agent for a disclosed principal to be held liable where there is "clear and explicit evidence of the agent's intention" to be bound. DBC.Br.3-4. DB Cayman asserts that it "did not intend to be individually bound" by the Subscription Agreements, noting

that it signed the Agreements and registered the shares to "Deutsche Bank (Cayman) Limited as Custodian for Sciens CFO" and "Custodian for Sciens Global." DBC.Br.5-6. But DB Cayman concedes that no matter how it signed the agreements, it was "the registered holder" of the shares. DBC.Br.6-7. DB Cayman accordingly agreed, under the Articles, that the Fund could "treat [it] as the absolute owner" of the shares it held. JA.269; *accord* DBC.Br.6-7 (acknowledging the Fund's "right to deal only with [DB Cayman]"). That is more than enough evidence to make DB Cayman a proper defendant here. *See, e.g.*, *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999) (purported agent that acted "in part[] on its own behalf" was not exempt from arbitration clause). And that outcome makes perfect sense, as New York's "clear and explicit evidence" requirement is intended to protect individuals, not to permit gamesmanship by multinational banks or their subsidiaries. *See Lerner v. Amalgamated Clothing and Textile Workers Union*, 938 F.2d 2, 5 (2d Cir. 1991) (seeking to protect "individual stockholders or officers of the corporation" from "individual liability"). The Court should give full effect to DB Cayman's explicit contractual

consent to act as the shares' "absolute owner" and thereby assume liability under its agreement with the Fund.

\* \* \*

Finally, it bears emphasis that the sum total of Defendants' arguments and the rulings below are even less persuasive than their constituent parts. The *raison d'etre* of Chapter 15 is to make U.S. courts available to assist the efforts of foreign liquidators in a spirit of comity and out of a concern for the interests of creditors of failed enterprises. Defendants would turn Chapter 15 into a series of traps for the unwary in which U.S. courts chauvinistically demand that foreign law conform to U.S. norms and leave foreign liquidators with far less authority to avoid even intentionally fraudulent transfers than their U.S. counterparts. Thus, while the SIPC trustee has been able to make substantial recoveries for innocent victims of Madoff's fraud, the foreign liquidators have been stymied at every turn. When BVI liquidation law gives foreign liquidators broader avoidance powers, it is faulted for not having intentional fraud as an element. When the foreign liquidators invoke foreign law empowering them to recover for intentional fraud, they are confronted with fanciful defenses or misreadings of governing law.

All of this can be avoided by a proper application of the presumption against extraterritoriality, or a proper reading of the text of §561(d), or a proper reading of BVI contract and common law and related decisions. But accepting all of Defendants' arguments creates a dynamic where U.S. courts directed to facilitate foreign bankruptcies will leave innocent victims of Madoff's fraud holding the bag while those who cashed out in full based on the principal of their fellow investors emerge unscathed. U.S. bankruptcy law does not allow that unjust result. BVI liquidation and common law do not allow that unjust result. There is no reason that U.S. courts operating under Chapter 15 to facilitate liquidations under BVI law should allow that unjust result.

## CONCLUSION

This Court should reverse and remand.

Dated: June 9, 2023

Respectfully submitted,

s/ Paul D. Clement

DAVID J. MOLTON
MAREK P. KRZYZOWSKI
BROWN RUDNICK LLP
Seven Times Square
New York, New York 10036
(212) 209-4800

PAUL D. CLEMENT
MATTHEW D. ROWEN
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, Virginia 22314
(202) 742-8900

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

I hereby certify that:

1. This brief complies with the type-volume limitation of this Court's November 23, 2022 Order because it contains 15,496 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Word 2016.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

June 9, 2023

s/Paul D. Clement
Paul D. Clement

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

June 9, 2023

<u>s/Paul D. Clement</u>
Paul D. Clement